```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:16-CR-00093-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
        VS.                         )
 6                                  )
     YALEXI RUIZ,                   )
 7                                  )    February 7, 2017
             Defendant.            )    Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                  TRANSCRIPT OF MOTION HEARING
                    BEFORE HONORABLE DAVID J. HALE
11                   UNITED STATES DISTRICT JUDGE

12                          *  *  *  *  *

13   APPEARANCES:
     For United States:       Robert B. Bonar
14                            U.S. Attorney's Office
                              717 West Broadway
15                            Louisville, KY 40202

16   For Defendant:          Patrick J. Renn
                             Smith & Helman
17                            600 West Main Street, Suite 100
                              Louisville, KY 40202
18
     Interpreter:            Roberto Hernandez
19

20   [Defendant present.]

21
                        Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                          232 U.S. Courthouse
23                        Louisville, KY 40202
                            (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1    (Begin proceedings in open court at 10:25 a.m.)

2    (The interpreter, sworn before the proceedings commenced,

3    interpreted the following.)

4        DEPUTY CLERK:  3:16-CR-93, *United States of America v.*

5    *Ruiz.*

6        MR. BONAR:  Good morning, Your Honor.  Rob Bonar for

7    the United States.

8        MR. RENN:  Good morning, Judge Hale.  Pat Renn with

9    Yalexi Ruiz, who is seated here at counsel table.  And we do

10   have the benefit of a Spanish interpreter here this morning,

11   Roberto Hernandez.

12       THE COURT:  Well, good morning.  I understand that

13   we're set for a hearing on -- let's see, three motions to

14   suppress, and I guess it also touches a bit on the motion in

15   limine.  I don't know, but certainly docket numbers 40, 41, and

16   56.  Is that right, the three motions to suppress that you

17   filed?

18       MR. RENN:  Yes, Your Honor.

19       THE COURT:  So there are, I guess, some factual

20   questions that have not really been addressed in the briefing

21   that I assume you-all are going to address during the course of

22   the hearing.

23   One, it seems to me, issue is that I would need to hear more

24   from the defendant on has to do with the probable cause argument

25   and, I guess, the issue regarding whether the statements made in

1    the affidavit were true and correct, because I don't think that,

2    Mr. Renn, the defendant has specifically alleged that the

3    statements were made intentionally untruthful or with

4    disregard -- the phraseology we find in the case law, reckless

5    disregard for the truth.  So I would think that you would need

6    to -- with respect to that discrete issue that you've raised, I

7    would expect that you would need to offer some evidence

8    regarding the falsity of the statements in the affidavit.

9         MR. RENN:  Your Honor, I didn't raise a *Franks v.*

10   *Delaware* hearing or motion in this case.  Obviously, today we

11   are going to hear for the first time witnesses that were out

12   there on the night of Mr. Ruiz's arrest.

13     Prior to this hearing, I did receive videotapes from the

14   United States, including the body camera of the officer.  I

15   believe that's going to speak for itself.  It will certainly

16   speak volumes.  I have not had that transcribed, regrettably.

17     And, obviously, I'm going to ask for briefing at the end of

18   this hearing to get into some of these factual allegations, and

19   that tape is going to be invaluable as far as, you know, what

20   defense we would actually have to the unlawful stop, unlawful

21   arrest of Mr. Ruiz, and ultimately the unlawful search of his

22   vehicle, his person.  And then based on that evidence that was

23   obtained unlawfully out on the highway, the search warrant was

24   applied for, obtained and they, you know, made an unlawful

25   search of the home.

1      My understanding is the United States is going to introduce

2    that videotape.  And I assume it's going to be the entire

3    videotape, because I think there was like six different videos.

4    And if the United States is not going to do that, then I'll

5    certainly have those introduced myself.  And then we can, you

6    know, go through them line by line once we get them transcribed,

7    because, again, I think it's very important to the issues that

8    we would have in this case.

9           THE COURT:  All right.  Well, we'll just see how it

10   unfolds then.

11          MR. RENN:  Your Honor, one side issue here.  I had

12   filed a motion to suppress evidence from the home of Mr. Yalexi

13   Ruiz based on the grounds that the law enforcement officers came

14   into his home.  There's no search warrant that I'm aware of,

15   certainly not one that we've been provided.  My understanding is

16   they came in with a key.

17      And the United States, I think this witness here,

18   Mr. Sanders, is going to admit here this morning that they did

19   take keys off of Mr. Ruiz and they used those keys to unlock a

20   shed and a toolbox at 5405 Minyard.  But in addition, they went

21   in the house that Mr. Ruiz shares with his wife, who is here in

22   the courtroom.

23      The United States responded that they were not going to use

24   any of the evidence obtained from that search.  And the court

25   then issued an order, Document Number 66, stating, well, that

1    the issue is moot.  The United States has raised a *Leon* good

2    faith as a fallback.  And in this case here, if the officers

3    went in unlawfully without a search warrant, with a key no less,

4    found her in a state of undress and, you know, did make a

5    search -- they did take photographs.  I don't believe any

6    evidence was seized, but certainly that would go to negate any

7    good faith.  Any reasonably well-trained officer would know you

8    can't make a search of somebody's home without a warrant, and

9    that was done in this case.

10       So she is here.  She could testify to that issue.  My hope

11   is she would not have to step outside the courtroom.  She is

12   here and able to hear what's going on through the benefit of the

13   interpreter.  But, again, she would have that additional

14   testimony, and I would like to have the court hear her testimony

15   at the conclusion of the hearing.  Again, if the United States

16   is going to raise good faith, reasonably well-trained officers,

17   again, I want to find out who went in the house ideally and how

18   they got in the house.

19            MR. BONAR:  Well, I guess a couple of things in

20   response to that.  As Mr. Renn pointed out, whatever -- however

21   we want to characterize the search at the residence, Mr. Ruiz's

22   residence, no evidence was obtained.  The United States is not

23   intending to introduce any evidence from that search.  That was

24   essentially our response.  There's nothing to suppress from that

25   search.

1        I understand that Mr. -- I think I understand that Mr. Renn

2    is stating that, well, if they did this on this other search,

3    then that means that they couldn't have acted in good faith on a

4    different search, and I don't really follow that.

5        The search that really I think is at issue in which they got

6    a warrant for the residence on Minyard was based on -- as I

7    stated, was based on a search warrant.  It is the United States'

8    position that the warrant itself stands on its own.  The four

9    corners of the warrant are really all that the court can look at

10   to determine whether that warrant was valid.

11       As a secondary argument, the argument would be that, well,

12   if the court were to find that that search warrant was facially

13   invalid, then a good faith argument would kick in.  But it's our

14   opinion that and position that we won't ever get to that point

15   because we think that that warrant is valid on its face.

16       So, basically, evidence of how they acted on some other

17   search that is -- didn't result in any evidence in which we're

18   not going to introduce anything from, I don't really see how

19   it's relevant to what we're dealing with here today.  I guess it

20   could at some point, depending on how the court rules with

21   respect to the search warrant at Minyard, but at this point, I

22   don't think we're at that point.  And I'm not conceding that

23   that would even be illustrative of whether they were acting in

24   good faith on a wholly separate search.

25            MR. RENN:  Again, for them to say that we didn't get

1    any evidence, there's no question that she would testify they

2    came in and took photographs.  That is a search.  That's

3    evidence.  I haven't seen it, but the Government is -- or at

4    least their agents are in possession of these photographs that

5    were taken that evening in a search without a warrant.

6         THE COURT:  But if the Government has declared that

7    those photographs, whatever information or knowledge was deemed

8    from -- or was gleaned from the search that you claim was

9    inappropriate is not going to be used by the Government in its

10   case, what would be left to suppress?

11        MR. RENN:  Well, again, if the fallback position is a

12   *Leon* good faith and if the same officers that did the --

13   executed the --

14        THE COURT:  You're talking about a fallback with

15   respect to the other --

16        MR. RENN:  The search at Minyard.  And if those same

17   officers that did the search at Minyard were the ones that went

18   in without a warrant and into his personal home with his keys

19   without any consent, without any warrant, again, to say they

20   were reasonably well trained and acting as a reasonable officer

21   would certainly fail in my view.

22        THE COURT:  All right.  Well, I don't think we need to

23   cross that bridge at this point.  Do we?  So let's hold that --

24   let's hold that argument until we get through the other issues

25   that are before us and then we'll revisit it.

1          MR. RENN:  Thank you.

2          THE COURT:  Who's prepared to go first?

3          MR. BONAR:  The United States is certainly willing and

4    prepared to go first, Your Honor.  I guess by way of preview,

5    we're going to, I think, call probably four witnesses today.

6    The issues that we're going to present evidence on are the

7    traffic stop and search of Mr. Ruiz's vehicle on August 4th, the

8    scope of how the agents executed the search warrant at Minyard

9    Drive, and what they did after they got the warrant and where --

10   the areas that they searched, and then circumstances surrounding

11   Mr. Ruiz's statement to authorities the next morning.  And so --

12         THE COURT:  You're going to -- in the course of that

13   you're going to address the presentment issue?

14         MR. BONAR:  Yes, sir.

15         THE COURT:  The time frame, the six-plus hour time

16   frame that's been raised by the defendant?

17         MR. BONAR:  Yes, Your Honor.  Agent Sanders was

18   present for essentially all of the relevant events in that

19   timeline, and he's going to lay those facts out for the court.

20         THE COURT:  All right.  Do we need separation of

21   witnesses?

22         MR. RENN:  Yes, Your Honor, we would make that

23   request, please.

24         MR. BONAR:  I would agree, Your Honor.  Agent Sanders

25   is essentially the lead in this case, so I would ask that he be

```
 1    allowed to stay in the courtroom.  But if we have any other
 2    witnesses that may testify, then we would invoke --
 3               MR. RENN:  The only witness that I would have would be
 4    Mr. Ruiz's wife.  And do you object to her staying in here?
 5    Again, she would have nothing -- or not going to glean anything
 6    from the testimony she might hear here.
 7               MR. BONAR:  It sounds like, based on what we talked
 8    about just a few moments ago, that we're not going to get into
 9    testimony about the search at her home, which it sounds like
10    what she would offer testimony for.  So if that's the case, then
11    I have no objection to her being in the courtroom.
12               THE COURT:  Well, at this point, I'm not -- I'm not
13    certain that we will.  I mean, I think I understand Mr. Renn's
14    argument that -- and correct me if I'm wrong, Mr. Renn, but I
15    believe your argument is to the -- or the essence of your
16    argument is that if these same officers investigating Mr. Ruiz
17    for the crimes -- for the same crimes with which he's charged in
18    this instant case committed -- or searched a residence
19    unlawfully in the course of the same investigation, then that
20    evidence is relevant for more than the issue of the suppression
21    of any -- the evidence of their inappropriate search would be
22    useful to the court in determining whether they acted in good
23    faith in another unrelated search.  Is that right?
24               MR. RENN:  Yes, Your Honor, yes.
25               THE COURT:  I think I would need a little bit of
```

Det. Chris Sanders - Direct

1   authority to that -- on that point.  As I sit here, I think I

2   understand your argument.  It's sort of -- it's an interesting

3   argument.  I can't recall having read where the Sixth Circuit or

4   the Supreme Court has addressed evidence of police misdeeds in

5   that way, but that doesn't mean there isn't some authority out

6   there for that.

7       So I think really what I was doing, Mr. Bonar, is just sort

8   of putting that off for the time being, and we might address

9   that towards the end of the proof.  So I don't know if that

10  changes your view on separation of witnesses or not.

11          MR. BONAR:  Your Honor, I don't have an objection to

12  her being in the courtroom.

13          THE COURT:  All right.  Let's go ahead and proceed

14  then.

15          MR. RENN:  Thank you very much, Your Honor.

16          MR. BONAR:  We'll call Officer Chris Sanders to the

17  stand.

18      (DETECTIVE CHRIS SANDERS, called by the Government, sworn.)

19                        DIRECT EXAMINATION

20  BY MR. BONAR:

21  Q.  Good morning, sir.

22  A.  Good morning.

23  Q.  Could you please state your name for the record.

24  A.  Yes, sir.  I'm Detective Chris Sanders with Louisville Metro

25  Police Department.

Det. Chris Sanders - Direct

1    Q.   Detective, what is your assignment at the Louisville Metro

2    Police Department?

3    A.   I currently work for Metro Narcotics.

4    Q.   And how long have you worked in that capacity?

5    A.   Since January of 2013.

6    Q.   And what are your general responsibilities in your present

7    assignment?

8    A.   In the present assignment is more specifically highway

9    interdiction.  Basically, we are teamed up with the sheriff's

10   office, Jefferson County Sheriff's Office, and we work basically

11   interstate corridors, the highway and the road corridors,

12   basically looking for criminal activity.

13           MR. RENN:  Excuse me, Your Honor.

14      I know I said --

15           THE COURT:  Having trouble hearing?

16           MR. RENN:  It's very difficult to hear, yes, Your

17   Honor.  I don't know.  I know you had said about moving to the

18   other part of the table, and I'm not sure if that's going to

19   help, but right now I keep hearing you and I can't hear the

20   witness.

21           THE INTERPRETER:  I can sit back here, Your Honor.

22           THE COURT:  That's fine or would it help, Mr. Renn, if

23   he sat closer to the defendant?  I don't know if that matters

24   for the wireless.

25           MR. RENN:  I can move here.

Det. Chris Sanders - Direct

1           THE INTERPRETER:  No, I'd rather sit back here.

2     If you don't mind, Your Honor, I'll sit farther away.

3           THE COURT:  That's fine.

4           MR. RENN:  Thank you.

5           MR. BONAR:  May we proceed, Your Honor?

6           THE COURT:  Yes.

7  BY MR. BONAR:

8  Q.  Detective Sanders, you were talking about your assignment

9  presently as an interdiction officer.

10  A.  Yes, sir.

11  Q.  And I think you said that you work with the sheriff's

12  department in tandem; is that right?

13  A.  Yes, sir.

14  Q.  What kind of cases do you work on?

15  A.  We work a variety of cases.  Basically, our responsibility

16  is basically just acting as -- as policemen that patrol the

17  interstate corridors and the highway corridors that run

18  throughout our jurisdiction.

19  Q.  In your present capacity do you typically work independent

20  investigations?

21  A.  On our own just basically that we have initiated?

22  Q.  Yes, sir.

23  A.  From time to time we have, yes, sir.

24  Q.  Do you also work in an assisting role in other

25  investigations?

Det. Chris Sanders - Direct

1   A.  Yes, sir.

2   Q.  All right.  Do you do that more often than your own

3   independent investigations?

4   A.  Yes, sir.

5   Q.  Now, prior to January of 2013, what was your previous police

6   experience?

7   A.   I worked in what was called a Flex Platoon.  Basically, it's

8   a plain clothes platoon that is -- basically serves at the

9   interest of the major running a police division, focusing on

10  specific types of crimes that he would like to have addressed

11  and worked.

12  Q.  How long did you work in that capacity?

13  A.  Since about 2002 to 2013.

14  Q.  All right.  And prior to 2002, did you have previous police

15  experience?

16  A.  Yes, sir.  I worked in the -- in patrol area.

17  Q.  And how long were you a patrol officer?

18  A.  From about 1998 to 2002.

19  Q.  So, Detective Sanders, how many years do you have on with

20  the police department?

21  A.  This past July was 19 and a half.

22  Q.  Throughout your police experience, did you --

23  A.  I'm sorry.  That's not correct.  This past July was 19.  So

24  we're at about 19-and-a-half years now.

25  Q.  All right.  Nineteen and a half now.

Det. Chris Sanders - Direct

1 A. Yes, sir.

2 Q. Back last summer, 19. Okay. During your course of police

3 experience, have you had occasion to work narcotics cases?

4 A. Yes, sir.

5 Q. Roughly what percentage of your police work has been

6 involved with narcotics investigations?

7 A. I would say probably the vast majority.

8 Q. Even going back to your patrol days?

9 A. Yes, sir.

10 Q. Detective Sanders, I'm going to draw your attention to

11 August 4th of 2016. Do you recall that day?

12 A. Yes, sir.

13 Q. Did you have occasion to be involved with a traffic stop on

14 the defendant in this case, Yalexi Ruiz?

15 A. Yes, sir, that is correct.

16 Q. Can you tell the court how it came to be that you were

17 involved in that traffic stop?

18 A. Yes, sir. At some point throughout my tour of duty while I

19 was working, I was contacted by the DEA task force and the

20 members of the Louisville Metro Police Department narcotics to

21 assist on their investigation and to basically make a traffic

22 stop of an individual that had or was believed to have had a

23 large amount of narcotics or illegal drugs in their possession.

24 Q. And when you were contacted by the DEA task force, do you

25 recall what day it was?

Det. Chris Sanders - Direct

1    A.  No, I don't.

2    Q.  Would it have been the same day that you did the traffic

3    stop?

4    A.  Yes, sir.

5    Q.  All right.  And you've testified to some degree about what

6    they told you.  What specifically did you know about their

7    investigation prior to doing the stop?

8    A.  I didn't have much information to go on except for

9    basically --

10         MR. RENN:  Objection, Your Honor, to what he may have

11   been told by somebody else if he does not have any firsthand

12   knowledge.

13         MR. BONAR:  Your Honor, he could --

14         THE COURT:  I can sort through that.  You do need to

15   clarify though whether it's firsthand or not.

16         MR. BONAR:  Certainly.

17   BY MR. BONAR:

18   Q.  So did you get a phone call?

19   A.  Yes, sir.

20   Q.  Do you remember who called you?

21   A.  It was a member of the task force.  I don't remember

22   specifically who it was.

23   Q.  And have you worked with the task force in the past?

24   A.  Yes, sir.

25   Q.  Was that something that you did fairly often?

Det. Chris Sanders - Direct

1    A.   With some regularity, yes.

2    Q.   Okay.  And generally what capacity do you work with them?

3    What do you do?

4    A.   Working in the capacity that I work in, having the car and

5    the uniform and everything else provides some opportunity for

6    intelligence gathering, interception or interdiction of illegal

7    drugs a lot of times that, during the course of an

8    investigation, I'm called upon to make traffic stops for them.

9    Q.   So when you say you're making a traffic stop for them, why

10   aren't they doing it themselves?

11   A.   Well, I think that sometimes, like I said -- as I was saying

12   before -- and if I didn't mention it before, being in uniform,

13   being in a marked police car offers a little bit of legitimate

14   subterfuge.  And during the course of an investigation, it may

15   not want to be conveyed directly that there is involvement of

16   the DEA or other investigators at that moment.

17   Q.   So getting back to your conversation prior to doing the

18   stop, specifically, if you can recall, did you know -- what was

19   the nature of their investigation?

20   A.   That it was a narcotics investigation that basically

21   centered around a person that was believed to be in possession

22   of a large amount of illegal drugs.

23   Q.   Okay.  And how did you know which vehicle to focus on?

24   A.   I was in direct communication with the task force and --

25   with task force and other DEA members.

Det. Chris Sanders - Direct

1   Q.   Okay.  And what were those individuals telling you?

2   A.   That we were focusing on a particular truck.  I believe it

3   was a Ford dually pickup truck.

4   Q.   And did they tell you why you were focusing on it?

5   A.   That it was conveyed to me that they had already developed

6   probable cause that this car --

7            MR. RENN:  Objection, Your Honor.  Legal conclusion.

8            MR. BONAR:  Well, may I respond to that, Your Honor?

9            THE COURT:  Yes.

10           MR. BONAR:  If that's what they told him, that's what

11   they told him.  Obviously, one officer can rely on what another

12   officer tells them.  There's certainly lots of case law about

13   general -- about the collective knowledge of the police and how

14   the police can rely on other people's knowledge as a reason for

15   doing what they do.  So conversations and what they told them, I

16   think, are relevant and it sort of helps tell the story of why

17   he did what he did.

18           MR. RENN:  If there was probable cause, Your Honor,

19   they could have made a stop and an arrest based on that probable

20   cause.  That was not done in this case here because they did not

21   have probable cause.

22           THE COURT:  I think you'll get an opportunity to

23   address that on cross.

24   BY MR. BONAR:

25   Q.   So you were told that there was probable cause to stop the

Det. Chris Sanders - Direct

1    vehicle.  And, specifically, did they tell you what was the

2    basis for the probable cause?

3    A.  I don't think so, but they relayed to me that it was now

4    more probable that he did have a large amount of narcotics or

5    illegal drugs in his possession at this point and that they had

6    asked me to initiate a traffic stop on the vehicle.

7    Q.  Detective Sanders, can you tell us how you found the vehicle

8    and began to initiate the stop?

9    A.  Sure.  Basically, a surveillance was -- surveillance was

10   conducted on the vehicle.  And as the vehicle left on to the

11   Preston Highway area where I was sitting, I waited for the

12   vehicle.  They communicated to me specifically what vehicle it

13   was that they were looking at and what they wanted me to stop.

14   Q.  And did you, in fact, see a vehicle that matched that

15   description?

16   A.  Yes, sir.

17   Q.  Did they give you any information about the occupant of the

18   vehicle?

19   A.  Not that I can recall.

20   Q.  Do you remember if you were told how many people were in the

21   vehicle?

22   A.  There was maybe some basic information regarding just the

23   number of people that were believed to be in the vehicle, and

24   which was one.

25   Q.  And were your observations of this vehicle you're describing

Det. Chris Sanders - Direct

```
 1   consistent with what they told you?

 2   A.  Yes, sir.

 3          MR. BONAR:  Your Honor, I'm going to -- may I approach

 4   the witness?

 5          THE COURT:  Yes.

 6   BY MR. BONAR:

 7   Q.  Detective Sanders, I'm going to show you two disks that are

 8   marked as Government's Exhibit 1 and Government's Exhibit 2.

 9   One indicates that it is a Body Cam Video and the other says a

10   Dash Cam Video.

11   A.  Yes, sir.

12   Q.  Have you had occasion to watch both the body cam video

13   footage and the dash cam video footage related to this?

14   A.  Yes, I have.

15   Q.  Did you watch that video in its entirety?

16   A.  Yes, sir.

17   Q.  Was that video an accurate representation of what happened

18   that day?

19   A.  Yes, sir.

20          MR. BONAR:  Your Honor, I'm going to move for

21   admission of Government's Exhibits 1 and 2.  At this time we

22   intend to play the body cam video in its entirety.  This is the

23   entirety of the dash cam video from Detective Sanders' car, but

24   at this time we're not going to play the entirety of that video.

25   We have a clip that we'll play later on with another witness,
```

Det. Chris Sanders - Direct

```
 1    but we're going to ask to admit both of them into the record.

 2              MR. RENN:  Your Honor, we had a discussion.  I have no

 3    objection to both videos being admitted and to only playing a

 4    partial of the dash cam, but obviously as we discussed during

 5    briefing of this, I may want to break that down and go through

 6    and point things out, the portions that have not been played

 7    here in the courtroom.  And there's not going to be an objection

 8    from the United States; is that correct?

 9              MR. BONAR:  No, sir, Your Honor.  That's --

10              THE COURT:  So you're only going to play part of it,

11    but you're submitting for the record the rest of it --

12              MR. BONAR:  Exactly, Your Honor.

13              THE COURT:  -- so that in posthearing briefs, if you

14    want to address it, I can review it in camera.  That's fine.

15              MR. BONAR:  It will be my intent to play the entirety

16    of his body cam video.  It has audio.  It coincides with the

17    dash cam video for the most part and is actually better quality

18    than the dash cam video.  So we'll play -- it's about 37

19    minutes.

20              THE COURT:  All right.

21              (Government Exhibits 1 and 2 admitted in evidence.)

22              MR. BONAR:  If we could put the body cam up.  We can

23    pause it right there.

24    BY MR. BONAR:

25    Q.  So, Detective Sanders, essentially as we've alluded, were
```

Det. Chris Sanders - Direct

1    you equipped with a body cam video on August 4th, 2016?

2    A.   Yes, sir.

3    Q.   Or camera?

4    A.   Yes, sir.

5    Q.   Where exactly is that situated on your person?

6    A.   There's a number of different ways you can wear it.  The way

7    I wear mine is a magnetic clip that affixes to this -- the

8    collar on our right side.  So, basically, it is sitting on my

9    right shoulder overlooking my right shoulder.

10   Q.   And how exactly does that video get triggered to start

11   recording?

12   A.   There are two parts to the battery -- two parts to the

13   camera.  There's the battery and the camera itself.  You can

14   initiate the camera recording by a push of the button.  It's on

15   the battery pack.  But the camera is designed so that it trails

16   about 30 seconds' worth of video prior to activation with the

17   push button.

18   Q.   So you hit the button and it automatically goes back and

19   grabs 30 seconds of footage?

20   A.   Right.

21   Q.   Is that part of the footage -- does that include audio?

22   A.   No, it's -- generally, the audio is not included in the

23   video until activation on the button.

24   Q.   So from the point of activation, you have both video and

25   audio?

Det. Chris Sanders - Direct

1    A.  Right.

2    Q.  Now, you see up here on the screen -- is your screen

3    working?

4    A.  Yes, sir.

5    Q.  Tell us what we're seeing here, and we'll hit play here in a

6    second.

7    A.  This appears to be the area of Preston Highway near

8    McCauley.  We appear to be going northbound on Preston Highway,

9    and the vehicle I'm about to stop is just ahead of the white car

10   that's in front of my car.

11   Q.  So on the screen here are we --

12   A.  Yes, sir.

13   Q.  That's where you're talking about?

14   A.  Yes, sir.

15        MR. BONAR:  I'm not sure I can clear it.  Thank you.

16   You can go ahead and play.

17   (Government playing DVD)

18   Q.  Detective, as we're watching this, just if you could just

19   kind of walk us through what we're seeing.

20   A.  Basically, I'm rolling up to the vehicle that I intend to

21   stop.  And I don't think I mentioned this before, but although

22   that we discussed that there was all -- their investigation had

23   led them to this vehicle, I would like to add that there's also

24   a violation, a state violation that I observed on the vehicle.

25        MR. RENN:  I'm sorry.  Say that again, please.

Det. Chris Sanders - Direct

1    A.   There was a vehicle violation basically that I also observed

2    at that point when I saw it northbound on Preston Highway.

3    Q.   Can you tell the Court --

4         THE COURT:  We're on Preston Highway here; is that

5    right?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Proceeding which direction?

8         THE WITNESS:  We are northbound on Preston Highway,

9    basically right between -- probably Fern Valley Road and Outer

10   Loop are probably the two largest intersections or two largest

11   landmarks.

12        THE COURT:  And I also didn't quite hear what

13   apparently Mr. Renn didn't hear.  What was it you observed?

14        THE WITNESS:  In addition to the information we had

15   already received, I also noticed that there was a violation of

16   the vehicle, more specifically, the window tint on the vehicle.

17   And you'll hear me talk about this with the defendant whenever

18   he gets out of the truck or when we make contact with the

19   defendant.

20   BY MR. BONAR:

21   Q.   When you say there is a violation with respect to the window

22   tint, what exactly do you mean by that?

23   A.   Well, the State of Kentucky requires that the window tint

24   not be excessive.  And from my standpoint and what I could see,

25   my observations at that point is that it was quite clear that

1    the tint on this vehicle were in excess of what state law would

2    allow.

3    Q.  And what was your basis for believing that it was excessive?

4    A.  You basically could not see inside the vehicle.

5    Q.  Have you had occasion in your experience as a police officer

6    to stop other vehicles with -- for the reason of excessive

7    window tinting?

8    A.  Yes, sir.

9    Q.  All right.  Is that something that you have cited people for

10   in the past?

11   A.  Yes, sir.

12   Q.  So prior to pulling over this vehicle, how long did you

13   observe it?

14   A.  Probably within a minute or two prior to the -- where the

15   video picks up.

16   Q.  And was it during that period of time that you could observe

17   the tinting?

18   A.  Yes, sir.

19   Q.  Now, Detective Sanders, you can see on the video the general

20   light outside at this point.  We've discussed that this was on

21   August 4th of 2016.  Are you aware generally what time of day

22   that was?

23   A.  Yes, sir.  I want to say it was in -- it was in the evening.

24   Q.  Was the lighting outside sufficient for you to observe

25   things such as the tinting?

Det. Chris Sanders - Direct

1    A.  Yes, sir.  It was still summertime so it was still quite

2    daylight.

3        (Government playing DVD)

4            THE COURT:  Mr. Bonar, you want to pause here and have

5    the witness explain who the conversation was with that was

6    recorded.

7            MR. BONAR:  Certainly, Your Honor.

8    BY MR. BONAR:

9    Q.  Detective Sanders, obviously, you -- at this point in the

10   video, you're having a conversation over the phone.

11   A.  Yes, sir.

12   Q.  Can you tell the court what's going on there and who you're

13   talking to.

14   A.  Sure.  As I mentioned before that I was contacted by the

15   task force and other members of the DEA -- and I don't remember

16   specifically who I was speaking with on the phone -- but as it

17   relates to the truck, I'm more or less forwarding some realtime

18   information or, you know, talking to them about what I'm seeing

19   so far.

20   Q.  And are you waiting for direction from them?

21   A.  Yes, sir.

22   Q.  Okay.  And what -- why are you waiting for direction from

23   them?

24   A.  Well, clearly although what I told him was I stopped him for

25   the violation of the -- the vehicle violation or the window

Det. Chris Sanders - Direct

```
 1   tint, you know, contrary to state law, basically we're basically
 2   there with him so that I can proceed with a K-9 arrival.
 3   Q.  You're looking for drugs at this point?
 4   A.  Right.
 5   Q.  Obviously, there's no further evidence of window tinting for
 6   you to find at this point?
 7   A.  No.
 8   Q.  All right.  You haven't told Mr. Ruiz your real purpose,
 9   have you?
10   A.  No, sir.
11   Q.  And why not?
12   A.  Basically, as I was saying before, that it offers a little
13   bit of legitimate subterfuge as to, you know, the direction of
14   the investigation.  In our best interest of the investigation,
15   it would not -- you know, it probably would have hindered the
16   investigation if we had just outright told him what they were
17   there for.
18   Q.  Detective, in your course of experience, have you had
19   occasion to be involved in investigations in which narcotics
20   were being transported in a vehicle?
21   A.  Yes, sir.
22   Q.  Does that happen pretty often?
23   A.  Yes, sir.
24   Q.  Based on your experience, do you -- do you know whether
25   individuals who are transporting narcotics take steps to conceal
```

Det. Chris Sanders - Direct

1    the narcotics?

2    A.  Yes, sir.

3        MR. RENN:  Objection, Your Honor.  There hasn't been

4    any foundation as to this witness being an expert.

5        MR. BONAR:  I'm just asking about his experience and

6    what he's seen in his 19-and-a-half years of police work, Your

7    Honor.

8        THE COURT:  You can go ahead.

9    BY MR. BONAR:

10   Q.  So individuals transporting narcotics, have you seen from

11   your own experience attempts to conceal the narcotics?

12   A.  Yes, sir.

13   Q.  And pretty often?

14   A.  Obviously, it's -- if it's a controlled substance to where

15   it's illegal, you'd want to hide it.  However, I would say that

16   in my experience working as a policeman, most often times that

17   I've found illegal drugs, they were concealed or hidden and not

18   in plain view.

19       MR. BONAR:  Your Honor, we'll proceed with the video,

20   if that's okay.

21       THE COURT:  Okay.

22     (Government playing DVD)

23       MR. BONAR:  Your Honor, just real quick, I want to ask

24   a couple of questions.

25   BY MR. BONAR:

Det. Chris Sanders - Direct

1   Q.   Detective Sanders, there are several individuals that we've

2   seen in the video at this point.

3   A.   Yes.

4   Q.   Obviously, the person that we're looking at right now, who

5   is that?

6   A.   The defendant.

7   Q.   That's the defendant.  And then you see behind him an

8   individual with "sheriff" written on his chest.  Who is that?

9   A.   That is Deputy Rodney Hall.  He was at the time working on

10  the team -- the same team that I worked on.

11  Q.   Your interdiction team?

12  A.   Yes, sir.

13  Q.   You had mentioned that you teamed up with the sheriff's

14  office?

15  A.   That's right.

16  Q.   So you were with LMPD and he was with the sheriff?

17  A.   That's correct.

18  Q.   And then there's a third individual that we've seen here

19  who's wearing a blue shirt, I believe, and can you tell us who

20  that is.

21  A.   Sure.  That's Detective Billy Keltner.  He's a K-9 handler,

22  Louisville Metro Narcotics.

23       (Government playing DVD)

24  Q.   Detective, what's going on at this point?

25  A.   Well, just prior to me walking back up to the truck and just

Det. Chris Sanders - Direct

1  prior to me getting back inside of my police car, you see me

2  standing outside with the defendant.  Although the shoulder

3  camera, the body camera didn't pick it up, Detective Keltner

4  actually walked behind me on the passenger's side of my car and

5  the passenger's side of the truck.

6      As I'm standing there with the defendant, Detective Keltner

7  is using his K-9 dog.  And although the -- given the way I was

8  standing and the way the camera's positioned on my shoulder, the

9  video did not capture the dog alert.  But, basically, I go in my

10  car for a moment.  I come back out.  Detective Keltner is

11  proceeding with a search of the vehicle based on the dog alert.

12  Q.  Did you personally see the dog alert?

13  A.  Yes, sir.

14  Q.  Is that something you've observed in the past with other

15  dogs?

16  A.  Yes, sir.

17  Q.  So at this point, we're looking inside the vehicle at this

18  point.  What part of the vehicle are we looking at?

19  A.  This is a four-door truck and we're looking at the rear

20  compartment of the cab of the truck.

21  Q.  And why are we looking at this part of the cab at this

22  point?

23  A.  Well, I'll let Detective Keltner give testimony on exactly

24  what his dog did, but Detective Keltner was directing me to this

25  area of the truck.

Det. Chris Sanders - Direct

1           (Government playing DVD)

2    A.   And while I'm continuing to work on the interior of the

3    truck and search the interior of the truck, Detective Keltner is

4    continuing with working his dog around the vehicle.

5    Q.   So as your -- the events that we're looking at here, he's

6    continuing his search with the dog?

7    A.   That's right.

8           (Government playing DVD)

9    Q.   Detective, some follow-up questions from what we just

10   watched.  You had mentioned, I think, at one point on the video

11   -- and obviously we can hear that you are -- that you were

12   speaking broken Spanish.

13   A.   Yes, sir.

14   Q.   What do you mean by that?

15   A.   Albeit a perishable skill, I have had some school and some

16   study in speaking foreign languages to include Spanish.  I don't

17   speak it enough for it to be completely fluent, but as

18   conversations go on the side of the freeway, generally the folks

19   that I come in conversation -- or come in contact with, we're

20   able to communicate with each other because they speak some or

21   mostly English to the point that I can communicate with them.

22   Q.   How do you feel that you were able to communicate with

23   Mr. Ruiz on this occasion?

24   A.   I'm confident that we both understood each other quite well.

25   Q.   At one point early on you asked Mr. Ruiz, "Are you okay?"

Det. Chris Sanders - Direct

1    A.   Yes, sir.

2    Q.   Do you recall that?

3    A.   I believe when he's standing at the back -- well, when he's

4    standing at the back of the truck, I believe.

5    Q.   Why did you ask him that?

6    A.   Just -- and I noticed that he had some signs of an outward

7    appearance of nervousness.

8    Q.   What do you mean by that?

9    A.   Well, generally everybody's nervous when they come in

10   contact with the police.  You know, if you can remember your

11   last speeding ticket or something like that, even as a

12   policeman, you're a little bit nervous when the police come up

13   to the car when you've done something wrong.  But what I noticed

14   about him almost immediately was that he was basically bracing

15   himself on the back of the truck, that I could see a rapid heart

16   rate and -- you could literally see the heartbeat in his neck

17   and in his chest, and he was breathing pretty -- what I would

18   consider pretty rapidly for just standing at the back of the

19   truck.

20   Q.   Based on your experience, is it your testimony that you --

21   that that stood out to you?

22   A.   Yes, sir, and that's pretty much why I asked him if he was

23   okay.

24   Q.   And in contrast to other individuals you've encountered on

25   the roadside, did you feel that was different?

Det. Chris Sanders - Direct

1   A.   Yes, sir.   Generally whenever you come in contact with,

2   like, the police that nervousness tends to subside, but it

3   seemed to remain pretty well consistent throughout our

4   conversation while we were talking with each other.

5   Q.   I'm going to ask you some general questions about the video

6   that we watched.   It appeared that at times the audio would cut

7   off.

8   A.   Yes, sir.

9   Q.   Can you tell the court what that was about.

10  A.   Although the batteries on these -- this equipment are rated

11  or supposedly work for 12 -- by their manufacturer say they'll

12  work 12 hours, sometimes they are inconsistent on their ability

13  to keep the camera rolling.

14      I think what you saw in some of the jumpiness was basically

15  the camera starting to fail and me making sure that the camera

16  was, you know, starting back up.   I think it was -- the battery

17  was depleted and that the camera was not capturing all of it in

18  its entirety, albeit just maybe a second or two, but I think at

19  the very end on the side of the truck is when the battery

20  finally fails on the camera.

21  Q.   So at the end, is that the reason why the camera cut off?

22  A.   Yes, sir.

23  Q.   All right.   At that point in the search though, what else

24  happened?

25  A.   While we were inside the cab of the vehicle shortly --

Det. Chris Sanders - Direct

1    probably after the camera quit working, we recovered a large

2    amount of cash that was in the center console in the front seat

3    of the truck.

4    Q.  So we don't see that on the camera?

5    A.  No, sir.

6    Q.  Now, you've testified about your conversations with the DEA

7    task force.  In previous cases prior to August 4th of 2016, had

8    you had similar conversations with the DEA task force?

9    A.  As it pertains to this case or other cases?

10   Q.  Just other cases.

11   A.  Other case, yes.

12   Q.  Was that something that was common for you to do?

13   A.  Yes, sir.

14   Q.  And based on the previous experiences with the DEA task

15   force, had you come to rely on them?

16   A.  Yes, sir.

17   Q.  Was it -- what was your experience with their information in

18   the past in terms of being reliable?

19           MR. RENN:  Objection, Your Honor.  No relevance here.

20           THE COURT:  Go ahead.

21   BY MR. BONAR:

22   Q.  Let me ask the question again.

23           MR. RENN:  Your Honor, it's bolstering is all it is.

24           THE COURT:  I can sort through it and you'll have a

25   chance to cross.

Det. Chris Sanders - Direct

1    BY MR. BONAR:

2    Q.   Simply, Detective Sanders, prior to August 4th of 2016, had

3    your experience with the DEA task force been one that you came

4    to rely on the information they gave you?

5    A.   Yes, sir.

6    Q.   Did you have occasions where you -- they were not telling

7    you the truth?

8    A.   No.

9    Q.   At one point in the video -- and I believe somewhere around

10   the 13:00 minute mark into the video you asked Mr. Ruiz if you

11   could look.  Do you recall that part?

12   A.   Yes, sir.

13   Q.   And I believe you used the word "mirar."

14   A.   Yes, sir.

15   Q.   What does that word mean?

16   A.   It means "to look."

17   Q.   In Spanish?

18   A.   Yes.

19   Q.   And what was Mr. Ruiz's response to that?

20   A.   He was okay with that.

21   Q.   And why do you think he was okay with that?

22   A.   I don't know.  Basically, up to that point -- you know, I

23   really couldn't tell you.  I mean, other than he was not in

24   custody or anything and, basically, we were standing there on

25   the side of the road.

Det. Chris Sanders - Direct

1   Q.  Well, let me ask it a different way.  Did he at any point

2   indicate to you that he didn't want you to look inside the

3   vehicle?

4   A.  No.  In fact, I was just thinking about it.  Whenever I

5   asked him for the consent, quite some time passes before we

6   actually even start working around or even moving around the

7   truck.

8   Q.  So after you asked for that consent and up and to the point

9   that you looked inside the vehicle but after he gave you that

10  consent, did he ever stop you?

11  A.  No.

12  Q.  Did he ever verbally indicate in any way that he didn't want

13  you inside the vehicle?

14  A.  No.  And I'll say this is -- pretty much just what we've

15  seen in the video here is pretty much atypical of what generally

16  happens on a traffic stop.

17          MR. RENN:  Objection, Your Honor, that generalization

18  testimony.

19          MR. BONAR:  I would like, if I could, Your Honor, to

20  ask him to elaborate on that.

21          THE COURT:  Go ahead.

22  A.  Although we -- I stopped him for the -- and told him what I

23  stopped him for and although he gave consent, you know, while we

24  were standing there -- this was an investigation by the DEA task

25  force.  And the DEA basically, what I was given of information

Det. Chris Sanders - Cross

1    regarding this truck, regardless of whether or not he consented

2    on the vehicle or not, he was not free to go.  And it was in my

3    mind that the consent was irrelevant.

4            MR. BONAR:  Your Honor, I have no further questions at

5    this time.

6            THE COURT:  All right.  Mr. Renn.

7            MR. RENN:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. RENN:

10   Q.  Detective Sanders, you had indicated that you've worked with

11   the DEA in the past; is that correct?

12   A.  Yes, sir.

13   Q.  And you've worked with them in connection with

14   investigations involving Hispanic individuals; is that correct?

15   A.  Yes, sir.

16   Q.  You indicated you've had some training in Spanish.  What is

17   that training that you've had?

18   A.  I received some study while I was in college.

19   Q.  What kind of studies in college?

20   A.  Spanish I and Spanish II classes.

21   Q.  How did you do in the classes?

22   A.  I believe I was an average student.

23   Q.  Average in C?

24   A.  Average or above -- maybe above average.

25   Q.  So you had two classes in college.  That's the extent of

Det. Chris Sanders - Cross

1    your Spanish?

2    A.  As well as, I believe, some study that was provided by the

3    department in basically our -- what's called our in-service or

4    ongoing training.

5    Q.  And tell me about that.

6    A.  I will.  From time to time, in addition to our mandated or

7    required training that the department and state requires us to

8    have, from time to time there will be other classes that are

9    provided by the department of members or individuals that are

10   instructors that are fluent in Spanish.  That training is

11   provided to officers that would like to develop or enhance

12   existing skills or to develop a skill of speaking in Spanish.

13   Q.  How many -- how much training did you have?  How many hours

14   of that kind of training have you had?

15   A.  For just the department provided?

16   Q.  Yes, sir.

17   A.  I believe I -- the last training I took was within the past

18   two years, and I believe it was a 36-hour course.

19   Q.  Okay.  You had indicated, I think, on your direct testimony

20   that you were on the force for some 19-and-a-half years at LMPD;

21   is that correct?

22   A.  Yes, sir.

23   Q.  When was it that you had your college education?

24   A.  Probably in '96, 1995 or 1996.

25   Q.  So some 20 years ago is when you had that training?

Det. Chris Sanders - Cross

1    A.  Yes, sir.

2    Q.  And then you've had this 36-hour class; is that correct?

3    A.  Yes, sir.

4    Q.  Are there differences between Spanish in Spain, Spanish in

5    Mexico, Spanish in Cuban?

6    A.  Yes, sir.

7    Q.  Different dialects?

8    A.  Yes, sir.

9    Q.  One you might be able to speak and perhaps not the other?

10   A.  I would believe that there's probably some interpretation

11   along the lines that does not interpret precisely.

12   Q.  And you're sworn to tell the truth here today; is that

13   correct?

14   A.  Yes, sir.

15   Q.  Would you care to have Mr. Hernandez question you in

16   Spanish?

17          MR. BONAR:  Objection, Your Honor.

18          THE COURT:  He can answer it if he can.

19   A.  You know, I would answer if I could but...

20   Q.  You want to give it a try?

21          THE COURT:  I don't think we're going to do that.

22   BY MR. RENN:

23   Q.  In the video you admitted that you had spoken with Mr. Ruiz

24   in broken Spanish; correct?

25   A.  Yes, sir.

Det. Chris Sanders - Cross

1    Q.   What's an "el trucko"?

2    A.   You know, as we had talked a little bit earlier, it is a

3    perishable skill.

4    Q.   It's a what?

5    A.   Speaking in another language is a perishable skill.  If

6    you're not using it quite often, sometimes it's -- it diminishes

7    in your ability.

8        Being on the side of the roadway in a situation that --

9    acting as a law enforcement officer, I would say, is a little

10   bit stressful.  And sometimes that stress, I think, probably

11   diminishes my ability to speak in Spanish.  But I think if you

12   hear me say that on the video, you'll also actually hear me

13   correct myself to a more generalized term.

14   Q.   "El trucko" is not a Spanish word, is it?

15   A.   No, not that I'm aware of.

16   Q.   You just made that up?

17   A.   I wouldn't say that.  I think I probably reverted somewhere

18   to -- somewhere between speaking English and speaking Spanish,

19   just based on the fact that it was -- it was a traffic stop, and

20   it was a stressful environment, and that I don't use Spanish as

21   often as I would like to.

22   Q.   At the very start of this you mentioned about are there any

23   kids in the vehicle; is that correct?

24   A.   Yes.

25   Q.   And then you said, "Any chicos?"  What's "chicos"?

1    A.   A young man or a child is my understanding.

2    Q.   A boy?

3    A.   Yes, sir.

4    Q.   "Chica" is girls.  "Chico" is boys.  Not kids; is that

5    correct?

6    A.   You know, I have talked with other individuals during my

7    career and during working as a policeman that have told me that

8    it was okay to generalize that children, or kids, or young

9    people was okay to use the word "chico," and that's basically

10   what I was using.

11   Q.   Okay.  Much of the time that you were conversing with

12   Mr. Ruiz, you didn't see his face.  Is that fair to say?  On the

13   video, much of the time when you were conversing with him, you

14   didn't see his face?

15   A.   No, and that's because the camera sits on, basically, a wire

16   that goes around your neck.  And depending on how the camera is

17   set, which you'll see me try to adjust it as much as I can to

18   capture eye level or head level, it tends to point off to the

19   right a little bit.  And just basically because of my training

20   and how I stand, a lot of times that you only see one part or

21   the lower part of the person I'm talking to.

22   Q.   On direct examination you had mentioned about seeing him and

23   this nervousness that he exhibited.  Is that correct?

24   A.   Yes, sir.

25   Q.   At one point there's a point in the videotape where the

Det. Chris Sanders - Cross

1    camera is on his face, and it shows him being really confused by

2    what you're asking him.  Did you catch that when you watched the

3    video?

4    A.  No.

5    Q.  And you were asked about -- at one point asking if he was

6    okay, again, going back to this nervousness; correct?

7    A.  Are you referring to when he's standing at the back of the

8    truck?

9    Q.  Yes.

10   A.  Yes, sir.

11   Q.  Okay.  You also asked him that after you had placed him in

12   the police car; is that correct?

13   A.  Yes, sir.

14   Q.  And he had been in this car for quite some time, locked car;

15   is that correct?

16   A.  No.  I think if you go back and look at the video, it's just

17   a matter of a few minutes.  But he was in the back of my car and

18   I wanted to make sure he was okay because it was August.

19   Q.  August the 4th; is that correct?

20   A.  Yes, sir.

21   Q.  2016.

22   A.  Yes, sir.

23   Q.  It was a 91 degree day; is that correct?

24   A.  Yes, sir.  And I think if you look at the video, you can see

25   the actual condensation forming on the ground underneath my

Det. Chris Sanders - Cross

1   police car because my air conditioning is running.

2   Q.  And he's saying that it was hot.  "Caliente" is what you

3   told the other officers; correct?

4   A.  I'd have to go back and look at the video.  That's probably

5   right.

6   Q.  When you were putting him in the car, he was speaking to you

7   or you were trying to speak with him about getting his legs in.

8   And you finally say, "I can't -- I can't tell him that."  Do you

9   remember seeing that?

10  A.  I'd have to go back and look at it.

11  Q.  Okay.  And at some point when he was asked about being okay,

12  you state on the videotape, "I can't understand him.  I don't

13  understand."  Do you recall that?

14  A.  No.  Let's go back and look at it.

15           MR. RENN:  Okay.  This would be video three, as well

16  as video five at the 5:50, 6:00 mark.

17      Are you able to bring it up?  Well, we can go to the one --

18  video five, 5:50.

19           THE COURT:  Is that one that was just played?

20           MR. RENN:  Yes.

21           THE COURT:  5:56?

22           MS. HICKEY:  If you can give me a description of where

23  it is.

24      (Off the record.)

25           MR. RENN:  This is when you're taking the photograph

Det. Chris Sanders - Cross

1    of Mr. Ruiz.

2         (Defendant playing DVD)

3    BY MR. RENN:

4    Q.  What did you say?

5    A.  I think the last thing I heard was, "I can't understand."

6    Q.  And you're standing right next to Mr. Ruiz.  He's the one

7    that you're speaking with; is that correct?

8    A.  Yes, sir.

9    Q.  Because he spoke Spanish to you?

10   A.  I couldn't tell what he said.

11   Q.  He didn't speak English to you, did he?

12   A.  I could not tell you what he said, if he said it in English

13   or Spanish.  I can't hear it on the recording.

14   Q.  You never asked him to repeat, did you?  "Pardon me.  I

15   can't understand you"?

16   A.  I'd have to see the video again.

17   Q.  Well, you've watched the videotape, you testified; right?

18   A.  Yes, sir.

19   Q.  You didn't fail to watch that part, did you?

20   A.  No, I watched it in its entirety.

21   Q.  Would it be fair to say -- you said that there's an

22   instructor that teaches this 36-hour class.  Is that an LMPD

23   officer?

24   A.  Yes, sir.

25   Q.  I think Willy Ortiz is here and he's going to testify; is

Det. Chris Sanders - Cross

1    that correct?

2    A.   That's my understanding, yes.

3    Q.   Does he have a uniform, Willy, Mr. Ortiz, Officer Ortiz?

4    A.   I'm assuming he does.

5    Q.   Okay.  So we could have had somebody -- or the DEA and/or

6    LMPD could have had somebody that speaks Spanish to have

7    conversations with Mr. Ruiz; is that correct?

8    A.   I guess if they wanted to.

9    Q.   Are there other officers on the force that speak Spanish a

10   whole lot better than you?

11   A.   Absolutely.

12   Q.   They don't speak broken Spanish; correct?

13   A.   I'm sure there's probably people in this room that can speak

14   better Spanish than I can, given that, you know, they had the

15   proper training.  But, you know, I don't know if Willy was there

16   or not.

17   Q.   You don't know what?

18   A.   I don't know if Willy was there.

19   Q.   Okay.  But obviously this was in the planning for some

20   period of time because they were able to reach out and telephone

21   call you; is that correct?

22   A.   I don't know to what extent -- what prior to me getting

23   involved that night or that evening, you know, what they had

24   going on.

25   Q.   But if we wanted to make sure that Mr. Ruiz, who clearly is

Det. Chris Sanders - Cross

1    Hispanic, would understand the questions being put to him, there

2    were officers with LMPD and perhaps the DEA that would have been

3    able to converse with him in Spanish.  Is that fair to say?

4    A.   Probably.

5    Q.   It's true, isn't it?

6    A.   Well, what I was saying before too is that this stop was

7    not -- did not hinge basically -- and then the search of the

8    vehicle in my understanding did not hinge on whether or not he

9    could understand me in Spanish or if I could understand --

10   Q.   You're not a lawyer, are you?

11   A.   I'm sorry?

12   Q.   You're not a lawyer, are you?

13   A.   No, sir, I'm not.

14   Q.   So, what, are you the one that's deciding whether this was a

15   good stop or a bad stop?

16   A.   No, I didn't say that.

17   Q.   Well, you're talking about whether this stop would hinge

18   on -- hinge on what?

19   A.   On whether or not he and I could communicate and give

20   consent to this vehicle.

21   Q.   If he doesn't understand what you're asking, do you think

22   you have the right to go ahead and search anyway?

23   A.   Based on the information given to me by my fellow officers

24   and detectives, yeah, yes, sir.

25   Q.   So you didn't need consent?

Det. Chris Sanders - Cross

1    A.   No, sir.

2    Q.   Okay.  You had testified about this traffic violation, this

3    window tint.  Is that correct?

4    A.   Yes, sir.

5    Q.   You said it's unlawful in Kentucky to have excessive window

6    tint; is that correct?

7    A.   That's what I told him.

8    Q.   That's what you told who?

9    A.   The defendant.

10   Q.   Well, you said "muy negro" is what you told him.

11   A.   Yes, sir.

12   Q.   Not excessive window tint.

13   A.   That was the best way that I could communicate to him at the

14   time that -- what I was stopping him for, and he seemed to

15   understand it.

16   Q.   Now, when you testified in here, you didn't say that the

17   window was very black, did you?

18   A.   Well, in my mind I'm trying to communicate to him that I'm

19   stopping him for excessive tint, trying to communicate to him at

20   that point what I'm stopping him for, which is what I was

21   telling him was for the excessive window tint.  The best way I

22   could communicate that at the time was "muy negro."

23   Q.   Very black?

24   A.   Yes, sir.

25   Q.   And, again, when you testified in here, you didn't say the

Det. Chris Sanders - Cross

1   window was very black.  You said it violated Kentucky law

2   because it was excessive.  Correct?

3   A.  I think what I said was that I observed a violation, which

4   would have been excessive window tint.

5   Q.  Okay.  And this window tint conversation with Mr. Ruiz, that

6   occurred after the vehicle was stopped; correct?

7   A.  Yes, sir.

8   Q.  And you had ordered this Rodney to have him removed from the

9   vehicle; correct?

10  A.  I asked him to exit the vehicle, yes, sir.

11  Q.  Now, you told Mr. Ruiz to get out of the car and you said,

12  "Officer Rodney, get him out."

13  A.  I think I said that I'm going to get him out.

14  Q.  No question about that.  You were in charge and you're

15  getting him out of his vehicle for window tint.

16  A.  Yes, sir.

17  Q.  For "muy negro" windows.

18  A.  No.  I'm getting out of the car because this is an

19  investigation involving the defendant.  I told him that I was

20  stopping him for excessive window tint.  And to be a little more

21  general about it, I was explaining to him the best way that I

22  could that his windows were too dark.

23  Q.  Was it a lie that you were stopping him for that?

24  A.  Well, I think there are a number of issues that we could say

25  we stopped him for, but probably more explainable would be the

Det. Chris Sanders - Cross

1   investigation that the DEA was conducting with the defendant.  I

2   had merely a secondary portion of a reason to stop him, which

3   would have been the vehicle or the violation of the extreme --

4   or the excessive window tint.

5   Q.   Let's get real clear.  Did you stop him because of the

6   investigation or did you stop him because of the window tint?

7   A.   I stopped him for the investigation.  I told him that I

8   stopped him for the window tint.  If you recall earlier, I was

9   saying that sometimes that in the course of my activities, being

10  in the position I'm in offers some legitimate subterfuge for the

11  focus or the direction of the investigation.

12  Q.   So the stop was for the investigation, not for the

13  subterfuge of the window tint?

14  A.   Right.

15  Q.   Okay.  What is the law in Kentucky for window tint?

16  A.   I could not recite it to you verbatim because it was -- I

17  could not recite it to you verbatim at this moment.

18  Q.   You have to test it, don't you?

19  A.   Most of the time whenever it's properly installed, there is

20  a decal on the inside of the vehicle, basically a decal that

21  says that the tint that is being installed on this vehicle

22  conforms to the standard by Kentucky state law.  I didn't see

23  that anywhere.

24  Q.   You have to test the window tint, don't you?

25  A.   I've never tested a window.

Det. Chris Sanders - Cross

1    Q.   You've cited people for it, you've said.

2    A.   Yes, sir.

3    Q.   And you don't know what the law is?

4    A.   Well, the law is that it has to have a decal on the inside

5    of the door saying that it's in compliance.  If I can't see

6    inside the vehicle and I see that there's no decal, I have cited

7    folks for that in the past, yes.

8    Q.   Well, you can't see the decal until you pull the car over.

9    Is that correct?

10   A.   I wouldn't say 100 percent of the times but --

11   Q.   How else --

12   A.   -- I think that's reasonable.

13   Q.   -- do you see the decal if you don't pull the car over?

14   A.   It might have been at the time another violation that I

15   observed.  You know, I can't say 100 percent of the time that

16   I've cited folks for excessive tint it was because I stopped

17   them for the excessive tint.  They might have been speeding,

18   failing to use a turn signal, any other number of reasons.

19   Q.   Well, is there a law in Kentucky on window tint?

20   A.   Yes, sir.

21   Q.   And are you aware of that law?

22   A.   Yes, sir.

23   Q.   What is the law?

24   A.   I cannot recite it to you directly, nor can I provide the

25   KRS number of it.

Det. Chris Sanders - Cross

1   Q.  It's a percentage, isn't it?

2   A.  As I understand it, yes.  I don't know what.

3   Q.  Well, you can't eyeball it and guess; is that correct?

4   A.  I would say that given that if you're -- it's impossible to

5   see inside the vehicle, it's likely the tint is in excess of

6   what the state law is allowing.

7   Q.  Probably a good thing he's not on trial for a window tint

8   here today.  Would that be fair to say?

9            MR. BONAR:  Objection.

10  BY MR. RENN:

11  Q.  Could you see Mr. Ruiz driving his vehicle?

12  A.  I think you can see in the video I can't.

13  Q.  Pardon me?

14  A.  No, sir, I can't.

15  Q.  So when he drove by, you weren't able to identify any

16  features for Mr. Ruiz; is that correct?

17  A.  I don't think he ever drove by me.  I think the only time I

18  actually saw the vehicle was when I was actually from the rear,

19  approaching from the rear.

20  Q.  When you approached the vehicle could you see him?

21  A.  No, sir.

22  Q.  Are you sure about that?

23  A.  I think you can see on the video I can't -- you can't see in

24  the back window.

25  Q.  Okay.  Is there a different standard for sedans, and vans,

Det. Chris Sanders - Cross

1    and trucks in Kentucky law with window tinting?

2    A.   I don't know.

3    Q.   Pardon me?

4    A.   I don't know.

5    Q.   You were a patrol officer for a number of years you

6    testified; is that correct?

7    A.   Yes, sir.

8         (Defendant playing DVD)

9    Q.   This is you stopping the Ford dually truck; is that correct?

10   A.   Yes, sir.

11   Q.   You followed him for one to two minutes and made this

12   determination that there was a window tint violation; correct?

13   A.   Yes, sir.

14   Q.   Couldn't see in the vehicle; correct?

15   A.   I think from this angle it's probably a little more improved

16   but --

17   Q.   It's probably what?

18   A.   I believe from this angle it is a little improved with the

19   light in the front windshield, but I think if you're standing --

20   depending on where you're standing.  I could not.

21        (Defendant playing DVD)

22   Q.   The window's down, isn't it?

23   A.   Yes, sir.

24        (Defendant playing DVD)

25   Q.   Are you able to see his hand through the window?

Det. Chris Sanders - Cross

1   A.   Yes, sir.

2        (Defendant playing DVD)

3   Q.   Can you see him reach in his back pocket?

4        (Defendant playing DVD)

5   Q.   You're able to see his hands moving here, aren't you?

6   A.   Yes, sir.

7   Q.   You can see his seat belt?

8   A.   Yes, sir.

9   Q.   You can see his license through the window; correct?  Is

10  that true?

11  A.   Yes, yes, sir.

12  Q.   You saw him remove his seat belt, now reaching into his

13  glove box; correct?

14  A.   Yes, sir.

15  Q.   Okay.  That's not what you testified to and that's not what

16  you stopped the vehicle for, is it?

17  A.   Well, as I was saying, the stop was based on what the

18  investigation led us to.  I was requested to stop the vehicle.

19  What I told him was that I stopped him for the violation of

20  having excessive window tint.

21  Q.   As an officer, can you make up charges when you stop

22  somebody?

23  A.   No.

24  Q.   You took his license, his Kentucky operator's license,

25  didn't you?

Det. Chris Sanders - Cross

1    A.  Yes, sir.

2    Q.  And you held on to it inside his car for quite a while,

3    didn't you?

4    A.  I guess prior to taking it outside the car, yes, sir.

5    Q.  Okay.  And then you gave him a warning ticket; correct?

6    A.  I didn't give him a ticket.  I gave him a verbal warning.

7    Q.  You didn't tell him he violated Kentucky law?

8    A.  Yes, and that he should correct the violation.

9    Q.  That was all in English that he ought to correct the

10   violation and go through this peeling off of the old "muy negro"

11   film; is that correct?

12   A.  Yes, sir.

13   Q.  You asked Mr. Ruiz how long he had been in the United

14   States; correct?

15   A.  I believe I did.

16   Q.  And he told you a year and three months; correct?

17   A.  I think that's what he said.

18   Q.  And despite being in this country, did you ever ask where he

19   came from, what country he came from?

20   A.  No, I don't think I did.

21   Q.  And you felt comfortable knowing that he was only here for

22   one year and three months speaking broken English or speaking

23   broken Spanish to him; correct?

24   A.  Well, given that we were -- the conversation was progressing

25   along and he was not stopping and saying, "I don't understand, I

Det. Chris Sanders - Cross

```
 1    don't understand," I felt comfortable proceeding with the
 2    conversation as we -- as it was then.
 3    Q.   What's "qué"?
 4    A.   It means "what."
 5    Q.   He said "qué" a whole lot to you, didn't he?
 6    A.   I don't -- I don't remember that.  I don't remember hearing
 7    it on the video either.
 8    Q.   "Cómo se dice?"
 9    A.   I'm asking, "How do you say?"
10    Q.   When you would say something and he's not understanding you,
11    is he?  So you're asking him how to say it in Spanish?
12    A.   Uh-huh.
13    Q.   Correct?
14    A.   Yes, sir.
15    Q.   Now, at some point you asked him about this "seguro."  Is
16    that correct?
17    A.   "Seguro?"
18    Q.   Sí, yes.  And that was the insurance?
19    A.   Yes, sir.
20    Q.   And he understood that; correct?
21    A.   Yes, sir.
22    Q.   The same way if I was asking you and I was -- you know, got
23    one word out, "Tie, tie."  "Oh, yeah, a tie."  But if I was
24    saying, "Do you know how to tie a tie?" you may not understand
25    that; correct?
```

Det. Chris Sanders - Cross

1    A.   I'm not sure your question.

2    Q.   Well, if I just said one word, "tie."  "Sí, rojo," red tie.

3    But if I asked you, "Do you know how to tie a tie?" you may not

4    understand all that if you don't speak English; correct?

5    A.   They're obviously two different questions or two different

6    statements.

7    Q.   Yeah.  One very specific about a single word, one a sentence

8    asking you to do something or do you understand something;

9    correct?

10   A.   Yes, sir.

11   Q.   And if I heard tie and I'm thinking you're just asking about

12   a tie and I say "yes" or "sí," I may not be answering your

13   question.  Would that be fair to say?

14   A.   That's correct.

15   Q.   Now, at some point you told Mr. Ruiz that you were going to

16   get his insurance out of the vehicle.  Do you recall that?

17   A.   Yes, sir.

18   Q.   Okay.  Now, when you stopped him and you had Officer Rodney

19   get him out of the car -- and he was a uniformed officer with a

20   firearm; is that correct?

21   A.   Yes, sir.

22   Q.   You were in a uniform; is that correct?

23   A.   That's correct.

24   Q.   Marked police car?

25   A.   Yes, sir.

1    Q.  And you told him to get out of the car.  He was not free to

2    leave, was he?

3    A.  No.

4    Q.  He was under arrest.

5    A.  I would not say that he was under arrest.

6    Q.  If a person is not free to leave, they're under arrest.  Is

7    that true?

8             MR. BONAR:  Objection.  Calls for a legal conclusion.

9             THE COURT:  He can ask him his understanding.

10   BY MR. RENN:

11   Q.  Your understanding as a trained police officer for 19-and-a-

12   half years, if you put somebody outside the vehicle and tell

13   them they can't leave, are they under arrest or not under

14   arrest?

15   A.  Well, as it existed at that point and what was conveyed to

16   me was we had probable cause to stop this vehicle, number one,

17   and that he was not free to leave.  The actual formal act of

18   arresting him had not yet occurred.

19   Q.  When do you believe he was -- the formal act of being

20   arrested?

21   A.  Whenever he was found to be in possession of the controlled

22   illegal drugs.

23   Q.  But, again, you're convinced as you sit here today, after he

24   was stopped and removed from the vehicle, he was not free to

25   leave?

Det. Chris Sanders - Cross

1    A.   No.

2    Q.   He couldn't walk away; is that correct?

3    A.   No.

4    Q.   He couldn't drive away?

5    A.   No.

6    Q.   And before the drugs were ever found in the car, you

7    actually did a pat-down of his person, didn't you?

8    A.   Yes, sir.

9    Q.   Okay.  Now, *Miranda*, you're familiar with that, I guess;

10   correct?

11   A.   Yes, sir.

12   Q.   And when somebody is under arrest, are they entitled to

13   *Miranda* warnings before they're interrogated?

14   A.   If they are in custody and they are to be interrogated, it

15   is my understanding, yes, sir.

16   Q.   Okay.  In this case here, Mr. Ruiz was not free to leave;

17   correct?

18   A.   That's correct.

19   Q.   You were asking him a number of questions; correct?

20   A.   I believe I asked him some questions on the side of the

21   roadway, yes.

22   Q.   We know you did because we saw the videotape.

23   A.   Yes, sir.

24   Q.   "Whose truck is this?  Where are you going?"  Correct?

25   A.   Yes, sir.

Det. Chris Sanders - Cross

1    Q.   "Where are you coming from?"  Correct?

2    A.   Sure.

3    Q.   "It's late.  Why do you still have the truck?"  Correct?

4    A.   Yes, sir.

5    Q.   "Where do you work?"

6    A.   Yes, sir.

7    Q.   "Who's your boss?"

8    A.   Yes, sir.

9    Q.   "Where does your boss live?"

10   A.   I don't remember asking him that, but I might have.

11   Q.   Can you trust me on that one?

12   A.   I believe when you say that.

13   Q.   Something about Bardstown Road and you even asked for the

14   numbers or the numbers for Bardstown Road.

15   A.   Okay.

16   Q.   You asked him a whole lot of questions after he was removed

17   from the vehicle; correct?

18   A.   Yes, sir.

19   Q.   You never provided him with any *Miranda* warnings, did you?

20   A.   I don't believe I did.

21   Q.   And Rodney -- and I keep saying Mr. Rodney, but what was

22   Rodney's last name, the deputy sheriff?

23   A.   It's Hall.

24   Q.   Hall, that's right.  He never read him any *Miranda* warnings

25   either, did he?

Det. Chris Sanders - Cross

1    A.   Not that I'm aware of.

2    Q.   Okay.  And on the videotape that I see, no one ever gave him

3    any *Miranda* warnings even after the drugs were found; is that

4    correct?

5    A.   That part I don't know.

6    Q.   Well, you've watched the videotape.  Did you see it anywhere

7    on there?

8    A.   If it was, it was not collected by the video that I was

9    wearing on my shoulder.

10   Q.   What I saw was handcuffs being placed on Mr. Ruiz; correct?

11   A.   Yes, sir.

12   Q.   And then he was placed in the squad car; correct?

13   A.   Yes, sir.

14   Q.   And at one point he was -- they had him get out of the car.

15   You were the one that actually got him out of the car; correct?

16   A.   Yes, sir.

17   Q.   Took pictures of him and put him back in the car?

18   A.   Yes, sir.

19   Q.   Up to that point no one ever gave him any *Miranda* warnings,

20   did they?

21   A.   You know, I don't know.

22   Q.   Well, the video will speak for itself.  Now, you tell him,

23   Mr. Ruiz, that you're going to go and get his insurance;

24   correct?

25   A.   Yes, sir.

Det. Chris Sanders - Cross

1    Q.  Not can I do it.  I'm going to get your insurance card?

2    A.  I think I asked him if that's okay.

3         (Defendant playing DVD)

4    Q.  He's responding to you in Spanish; correct?

5    A.  Yes, sir.

6         (Defendant playing DVD)

7    A.  And English.

8         (Defendant playing DVD)

9    Q.  What did he say?

10   A.  I couldn't make out what he said.

11   Q.  If you listen to it with headphones, you think you can

12   understand?

13   A.  Play it again.

14        (Defendant playing DVD)

15   Q.  You've already started and you say, "I'm going to get it.

16   Okay?"

17   A.  Can you go ahead and let it play.

18        (Defendant playing DVD)

19   Q.  That's all that was said is "I'm going to get it.  Is that

20   okay?"

21   A.  I don't know if he -- I don't know if he nodded at me or

22   what caused me to proceed with that, but I -- you know, he may

23   have nodded at me and said that was -- that he understood and it

24   was okay, but I can't tell you precisely.  If he had -- if he

25   had said, no, I don't want you to go in the truck, I certainly

Det. Chris Sanders - Cross

```
 1   wouldn't have gone in the truck but --

 2   Q.  You told him you were going to get the insurance card;

 3   correct?

 4   A.  Yes, sir.

 5   Q.  You do a search of the vehicle, don't you?

 6   A.  I'm looking inside the glove box for the insurance card or

 7   any insurance information.

 8       (Defendant playing DVD)

 9   A.  And you'll hear me read aloud the things I'm seeing as I'm

10   looking for it.

11   Q.  I heard that as well, names, addresses; is that correct?

12   A.  Yes, sir.

13   Q.  That's a search, isn't it?

14   A.  Yes, sir.

15   Q.  Okay.  And this was before any consent was given; correct?

16   A.  Yes, sir.

17   Q.  And, in fact, after you make this search, you go back to the

18   car and say -- you asked about who it was -- it was a female you

19   were talking to; is that correct?

20   A.  Yes, sir.

21   Q.  Special Agent Jennifer Traud?

22   A.  Yes.

23   Q.  You call her "Jen" or "Jennifer" throughout this?

24   A.  I think so.

25   Q.  And you go back and ask her, "Did you-all see him carrying
```

Det. Chris Sanders - Cross

1    any kind of duffel bag or backpack out?"  Is that correct?

2    A.   I believe that's what the video says, yes, sir.

3    Q.   You also looked around the vehicle and made a search, didn't

4    you?

5    A.   I didn't see anything in plain view, no.

6    Q.   You didn't see anything in plain view, but you looked.

7    A.   Yes, sir.

8    Q.   You had to open the car door in order to do that; is that

9    correct?

10   A.   Yes, sir.

11        (Defendant playing DVD)

12   Q.   Those documents didn't look like an insurance card, did

13   they?

14   A.   I can't tell from here.

15   Q.   Did you ever find an insurance card?

16   A.   I don't think so.

17        (Defendant playing DVD)

18   Q.   When you got back to the car and you called Jennifer, that's

19   when you told her that you haven't asked for consent yet and you

20   haven't asked for Wes yet; is that correct?

21   A.   That's right.

22   Q.   And "Wes" is Wes Parks; is that correct?

23   A.   Yes, sir.

24   Q.   What is Wes's role with LMPD?

25   A.   He does not work for LMPD.

Det. Chris Sanders - Cross

1    Q.   Where does he work?

2    A.   He works for the City of J-Town.

3    Q.   Okay.  And is he a K-9 unit?

4    A.   Yes, sir.

5    Q.   Okay.  So we've got Billy Keltner, who is out here and

6    apparently going to come in at some point, but for some reason

7    you wanted Wes.  Is that correct?

8    A.   I think at that point I had just assumed that Wes was going

9    to be there.

10   Q.   Who told you Wes was going to be there?

11   A.   I don't know.

12   Q.   Somebody with DEA or somebody with LMPD?

13   A.   Probably.

14   Q.   But Billy Keltner was there with his dog Jozie; is that

15   correct?

16   A.   Yes, sir.

17   Q.   You didn't want to use Billy or you didn't want to use

18   Jozie, did you?

19   A.   I would have used any dog.

20   Q.   And you're heard on the recording here:  "Hey, let's have

21   Wes pull up" -- and this is a summary -- "and do the whole,

22   'Hey, what are you guys doing here?'  Well, since you're here,

23   let's run your dog around the truck."  Do you recall that

24   conversation?

25   A.   Yes, sir.

Det. Chris Sanders - Cross

1    Q.  So, again, talking about this subterfuge or this misleading,

2    you were going to make it look like Wes just happened to pull up

3    on the scene; correct?

4    A.  Yes, sir.

5    Q.  And you've done that apparently other times because you

6    said, "Let's do the whole, 'Hey, what are you guys doing here?'"

7    So that's something that you do commonly; is that correct?

8    A.  I wouldn't say commonly, but we've talked about it before,

9    and we have basically employed or used that in conversation

10   while conducting investigations, yes, sir.

11   Q.  But if you had probable cause to search the vehicle,

12   probable cause to arrest Mr. Ruiz, why did you even need the K-9

13   unit?

14   A.  You know, I don't think we really did.

15   Q.  You don't believe you did what?

16   A.  Needed a K-9 actually to be there, but as it -- you know, as

17   it stood at that moment, this was an ongoing investigation and

18   we wanted to maximize our results.

19   Q.  Because that's what you said on direct examination, that the

20   DEA told you or someone told you, the task force, that there was

21   probable cause; is that correct?

22   A.  Yes, sir.

23   Q.  And you didn't need the window tint because there was

24   probable cause; correct?

25   A.  Right.

Det. Chris Sanders - Cross

1    Q.  So the drug dog or this K-9 unit gives no probable cause at

2    that point; is that correct?

3    A.  I think, if anything, it enhances our case.

4    Q.  But you didn't need it.

5    A.  No.

6    Q.  Now, at some point you asked Mr. Ruiz about weapons in the

7    car, "pistolas," drugs, "dinero"; correct?

8    A.  Yes, sir.

9    Q.  And he was having a difficult time understanding you.  And

10   this is where you said about searching the "el trucko"; correct?

11   A.  I might have said that, yeah.

12   Q.  You want to hear it?

13   A.  I believe you.

14   Q.  Okay.  All right.  And then very shortly after that, you

15   make -- this will be a summary -- "You understand what I'm

16   saying, because if you were in the business world, you're out

17   there trying to make money.  You'd have to know what I'm

18   saying."  Correct?

19   A.  You know, I don't think I said it exactly like that but,

20   yes, I would have to agree with you.  That's the gist of the

21   conversation.

22   Q.  This is the whole gist of whether there was consent or not,

23   whether he understood.  And you're telling him, "You do

24   understand what I'm saying."  Correct?

25   A.  I'm asking --

Det. Chris Sanders - Cross

1    Q.   You're not asking.  You're telling.

2    A.   I think I say that.

3    Q.   Pardon me?

4    A.   I'm pretty sure I do say that but --

5    Q.   You're telling him he understands what you're saying.

6         (Defendant playing DVD)

7    A.   I think I asked him in English if he knows you have the

8    truck and he says yes in Spanish.

9         (Defendant playing DVD)

10   Q.   This is where I was saying when he was looking at you like,

11   "What are you saying?"  Would that be fair to say, if you're

12   observing somebody?

13   A.   Well, you mean after he was asking -- I was asking him

14   questions in English and he was answering me those answers in

15   Spanish?

16   Q.   No.  I let this video speak for itself, but he certainly

17   didn't seem like he understood what you were saying in my view.

18   What's your view?

19   A.   He seems to be leaning in, again, to ask me what I'm saying.

20        (Defendant playing DVD)

21   Q.   Blank stare; correct?

22   A.   I think he was -- looked like he was thinking about what I

23   said to him.

24   Q.   Let's skip here to what we were asking, 13:32.  That's where

25   you were telling him, "You understand what I'm saying.  You're

Det. Chris Sanders - Cross

1    in the business world, you have to speak English."  Correct?

2    A.   Yes, sir.

3    Q.   After you went to do the search, he had been leaning on the

4    back of his vehicle, is that correct, with his arm up?

5    A.   Yes, sir.

6    Q.   And when you went to make the search, you're the one that

7    made him move to the front of the vehicle and then told Rodney

8    or Deputy Hall to stay with him; correct?

9    A.   Are you referring to when I went up to get the insurance

10   cards or whatever I could get out of the glove box?

11   Q.   This is a little bit later than that but, yes.

12   A.   And you're referring to when he was standing at the back of

13   the truck with his arm up on the back of the truck?

14   Q.   Yes.

15   A.   And what is your question to that?

16   Q.   You were in charge of him.  You were able to move him

17   around, tell him where to go; correct?

18   A.   Yes, sir.

19   Q.   Okay.  And then had Deputy Hall stay with him; correct?

20   A.   That's correct.

21   Q.   And then this is at some point when all of a sudden --

22   again, you're talking about Jen and you're telling who we now

23   know to be Billy Kletner that Jen was sending Wes over here;

24   correct?

25   A.   You know, I don't know.  I don't know what they were talking

Det. Chris Sanders - Cross

```
 1    about or what they were doing at that point.  I don't know --
 2    that was not more or less in part of, I guess you could say, the
 3    finer points of what I was doing.  But, basically, I was just
 4    asking who was coming over here.  You-all decide, basically, who
 5    is coming over here and come over here.
 6              THE REPORTER:  Mr. Renn, we lost the signal.
 7    Q.  This one here, this gentleman in the blue shirt, again, this
 8    is Billy Keltner; is that correct?
 9    A.  I don't have any video.
10              THE COURT:  It's not playing, Mr. Renn.
11              MR. RENN:  May fault.  I'm sorry.
12    BY MR. RENN:
13    Q.  Can you see the video now?
14    A.  Yes, sir.
15    Q.  So this fellow in the blue shirt, again, that's Billy
16    Kletner?
17    A.  Billy Keltner, yes.
18    Q.  My fault.  Yes, Keltner.
19          (Defendant playing DVD)
20    Q.  He's got Jozie there; is that correct?
21    A.  Yes, sir.
22          (Defendant playing DVD)
23    Q.  So he's here with his dog, but you're telling him, "However
24    they want to do it," meaning the DEA or the task force; correct?
25    A.  Well, there's a little bit of -- dog handlers in general, in
```

Det. Chris Sanders - Cross

1   my experience generally -- I won't call it a pecking order,

2   referred to similar to a pecking order but -- so saying it was

3   irrelevant to me what dog was there.  I just needed a qualified

4   dog there.

5       And if the DEA wanted, you know, a dog to go ahead and --

6   you know, that was there to perform the search, it was on them.

7   Basically, I was referring to them and asking for them to make a

8   decision on what they wanted.  You know, obviously, they said,

9   "Billy Keltner is there.  Go ahead and have Billy run the dog."

10  Q.  But in the pecking order, Billy and Jozie are down here --

11  A.  It's like anything else.  I mean, you know, you've got

12  someone that has a skill and the equipment to do it.  And, you

13  know, I guess you could say in the professional world you didn't

14  want to step on anybody's toes is basically what I was arriving

15  at, that I didn't want to get someone -- you know, cut in line

16  or cut -- you know, whatever their natural order of, you know,

17  how they do things because I'm not a dog handler.  I do know

18  that, you know, we wanted to make a decision on it.  And they

19  said, "Billy Keltner is there so go ahead and use Billy."

20  Q.  But in the pecking order, Billy and Jozie are down here

21  and --

22  A.  I have no idea.  You know, it's not my -- you know, it

23  wasn't completely my investigation so I deferred to them to make

24  the decision.

25  Q.  Did Wes ever arrive?

Det. Chris Sanders - Cross

1    A.   I don't remember.

2    Q.   And at one point, again, before anything was found and

3    before you gave any *Miranda* warnings to Mr. Ruiz, you asked him

4    if he was the only one that drove the truck; correct?

5    A.   Yes, sir.

6         (Counsel conferring off the record.)

7    BY MR. RENN:

8    Q.   At some point Jozie and Billy do go work the truck; is that

9    correct?

10   A.   Yes, sir.

11   Q.   And according to you Jozie alerted; is that correct?

12   A.   That's my understanding, just based on what I saw from her.

13   And, like I said, I'm not a dog handler, but just from what I

14   have seen in the past that it appeared that the dog alerted on

15   it.

16        I think you can actually hear me say to the defendant, "I

17   guess the dog, you know, smelled drugs or something," you know,

18   because I think at the time he was looking at me.  And I tell

19   him in Spanish, "I don't know."  You know, so that --

20   Q.   Do you know how Jozie alerts?

21   A.   Usually from what I understand, it is a passive alert,

22   basically where she sits down.

23   Q.   In this case here she got in the truck and laid down, didn't

24   she?

25   A.   I guess.  You know, she's inside the truck when I walked up

Det. Chris Sanders - Cross

1    to Billy so -- Detective Keltner so I'm assuming that -- and

2    however they do the dog, work the dog that he was led into the

3    truck by the dog.

4    Q.  Well, it could have just been a lazy dog.  Wouldn't that be

5    true?

6    A.  I don't know.  I'm not a dog handler.

7    Q.  The dog got in the truck and laid down; correct?

8    A.  That's my understanding.

9    Q.  Okay.  And that's what you told Jennifer, that the dog --

10   A.  Alerted.

11   Q.  Yeah, by laying down.

12   A.  I don't think I ever said "by laying down."  But I say, "I

13   think we have a dog alert."  And there again, I'm relying on

14   Detective Keltner's experience and training that that's what

15   he's doing when we're going -- proceeding with the search of the

16   vehicle.

17   Q.  But the dog was wrong, wasn't it?

18   A.  I have no idea.

19   Q.  The dog alerted in the rear of the truck; correct?

20   A.  The dog alerted on the truck from what I could see.

21   Q.  The dog got inside the truck and laid down in the back seat,

22   didn't it?

23   A.  I could see that the dog was laying down in the back seat,

24   but I think that's probably a more appropriate question for

25   Detective Keltner.

Det. Chris Sanders - Cross

1    Q.  Well, you're the one that went and searched the heck out of

2    the back truck -- or the back seat for several minutes.  Isn't

3    that correct?

4    A.  Well, as we talked about before, there are a number of ways

5    you can conceal illegal contraband.  And from what I could tell

6    by the -- you know, by the dog alert and where we were -- where

7    Detective Keltner was beginning to search, that I was searching

8    the area that was believed that the dog had alerted on

9    immediately -- or initially.

10   Q.  Well, if Billy thought you were in the wrong place, wouldn't

11   he have told you, "Hey, Detective Sanders" --

12   A.  You know, it's one of those things that, you know, there may

13   not have been an odor there present -- and, again, I'm talking

14   about something that's completely outside of my formal training,

15   but there could have been something there before.

16        MR. BONAR:  Your Honor, I would object to this

17   questioning.  Officer Keltner is here and he can testify to the

18   dog.  I think that everything else is speculation on behalf --

19        MR. RENN:  I'll ask him what he told Jennifer.

20   BY MR. RENN:

21   Q.  Didn't you tell Jennifer, "No, not where the dog is showing

22   interest"?  Do you remember telling her that?

23   A.  At that point?

24   Q.  While you were -- after the dog is supposed to have alerted

25   by laying down, you made a several minute search of the back

Det. Chris Sanders - Cross

1  seat of that truck, didn't you?

2  A.  I think I continued to search while Billy was still running

3  his dog.

4  Q.  You searched both sides of the back seat of the truck,

5  didn't you?

6  A.  I -- yes, sir.

7  Q.  You never looked in the front of the truck, did you?

8  A.  I looked where the dog alerted initially.

9  Q.  Which was the back seat; correct?

10  A.  Yes, sir.

11  Q.  And that's where you searched; correct?

12  A.  That's one of the places, yes, sir.

13  Q.  You removed the seats.  You opened up the console.  You

14  searched the back seat of the truck.  Correct?

15  A.  Yes, sir.

16  Q.  And then when you moved around to the driver's back side,

17  you're on the phone with Jennifer.  You asked Billy, "Do you

18  have your radio on?"  You said that twice.  "Have you turned it

19  down?"  Why did you do that?

20  A.  Because there was information that I wanted to talk with

21  among the other investigators that I did not want broadcast

22  to -- for everyone to hear.

23  Q.  And that's when you said, "The dog's hit on the wrong area,"

24  didn't you?

25  A.  No, I never said that.  No, I think what I say in the video

Det. Chris Sanders - Cross

```
 1    is that, no, not where the dog alerted.

 2    Q.   Two or three times you said that.

 3    A.   I may have.

 4              THE COURT:  Before you play that, can I see counsel.

 5         (Bench conference on the record.)

 6              THE COURT:  How much longer do you think you have?

 7              MR. RENN:  I don't know.  I'm never good at that.

 8              THE COURT:  Well, we've been at it for two hours and

 9    20 minutes.  I've got to take care of a couple other things, so

10    I'm going to have to take a break.  So the point of my question

11    is, if you say you've got roughly 10 minutes left, I'll let you

12    finish with him.  If you think -- if you're unsure, we can just

13    take a break now.

14              MR. RENN:  I would say I'm unsure.

15              THE COURT:  We're going to have to take an hour break.

16    I've got several things to do.

17              MR. RENN:  Obviously, he's not to be talked to by

18    anybody.

19              THE COURT:  Yeah, I think they understand the rule or

20    rules that are applicable to their witness.

21         (End of bench conference.)

22              THE COURT:  We're going to take a break.  I'll see you

23    back in the courtroom in an hour.

24         (Recess at 12:46 p.m. until 1:59 p.m.)

25              THE COURT:  Go ahead, Mr. Renn.  Thank you.
```

Det. Chris Sanders - Cross

```
 1           MR. RENN:  Thank you, Your Honor.
 2    BY MR. RENN:
 3    Q.  Detective Sanders, I probably should have asked you before
 4    we got started with the cross-examination, but do you have any
 5    reports or notes regarding your investigation back on August the
 6    4th, 2016?
 7    A.  No, sir.
 8    Q.  Okay.  So everything you did in this case is reflected on
 9    the videotape and nothing more; is that correct?
10    A.  That's correct.
11    Q.  Okay.  When we were breaking, we were talking about you
12    doing a search of the vehicle, and this was after Jozie, the
13    dog, had been in the rear of the truck.  Is that correct?
14    A.  Yes.
15    Q.  Okay.  So Billy Keltner, the handler, put the dog in the
16    truck, and this was in the rear of the silver dually; correct?
17    A.  Yes.
18    Q.  And according to you, Detective Keltner indicated that there
19    was an alert; is that correct?
20    A.  That's right.
21    Q.  And for you that was a passive alert?
22    A.  As I interpret it, yes.
23    Q.  And in this case here, the dog actually laying down?
24    A.  The initialer was the dog sitting down.  And whenever I got
25    to Billy, Detective Keltner, at the rear of the truck, he was
```

Det. Chris Sanders - Cross

1    lying -- she was lying down in the back seat.

2    Q.  And you asked Detective Keltner to have the dog removed from

3    the back of the truck; correct?

4    A.  Right.

5    Q.  And you began a search?

6    A.  Yes.

7    Q.  And that was several minutes of a search; correct?

8    A.  I think I'm searching the vehicle for quite some time during

9    the video.

10   Q.  The back seat in particular?

11   A.  Yes, sir.

12   Q.  Okay.  And then we went through this where you asked Billy,

13   Detective Keltner, asked if he had turned his radio down.  You

14   asked that twice; correct?

15   A.  I believe so.

16   Q.  Okay.  And what you said on cross-examination before the

17   break was you did that because you didn't want everybody to hear

18   what you were saying to Jennifer, in this case Special Agent

19   Traud; correct?

20   A.  Right.

21   Q.  Okay.  And we were about to play this, and this is where I

22   was asking.  What I heard -- and if you want to play it, we can

23   play it -- was that so far we've got a blank, meaning we haven't

24   got anything from the back search of the truck.  Correct?

25   A.  Of the interior?

Det. Chris Sanders - Cross

1    Q.   Yes, sir.

2    A.   So far the search of the interior was a blank.

3    Q.   The interior, again, the back seat of the truck where the

4    dog had alerted; correct?

5    A.   The first time?

6    Q.   Yes, sir.

7    A.   Yes, sir.

8    Q.   Okay.  And then you state, "No, where the dog is showing

9    interest."  Again, meaning the back seat of this truck; correct?

10   A.   Well -- and, again, I'm not a dog handler so I can't testify

11   as to what the dog is doing, but I began searching the area

12   where the dog initially first showed interest and was -- where

13   Detective Keltner showed me where she showed interest.  That's

14   not the only place the dog alerted.

15   Q.   I'm sorry.  Say again.

16   A.   But that's not apparently the only place the dog alerted.

17   Q.   Did the dog ever alert to the front of the vehicle?

18   A.   You'd have to ask Detective Keltner.

19   Q.   Well, again, you viewed the videotape; correct?

20   A.   Yes, sir.

21   Q.   And never did you get in the front part of the vehicle while

22   the video was working; correct?

23   A.   My face was down basically looking in the back seat, like

24   you were saying before.  And I think almost simultaneously while

25   I was looking in the back seat -- in fact, I think if you looked

Det. Chris Sanders - Cross

1    at the in-car camera, you'll see that Detective Keltner is

2    continuing to work his dog around the truck.  I think he ends up

3    in the back of the pickup truck.

4    Q.  And he ended up in the back of the truck after you had this

5    telephone call with Special Agent Traud; correct?

6    A.  I think he was back -- probably back there the same time.

7    Q.  Do you remember Special Agent Traud stating something to you

8    about checking a bag?

9    A.  I heard something about that, but I don't recall what she

10   was talking about.  I heard something like that on the video.

11   Q.  And ultimately that's where this 4 kilograms of

12   methamphetamine was found was found in a corn bag in the back of

13   the truck; correct?

14   A.  Yes, sir.

15   Q.  Had the DEA, had they already searched this truck before

16   Mr. Ruiz was stopped by you?

17   A.  Not that I'm aware of.

18   Q.  They could have because you weren't there at the scene, were

19   you?

20   A.  The beginning of my participation is where you see start on

21   the camera.

22   Q.  But there's no question you heard and I heard Special Agent

23   Traud ask, "Did anybody check the bag?" meaning in the back of

24   the truck?

25   A.  No, that's what I'm saying is it's not clear to me.  I hear

Det. Chris Sanders - Cross

1   something about a bag on the video, but I don't remember her

2   saying anything about a bag at the time.

3   Q.  It's almost simultaneous after she tells you over the phone

4   about searching a bag in the back of the truck that that's when

5   Detective Keltner says, "I've got something in the back of the

6   truck."  Correct?

7   A.  Okay.

8   Q.  And there's a corn bag; correct?

9   A.  Some sort of meal bag or feed bag of some sort.  I don't

10  know what it is precisely.  To describe it, it looked like a bag

11  of corn or something like that to that effect.

12  Q.  Which it sounds likes somebody, in this case Special Agent

13  Traud, knew that that bag was in the back of the truck.

14  A.  There again, I don't know.  I don't remember her saying

15  anything like that.  You hear it in the -- something about a bag

16  in the video, but I don't have any recollection of it.

17      (Defendant playing DVD)

18  Q.  Now, you were still working the area where you said the dog

19  hit; correct?

20  A.  Where Detective Keltner said the dog showed an interest,

21  yes, sir.

22  Q.  Again, the back seat of the truck?

23  A.  I said that appears to be where I was, yes, sir.

24  Q.  Okay.  And nothing was found in the back seat of the truck?

25  A.  No, sir.

Det. Chris Sanders - Cross

1  Q.  And you were able to communicate with Detective Keltner

2  during this period of time because you were asking him about him

3  having his radio on; correct?

4  A.  I don't know exactly where that is before or after.  I think

5  it was before -- you know, the radio conversation was before --

6  Q.  It was before?

7  A.  -- this.

8  Q.  Before the conversation with Special Agent Traud.  But he

9  was able to hear you; correct?

10  A.  I don't know if he heard me after that, but I asked him if

11  his radio was turned down.

12  Q.  Okay.  Twice?

13  A.  Okay.

14  Q.  And, again, Special Agent Traud is the one that says about

15  searching a bag in the back of the truck and then Detective

16  Keltner does that; correct?

17  A.  When I was searching the back of the truck, I looked up and

18  saw Detective Keltner was moving towards the defendant and that

19  they were placing the defendant in handcuffs.  So my assumption

20  is that he located something or recovered something that would

21  precipitate him putting him in handcuffs.

22  Q.  But, again, you heard Special Agent Traud say about

23  searching a bag; correct?

24  A.  It's -- I can't say exactly what she said about a bag, but

25  you can hear her say something about a bag.

Det. Chris Sanders - Cross

1   Q.  Okay.  And, again, we were talking about a passive alert by

2   the dog, but in this case here, Detective Keltner says that the

3   dog was biting at the bag.  Correct?

4   A.  I think so.  I would have to go back and look at the video

5   again, but I think that's what he says.

6   Q.  Again, that's not a passive alert by the dog; correct?

7   A.  I have no idea.  You know, that's a question that you could

8   ask one of the dog handlers but, you know, in my -- if you're

9   asking me from what I've seen, I've seen dogs, you know, do all

10   kinds of things, you know, but I can't tell you, you know, or

11   testify to the handling of the dog and all the particulars about

12   a dog and their alerts.

13   Q.  So if you walk up to the cocaine and say, "Sit, Boo Boo,"

14   that's not a pretty good alert, is it?

15   A.  I would think not.

16   Q.  Okay.  The same here.  If the dog is trained to do a passive

17   alert, to sit or lay, that's different than the dog biting the

18   object; correct?

19   A.  Yes.

20   Q.  Okay.  And in this case here, that's what Detective Keltner

21   said this dog was doing after it did the passive alert inside

22   the car.  Now it's biting the bag on the outside.

23   A.  Okay.

24   Q.  That's what he says on the video.

25   A.  Okay.

Det. Chris Sanders - Cross

1    Q.  You had testified on direct examination that this was

2    sometime in the evening and referenced the lighting; is that

3    correct?

4    A.  Yes, sir.

5    Q.  Do you know what time specifically it was that you stopped

6    Mr. Ruiz?

7    A.  I would have to look at the dashboard camera or the onboard

8    camera, the time stamp on that, but I want to say it was

9    somewhere between 8:00 or 9:00, around 8:00 or 9:00.

10   Q.  Okay.  So there will be a specific time reference, and that

11   time would have been accurate; correct?

12   A.  It should be.

13   Q.  Okay.  After the stop of the vehicle, you had him get out of

14   the vehicle.  And at some point he was patted down by you; is

15   that correct?

16   A.  I believe the video reflects, yeah, that at some point I did

17   pat him down.

18   Q.  Patted down and searched; correct?

19   A.  Probably.  I don't know.

20   Q.  Do you want to see it?

21   A.  I believe I patted him down for, you know, a pat-down.

22   Q.  Okay.

23   A.  And then left him.

24   Q.  And that was before the search of the vehicle and recovery

25   of any items; correct?

Det. Chris Sanders - Cross

1   A.   Yes, sir.

2   Q.   Okay.  And then after the recovery of the items from the bag

3   in the back of the truck, that's when he was -- or had handcuffs

4   placed on him; is that correct?

5   A.   That's correct.

6   Q.   Okay.  Do you know how long he was there at the scene before

7   he was transported away?

8   A.   No, I don't.

9   Q.   Okay.  And he was placed in the back seat of your vehicle;

10  correct?

11  A.   Yes, initially, yes.

12  Q.   And that's what I was going to get at.  At some point did he

13  get transferred from your vehicle to another vehicle?

14  A.   Yes.

15  Q.   And do you know what time that was?

16  A.   No, I don't.

17  Q.   Okay.  Do you know whose vehicle he was placed in?

18  A.   I believe he went with agents of -- DEA agents, but I don't

19  know specifically what vehicle they went in.

20  Q.   That leads us to another question, I guess.  You're

21  obviously with LMPD; correct?

22  A.   Yes.

23  Q.   And Detective Keltner, LMPD; correct?

24  A.   Yes.

25  Q.   Wes Parks we've talked about.  You said he was with J-Town;

Det. Chris Sanders - Cross

1    correct?

2    A.   Yes, sir.

3    Q.   But despite the local involvement, this case was directed by

4    the Drug Enforcement Administration; correct?

5    A.   Yes, sir.

6    Q.   Okay.  And you had testified on direct examination about

7    being involved in hundreds of these investigations and that you

8    don't tell the person why they're being stopped because you

9    thought that it would hinder the investigation; correct?

10   A.   If I said hundreds, numerous.

11   Q.   Okay.  And that might -- I apologize.  It would hinder the

12   investigation if you told the person why they were being

13   stopped?

14   A.   Not every investigation is the same, but we'll just say just

15   in general, depending on the duration of the investigation, we

16   may not tell them exactly what the actual -- you know, the

17   specific -- I guess ultimate end of the investigation.

18   Q.   And here again, what you told to Mr. Ruiz was it was because

19   of this window tinting; correct?

20   A.   Yes, sir.

21   Q.   And as you sit here today, you don't know what percentage

22   you're allowed to have as far as window tinting in Kentucky;

23   correct?

24   A.   No.

25   Q.   And are you aware that that percentage does change whether

Det. Chris Sanders - Redirect

1    it's a sedan, whether it's a van?

2    A.   It very well may.

3    Q.   Okay.  And, again, the subterfuge was basically to not let

4    him know what was going on; correct?

5    A.   That's correct.

6    Q.   In this case here, did anybody ever tell him he had a right

7    to not answer your questions that you were posing to him?

8    A.   I did not provide that.

9    Q.   Nor did anybody else in your presence, did they?

10   A.   I don't know if anyone else did.

11   Q.   On the videotape we don't see that, do we?

12   A.   The camera doesn't capture it.  If it was provided, it was

13   not while I was standing there.

14   Q.   Okay.  And no one told him that he had a right to refuse you

15   searching his vehicle; is that correct?

16   A.   There again, if it was told to him, it was not told in my

17   presence and I did not tell him.

18           MR. RENN:  Okay.  Your Honor, nothing further.

19           THE COURT:  Mr. Bonar.

20           MR. BONAR:  Your Honor, I think just one question.

21   It's essentially already in the record, but there's -- Exhibit 2

22   is what it is.  I just want to put the opening frame of Exhibit

23   2 up on the screen here.

24                         REDIRECT EXAMINATION

25   BY MR. BONAR:

1    Q.   Detective, do you see this video still in front of you?

2    A.   Yes, sir.

3    Q.   Do you see the time and date stamps at the top?

4    A.   Yes, sir.

5    Q.   Can you state for the record the time and date that you see

6    on there.

7    A.   The time on the in-car camera is recorded in military time

8    or 24-hour time, and it shows that it's 20:44 hours and 34

9    seconds --

10   Q.   Okay.  And --

11   A.   -- which would be -- translate to 8:00, 8:44.

12   Q.   8:44 in the evening.  Is that the point that your video

13   comes on?

14   A.   Yes, sir.

15             MR. BONAR:  No further questions, Your Honor.

16             THE COURT:  All right.  You may step down.  Are you

17   going to call your next witness?

18             MR. BONAR:  Your Honor, we would call Billy Keltner to

19   the stand.

20        Your Honor, I'm going to tell Detective Sanders that he can

21   leave.  I don't anticipate that --

22             MR. RENN:  I don't have anything else.  Thank you.

23        (DETECTIVE BILLY KELTNER, called by the Government, sworn.)

24                          DIRECT EXAMINATION

25   BY MR. BONAR:

Keltner - Direct

1    Q.   Good afternoon, sir.

2    A.   Good afternoon.

3    Q.   Could you please state your name for the record.

4    A.   My name is Billy Keltner.

5    Q.   And, Officer Keltner, where are you presently employed?

6    A.   Louisville Metro Police Department.

7    Q.   And in what capacity?

8    A.   I am a K-9 handler for Louisville Metro Narcotics Division.

9    Q.   How long have you been employed in that capacity?

10   A.   Since I received the dog last May of 2016, and I've been a

11   part of Metro Narcotics for five plus years.

12   Q.   Prior to that what was your previous police experience?

13   A.   Flex Platoon detective in the Eighth Division for

14   approximately four years.

15   Q.   Were you a patrol officer before that?

16   A.   I was in a traffic car before that.

17   Q.   And prior to your service as a traffic car, did you have

18   previous police experience?

19   A.   I was a patrolman in the old Adam District for the county

20   police before --

21   Q.   What's your total years of police experience?

22   A.   Fifteen plus years.

23   Q.   Okay.  And what's your current rank?

24   A.   Detective.

25   Q.   Detective.  I'm sorry.  I called you officer.  Detective

1    Keltner, can you tell us, as a K-9 handler, what are your

2    responsibilities?

3    A.  My responsibilities is to answer any calls to assist with

4    K-9 and to search for narcotics, currency, illegal contraband,

5    such as that.

6    Q.  And how do you become qualified to be a K-9 handler?

7    A.  We have an instructor with Louisville Metro Police

8    Department that puts us through a series of training.  And when

9    they feel that it is needed, we'll actually do the certification

10   course to become certified.

11   Q.  And is that -- is that since May of 2016?  Is that when you

12   got your certification?

13   A.  Yes, I received it in June 2016.

14   Q.  June.  Excuse me.  And what does that mean, to receive your

15   certification?

16   A.  It means that the instructor has deemed you able to assess

17   the dog when the dog has found something.  You and the K-9 dog

18   are working as a team and are able to find narcotics.

19   Q.  So does your training, is it specific to a particular dog?

20   A.  Yes.

21   Q.  And what is your dog's name?

22   A.  Jozie, with a Z.

23   Q.  And I think you said you -- did you receive Jozie at the

24   same time you became a K-9 handler?

25   A.  I received Jozie May of 2016.  We did some bonding, me and

1    the dog did some bonding before we initiated some training on

2    trying to find narcotic hides and stuff like that.

3    Q.   How old was Jozie when you received her?

4    A.   Four years old.

5    Q.   Four years old?

6    A.   Yes, sir.

7    Q.   Do you know what Jozie had been doing before you received

8    her?

9    A.   Another handler in Metro Narcotics had Jozie before me.

10   Q.   How long has Jozie been in service?

11   A.   I'm not exactly sure.  I believe since she was probably

12   about one or one-and-a-half years of age.

13   Q.   Since you got your initial certification with Jozie, what

14   kind of ongoing training have you undertaken with her?

15   A.   Each week LMPD does a training on Wednesday nights to locate

16   four different odors of narcotics to include marijuana, heroin,

17   meth, and cocaine.  And I also do independent training on my own

18   with hides as well.

19   Q.   And how do -- how do you and LMPD keep track of Jozie's

20   ongoing training?

21   A.   The instructor of the K-9 unit for LMPD puts it into the

22   computer, into a database, on for Wednesday nights when we have

23   our training.  And I keep a notebook log of the days that I do

24   my individual training.

25   Q.   And have you provided my office with that documentation?

Keltner - Direct

1   A.   Yes, I have.

2   Q.   Officer Keltner, in your experience with Jozie since

3   approximately May of 2016, have you had occasion to develop an

4   opinion on her reliability?

5   A.   Absolutely.

6   Q.   Can you tell the court about that.

7   A.   Her reliability is absolutely on point.  The dog is -- for

8   me has worked great.  There are several ways of determining when

9   the dog is alerting me to when she finds something.

10  Q.   What are those ways?

11  A.   She will sit.  She will usually get as close to the odor as

12  she possibly can.  Sometimes it's sitting.  Sometimes it's

13  lying.  Sometimes it's even standing up on her back two legs,

14  just so she can get her nose as close to the odor as she

15  possibly can.

16  Q.   And in terms of your opinion of Jozie's reliability, is that

17  based on her training as well as actual work in the field?

18  A.   Yes.

19  Q.   So since you first got Jozie and started working with her in

20  the field, have you had regular occasion to use her?

21  A.   Yes.

22  Q.   Without giving specific numbers, approximately how often are

23  you and Jozie asked to detect or not detect odors?

24  A.   It varies.  It could be three or four, five times a day and

25  it could be not within a day.  It just depends on who is needing

Keltner - Direct

1    assistance with searches.

2    Q.   So since 2016 -- actually, prior -- let's say during the

3    period of time between May of 2016 and August 4th of 2016, had

4    you had occasion to employ Jozie in the field?

5    A.   Multiple times, yes.

6    Q.   And on August the 4th of 2016, had your opinion of Jozie's

7    reliability been formed at that point?

8    A.   Yes.

9    Q.   And what was it on that day?

10   A.   That she was accurate in her findings.

11   Q.   Okay.  I'm going to draw you specifically then -- your

12   attention to August 4th of 2016.  Do you recall being deployed

13   to a roadside location along Preston Highway?

14   A.   Yes, I do.

15   Q.   Can you tell the court how it came to be that you went to

16   that location.

17   A.   I was called to come up there and assist on a traffic stop.

18   And when I got there, I came in contact with Chris Sanders,

19   which he works in Metro Narcotics as well, asked him kind of

20   what was going on.  Was there consent of the truck?  I believe

21   there was consent of the truck.  Ran my dog around the truck.

22   The dog alerted on the passenger's side of the vehicle with a

23   sit down next to the truck.

24       Once we determined that the alert was -- once I determined

25   that the alert was there with the sit, opened the door.  The dog

Keltner - Direct

1    immediately jumped into the truck and got into the rear of the

2    cab area and laid down closest to the rear of the back of the

3    cab.

4    Q.  And by the dog laying down, what did that mean to you?

5    A.  It told me that there was odor there or near, and she was

6    trying to get as close to it as she possibly could inside the

7    truck.

8            MR. BONAR:  Your Honor, may I approach the witness?

9            THE COURT:  Yes.

10   BY MR. BONAR:

11   Q.  Detective, I'm going to show you what's marked as

12   Government's Exhibit 3.  On the bottom of it it says Dash Camera

13   Video Clip.

14   A.  Yes.

15   Q.  Have you seen the video of Detective Sanders' dash cam?

16   A.  Yes.

17   Q.  And, in fact, did we create a clip yesterday?

18   A.  Yes, we did.

19   Q.  And that appears to be this?

20   A.  Yes, sir.

21           MR. BONAR:  All right.  Your Honor, I would move for

22   admission of Government's Exhibit 3.

23           MR. RENN:  No objection, Your Honor.

24           THE COURT:  It will be admitted.

25           (Government Exhibit 3 admitted in evidence.)

Keltner - Direct

1              MR. BONAR:  If we could place Government's Exhibit 3

2     up there.

3              THE COURT:  What's the exhibit number for the full

4     length --

5              MR. BONAR:  2.

6              THE COURT:  2.  That's what we talked about before the

7     lunch break?

8              MR. BONAR:  Yes.

9     BY MR. BONAR:

10    Q.  Detective, before we start playing here -- just pause it for

11    one second -- what do we see here?

12    A.  We see the pickup truck that the individual here on the

13    right side of the screen was operating to my knowledge.

14    Q.  All right.  Detective, we're going to play this video clip.

15    It's approximately 11 minutes and I'll have some questions for

16    you.

17    A.  Okay.

18        (Government playing DVD)

19    Q.  Detective, we obviously can't see you at this point.  Based

20    on your review of this video, what's going on at this point,

21    just to orient us?

22    A.  I'm coming up on the passenger's side of the vehicle to run

23    my dog up and down the side of the truck.

24        (Government playing DVD)

25    Q.  What's going on at this point?

Keltner - Direct

1    A.   At this point I'm telling Chris that the dog has alerted to

2    me in the back of the cab area that there's an odor to be found.

3         (Government playing DVD)

4    Q.   Just kind of walk us through what's going on.

5    A.   She's searching for this odor in the truck.  As you can see,

6    when I was coming away from the truck, she was still pulling

7    back toward the truck because there was a strong odor coming

8    from the truck somewhere, and she was determined to find the

9    odor.  And she wants to get paid by finding the odor with a

10   tennis ball, meaning find the drugs.

11        Right now she has an odor.  She found the bag that was

12   nearest to the cab, the back of the cab that contained the bag

13   that I'm pulling out right there that contained a large amount

14   of narcotics.  You can see that she is very relentless on trying

15   to get ahold of that to let me know that there's -- there is

16   drugs here.

17   Q.   And when she initially alerted on that bag, how -- what was

18   it that you observed about her that told you that it was an

19   alert?

20   A.   They will almost get into a pointing stance sometimes if

21   they can't sit.  A lot of times a dog can't sit due to the

22   environment that they're in.  If something's in the way, they

23   can't sit or something.  So they'll get very still a lot of

24   times and almost in a pointer stance, and their tail will

25   sometimes get very stiff in the wag.  It will not be like a

Keltner - Direct

 1   flimsy or floppy wag of the tail.  It will be a stiff wag of the

 2   tail.

 3       And we're just kind of putting her back up there to make

 4   sure she doesn't see or smell anything else, you know, detect

 5   anything else.

 6       As you can see, she keeps going straight back to that bag

 7   because she knows -- I don't know at this point in time what is

 8   exactly in the bag, but she knows that there's a narcotic odor

 9   coming from that bag.  And she was just relentless on trying to

10   get to it.

11       (Government playing DVD)

12   A.  At this point I'm putting the dog away in my vehicle to come

13   back to further see what the issue with the bag is.

14       (Government playing DVD)

15   A.  At this point we're -- I'm looking at it with a flashlight

16   determining -- it appears to be a large quantity of meth, ICE,

17   whatever you want to call it, and asking Chris to observe it as

18   well.

19       (Government playing DVD)

20   Q.  Detective, just a couple more questions.  Early on in that

21   video when Mr. Ruiz is in front of the camera --

22   A.  Yes.

23   Q.  -- while you're inside the cab, you had testified that Jozie

24   indicated in the back seat of the cab?

25   A.  Yes.

Keltner - Direct

1    Q.  Did you end up finding anything that she had indicated on in

2    the back seat?

3    A.  I'm not aware if there was anything located.  I explained

4    and showed Chris Sanders where the dog was lying and where the

5    indication was.  I believe him and maybe somebody else then

6    searched that area.

7    Q.  Let's say if nothing -- if no drugs were found in the back

8    seat of that cab, what does that mean to you?

9    A.  It means she was detecting the odor that was in the back of

10   the cab right up against the cab.  It was probably seeping

11   through.  The odor was probably dropping down from the bed,

12   maybe into the cab area, or there could have possibly been

13   something previously in the area where she was at.  Maybe, you

14   know, before the traffic stop, there could have been some drugs

15   or something in that area of the truck as well.

16   Q.  Is that a common scenario?

17   A.  Yes.

18   Q.  Have you had occasion where the dog hits on -- or Jozie hits

19   on a place where drugs weren't there but had previously been

20   there?

21   A.  Yes.

22   Q.  Is that something that has happened in training scenarios?

23   A.  In training scenarios, yes.

24   Q.  Did you -- were you involved with the execution of the

25   search warrant in this case?

Keltner - Cross

1    A.  Yes, I was.

2    Q.  Did you employ Jozie during that search warrant execution?

3    A.  I did.

4    Q.  There were some sheds or outbuildings at the location.  Is

5    that right?

6    A.  Yes.

7    Q.  Did you employ Jozie on the sheds?

8    A.  I did not.

9    Q.  Why is that?

10   A.  Because there was, I believe, chickens or some sort of

11   livestock or animals back there near the shed or buildings that

12   was back there, and that would be such a distraction for the

13   dog.  And I just didn't really see no reason to put the dog in

14   harm's way, if there was chickens or roosters out there,

15   possibly an attack or something upon the dog.  I don't know if

16   they're loose or caged or what.

17          MR. BONAR:  I have no further questions at this time,

18   Your Honor.

19          THE COURT:  Mr. Renn.

20          MR. RENN:  Thank you, Your Honor.

21                       CROSS-EXAMINATION

22   BY MR. RENN:

23   Q.  It is Detective Keltner; is that correct?

24   A.  Yes, sir.

25   Q.  I apologize.  I've had it written down and I was here and

1    examining and I was butchering your name.  So I apologize in

2    advance.

3        You indicated that you did become part of this investigation

4    at some point.  When was it that you first were contacted by the

5    task force or by DEA about getting involved?

6    A.  At the time of the stop.

7    Q.  Right at the stop?

8    A.  Yes.

9    Q.  So you were just on duty; is that correct?

10   A.  Yes.

11   Q.  And you heard over the radio channel that there was this

12   investigation going on of this stop?

13   A.  I believe somebody called me by phone, but I'm not sure who

14   that individual was that called me and asked me to respond to

15   this location.

16   Q.  Was it somebody with LMPD or was it the DEA?

17   A.  I believe it would have been somebody with the LMPD.

18   Q.  Okay.  During the previous witness, we saw the name Wes

19   Parks, and I saw that also in some of your reports as well.

20   A.  Uh-huh.

21   Q.  Who is Mr. Parks?

22   A.  Wes Parks is another K-9 handler that works with

23   Jeffersontown PD, as I believe he's assigned to a DEA task

24   force, I believe.

25   Q.  Okay.  And in this case here, you and Jozie were on the

Keltner - Cross

1    scene and Mr. Parks was not on the scene -- or Officer Parks was

2    not on the scene, was he?

3    A.   Correct.

4    Q.   And there was some discussion between you and Officer Chris

5    Sanders or Detective Chris Sanders about when and if you would

6    get to run your dog around the vehicle; correct?

7    A.   Yes, if they wanted -- if they preferred me or Wes Parks or

8    who.

9    Q.   And it sure seems like from the video I've seen they wanted

10   Wes Parks.  Is that correct?

11   A.   I'm not sure.

12   Q.   Well, you were there, but isn't it true that Detective Chris

13   Sanders asked you to go back and call Jennifer to see where Wes

14   Parks was?

15   A.   He may have.  I do not remember that.

16   Q.   Okay.  Again, we've seen the videotape and the videotape

17   will speak for itself, but you don't have any independent

18   recollection of that; is that correct?

19   A.   No, sir.

20   Q.   Did you ever see Wes Parks at the scene?

21   A.   Of the traffic stop?

22   Q.   Yes, sir.

23   A.   I don't believe so.

24   Q.   Okay.  Obviously, at some point you did get Jozie out and

25   take Jozie around the vehicle.  You've seen that; is that

Keltner - Cross

1    correct?

2    A.   Along the passenger's side of the vehicle, yes.

3    Q.   And you had testified on direct examination about you being

4    or having Jozie for approximately three months at that time,

5    from May 2016 before August 4th; is that correct?

6    A.   Yes.

7    Q.   Okay.  And you said you became certified in June of 2016;

8    correct?

9    A.   Yes.

10   Q.   And isn't it also true that it was actually the end of June?

11   June 21st is when you became certified?

12   A.   I believe that is the date.

13   Q.   Okay.  So basically a month and a half, give or take, is how

14   long you were certified before you did this particular search;

15   is that correct?

16   A.   Sounds about right.

17   Q.   Okay.  Now, we were talking with Detective Sanders about

18   various kinds of alerts, and I'm going to say it half jokingly.

19   Jozie doesn't fly, does she?

20   A.   Fly?

21   Q.   Fly.

22   A.   No.

23   Q.   She's not like a bird?

24   A.   No.

25   Q.   But you testified on direct examination that she would alert

Keltner - Cross

1    by standing?

2    A.   Yes.

3    Q.   Sitting?

4    A.   Yes.

5    Q.   And laying down?

6    A.   Yes.

7    Q.   And then you went on to say later that even can do it by

8    wagging its tail or wagging her tail?

9    A.   If she can't get into position to sit or lie down.

10   Q.   There's not a whole lot else that a dog can do short of

11   using the restroom, standing, sitting, and laying, would you

12   agree with that?

13   A.   I'm not sure what you're asking.

14   Q.   You said --

15   A.   Can you repeat.

16   Q.   -- the dog alerts by standing, sitting, and laying down.

17   A.   Yes.

18   Q.   If the dog doesn't fly, what else can the dog do?

19   A.   Dog can do a lot of things.

20   Q.   What?

21   A.   Run, play.  I mean, I don't know what you're really asking.

22   Q.   Okay.  So if the dog doesn't run away from you or go play

23   with somebody, anything else is an alert?

24   A.   No.

25   Q.   But standing, sitting, and laying down are all alerts?

Keltner - Cross

1    A.   In a still motion, a still moment.  If she gets very still

2    and is directed at something is an alert as well.

3    Q.   So, again, anything other than running away and playing.

4    Now standing, sitting, laying down or standing still?

5    A.   Those are forms of alerts.

6    Q.   Again, what else can the dog do?

7    A.   I don't know what you want me to tell you.  The dog can do

8    all kinds of things.  Are you talking about what the dog can do

9    when the dog is alerting or when the dog is just being a dog?

10   Q.   You're the expert here, in quotes.  You're the one that says

11   that the dog made an alert.

12   A.   Correct.

13   Q.   And the dog can alert by doing those three things.

14   A.   Uh-huh.

15   Q.   Even standing still is still standing.  There's nothing else

16   that the dog could have done.  Would that be fair to say?

17   A.   The dog could have ran away, but the dog chose not to.

18   Q.   You had the dog on the chain, didn't you?

19   A.   Yeah.

20   Q.   And at one point you said, "We were putting the dog back

21   up."  We all saw what you did.  You're the one that directed the

22   dog.  The dog didn't direct you.  You said, "We're putting" --

23   showing the video -- "We're putting the dog back to see if there

24   was anything else."  As a trainer, you're not supposed to lead

25   the dog, are you?

Keltner - Cross

1    A.   Yes.

2    Q.   You are?

3    A.   Yes.  I can't let the dog get out into traffic or anything.

4    Q.   Okay.  Well, this is in the back of the truck while the dog

5    is searching.  You're the one that directed the dog to the

6    search.

7    A.   I don't believe I did.  I think the dog directed the search.

8    Q.   You just testified to that.  "We're putting the dog back up

9    to see if there's anything else."  Those were your words, not my

10   words.  You directed the dog where to go look, didn't you?

11   A.   In the back of the truck?

12   Q.   Yes, sir.

13   A.   Yes.

14   Q.   Okay.  Now, you had a radio there yourself; isn't that true?

15   A.   I did.

16   Q.   And at some point Detective Chris Sanders told you to turn

17   yours down, didn't he?

18   A.   I'm not familiar with that.  I don't --

19   Q.   We all heard it and he testified about it.

20   A.   Okay.  I don't recall that.

21   Q.   Do you recall Special Agent Traud telling you-all to search

22   a bag in the back of the truck?

23   A.   Traud?

24   Q.   Jennifer.

25   A.   No.

Keltner - Cross

1   Q.   Do you know who that is?

2   A.   No.

3   Q.   And I may be butchering her name.  Chris Sanders was on the

4   phone with somebody, wasn't he, when he was searching in the

5   back of the vehicle?

6   A.   My concentration was not on Chris Sanders at that point in

7   time when I was working the dog.  Is Jennifer Traud -- I've

8   heard of her name, but I'm not sure if I've ever met her.

9   Q.   Did you hear her telling Chris Sanders to look in the -- a

10   bag in the back of the truck?

11   A.   No.

12   Q.   Have you had any training in Spanish?

13   A.   No.

14   Q.   So you don't speak Spanish?

15   A.   No.

16   Q.   Okay.  Now, you said the dog alerts by standing, sitting,

17   laying, standing still, but when you finally got the bag out of

18   the back of the truck, the dog didn't do any of those things.

19   The dog was biting the bag; isn't that correct?

20   A.   Yes.

21   Q.   So is that an alert?

22   A.   That is an alert as well.

23   Q.   Now, Detective Sanders got in the back rear of the truck; is

24   that correct?

25   A.   Yes, inside.

Keltner - Cross

1    Q.   Yes, inside?

2    A.   Yes.

3    Q.   That was after you put the dog inside the truck?

4    A.   Yes.

5    Q.   And the dog laid down in the back of the truck?

6    A.   Yes.

7    Q.   Just as if the dog was going for a ride, the dog got back

8    there and laid down.  Isn't that correct?

9    A.   No.

10   Q.   How else does a dog ride if the dog is laying down in the

11   back of a car?

12   A.   The dog laid down in the back of the car as if the dog was

13   alerting on something.

14   Q.   Okay.  You got the dog out and Detective Sanders got in the

15   vehicle and began a search because that's where the dog alerted;

16   correct?

17   A.   Correct.

18   Q.   He didn't find anything, did he?

19   A.   I'm not aware if he did or did not.

20   Q.   Well, you were at the scene.  Do you recall anything else

21   other --

22   A.   I do not -- I do not recall anything else being found back

23   there.

24   Q.   Okay.  And you probably would have heard if he found

25   anything, wouldn't that be fair to say?

Keltner - Cross

1    A.   I would hope so.

2    Q.   Pardon me?

3    A.   I would hope so, yes.

4    Q.   Okay.  Did you run -- well, strike that.  There was also

5    money seized out of that vehicle, wasn't there?

6    A.   That I'm not aware of.

7    Q.   You and Jozie didn't find any money, did you?

8    A.   No.

9    Q.   Jozie -- you mentioned those four odors on narcotics and the

10   marijuana, nonnarcotics.  Jozie can also alert on money, can't

11   she?

12   A.   She can and she has.

13   Q.   She did what?

14   A.   She can and she has, yes.

15   Q.   But she didn't do that this night, did she?

16   A.   No, she did not.

17   Q.   So that's a fail, isn't it?

18   A.   No.

19   Q.   Why isn't it a fail?

20   A.   Maybe the currency was not with any type of narcotics.

21   Q.   Isn't it true that all currency has the smell and odor of

22   narcotics?

23   A.   I'm not -- I don't know that to be true.  If you got brand

24   new money, it's not going to be near narcotics.

25   Q.   You explained that, again, the dog alerted in the back of

Keltner - Cross

1    the vehicle and there wasn't anything found in the back of the

2    vehicle; correct?

3    A.   To my knowledge, there was nothing found inside the cab.

4    Q.   You explained where it could have been that there was

5    something there beforehand; is that correct?

6    A.   Possibly, yes.

7    Q.   And that's a way to make the dog look more reliable, if you

8    can explain away the absence by saying, well, something could

9    have been there; right?

10   A.   There could have been something there.  It's not me to

11   explain it because I can't detect the odors that the dog can

12   detect.

13   Q.   You mentioned that there were computer-generated reports

14   that were done by the people that supervise you; is that

15   correct?

16   A.   Yes.

17   Q.   Does this document that I'm showing here, does this look

18   like those computer-generated reports?

19   A.   That's what was sent to me when I requested it, yes.

20   Q.   Okay.  Looking at this highlighted portion, are you able to

21   read that if I zoom this in?

22   A.   It looks like it says, "Not be less than three grams nor

23   more than one ounce."

24   Q.   So that's kind of the parameters to see if a dog is

25   reliable; correct?

Keltner - Cross

1   A.  I'm not sure what the weights are that they use for training

2   purposes.

3   Q.  Again, I didn't generate this.

4   A.  No.

5   Q.  Correct?

6   A.  Correct.

7   Q.  You requested and this is what you received; correct?

8   A.  Yes.

9   Q.  And you gave it to the assistant United States attorney;

10  correct?

11  A.  Yes.

12  Q.  How much is an ounce?

13  A.  I believe it is approximately 28 grams.

14  Q.  Okay.  When this search here -- right where it says, first,

15  that you shouldn't be more than one ounce, isn't it true that

16  when you were searching in this particular instance, you and

17  Jozie, there were 40 grams of marijuana?

18  A.  That's what it says.

19  Q.  Okay.  And over here in this column we've got a "pass" and

20  we've got a "true."  What does that mean?

21  A.  I do not know.

22  Q.  Because below it, again, you and Jozie; correct?

23  A.  Yes.

24  Q.  And here we've got "all good, some needed to detail," and a

25  "false."

Keltner - Cross

1    A.   I do not know what that means.

2    Q.   Could it mean the dog wasn't reliable?

3    A.   I do not think so.

4    Q.   Well, when it states up here under the heading "remedial

5    training, if needed, some needed."

6    A.   Could we go back to where --

7    Q.   Yes, sir.

8    A.   Because I believe there's multiple people's names attached

9    to this, not just mine.

10   Q.   But it could have been a fail by you; correct?

11   A.   No.

12   Q.   Your dog's never failed?

13   A.   I've never been notified my dog has failed in training.

14   Q.   You've never had the dog fail?

15   A.   No, nobody has ever notified me that my dog has failed in

16   training.

17   Q.   That's not -- that wasn't the question.  My question was

18   Jozie's never failed?

19   A.   Failed at what?

20   Q.   Pardon?

21   A.   Failed at what?

22   Q.   Failed at any training.

23   A.   Not to my knowledge.

24   Q.   Again, we've got a list here.  We've got 40 grams of heroin.

25   More than an ounce; correct?

Keltner - Cross

1    A.   Yes.

2    Q.   Forty grams of marijuana, more than an ounce; correct?

3    A.   Yes.

4    Q.   "All did well, some needed to detail.  False certification."

5    A.   You would have to talk to the trainers about that to

6    explain.

7    Q.   You didn't review this?

8    A.   No, I did not.

9    Q.   You just asked for it and then turned it over and never said

10   any more about it?

11   A.   Yes, I did.  It never had been brought to my attention that

12   there were any issues.

13   Q.   And you and Jozie and we've got a false.

14        We've got Jozie again, another false.

15        Jozie, 40 grams, half a pound of marijuana.  We've still got

16   a false.

17        We won't go through the rest of those.  You keep your own

18   records, you testified; correct?

19   A.   Yes, I do.

20   Q.   And that's in these spiral notebooks; right?

21   A.   Yes.

22   Q.   This is a photocopy that I was given yesterday afternoon.

23   And these are, what, independent work by you?

24   A.   Yes, it is.

25   Q.   And I've gone through each one of these pages.  Every one of

Keltner - Cross

1   them just lists various drugs.  Is that correct?

2   A.  Yes, the four that I've mentioned previously.

3   Q.  Heroin rag, cocaine rag, and then here we've got 1 ounce of

4   meth.  As part of your job are you able to take an ounce of

5   meth?

6   A.  Yes.

7   Q.  Do you have to log it in, log it back out?

8   A.  We are issued narcotics for training aids, and we make up

9   our own training aids and it is kept in a secured area.

10  Q.  Am I reading this right, 35 ounces of cocaine?

11  A.  3.5 ounces.

12  Q.  Okay.  Still a pretty good amount; correct?

13  A.  Yes.

14  Q.  And you had that on your person?

15  A.  Some of these are my training aids and some of them may be

16  other people's training aids that we train with, other K-9

17  handlers.

18  Q.  And there isn't anything in any of these about any kind of

19  failure; is that correct?

20  A.  No.

21  Q.  And in addition, there's never an instance where there isn't

22  drugs; correct?

23  A.  Where there isn't drugs?

24  Q.  Yes.

25  A.  Yes.

Keltner - Cross

1    Q.  I don't see it in those sheets where you just walked the dog

2    into a room where you knew there wasn't any controlled

3    substances.

4    A.  Yes.

5    Q.  You've done that?

6    A.  Yes.

7    Q.  It isn't in your sheets.

8    A.  No, it is not.

9    Q.  Pardon me?

10   A.  It is not.

11   Q.  Okay.  So the only record that we have is when we know that

12   there were the presence or the odor of various drugs.  We don't

13   have any record of where there was nothing; correct?

14   A.  Yes.

15   Q.  So the dog, after all those times, has to assume, when the

16   dog goes out working with you, it's going to find something and

17   it's going to get that ball; right?

18   A.  Yes.

19   Q.  This was not turned over as part of discovery, but I found

20   it yesterday.  And this one here is the one that relates to the

21   search on August the 4th.  Is that correct?

22   A.  Yes.

23   Q.  And down here, you put the summary, "2011 Ford 350, gray

24   temporary tag.  Jozie alerted on corn feed bag in the back of

25   truck that contained four kilos of ice."

Keltner - Cross

1    A.   Yes.

2    Q.   You didn't put in here that Jozie also alerted inside the

3    cab, did you?

4    A.   No, I did not.

5    Q.   Is that being truthful?

6    A.   It's something I just didn't put on there.

7    Q.   Is it being truthful?

8    A.   Yes, it's being truthful.

9    Q.   How so?

10   A.   Because I put that she alerted on the corn feed bag and she

11   did.

12   Q.   But you didn't put that she alerted inside the vehicle and

13   there wasn't anything found.

14   A.   No, I did not put that on there.

15   Q.   And if you didn't do it, no one else was able to do it

16   either; correct?

17   A.   It was seen on video.

18   Q.   So no one was ever -- no one can test the reliability of the

19   dog if you get a stack of half truths.  Is that true?

20   A.   No, that is true.  She alerted on a corn feed bag.

21   Q.   But if she missed six or more other times and we don't know

22   about it, I'm not going to know that.  In this case here there

23   was a videotape.  Does that make sense that you ought to be able

24   to put in there when the dog alerted and there wasn't anything?

25   A.   Yes, I probably should have put that she alerted in the cab

Keltner - Cross

1    of the truck.

2    Q.   And you didn't?

3    A.   I didn't.  I didn't think that it was important, I guess.

4    Q.   Because it would hurt the case?

5    A.   No, I don't think it would.

6    Q.   It would hurt the reliability of the dog, future cases.

7    Would you agree with that?

8    A.   No.

9    Q.   Now here the day after, 8-5, is where Jozie alerted on a

10   backpack in the front bedroom and it came -- contained U.S.

11   currency; correct?

12   A.   That's what it says, yes.

13   Q.   And, again, we didn't put here as part of this search that

14   you missed the currency inside the front of the vehicle, did

15   you?

16   A.   And I wasn't aware there was any.

17   Q.   Now, you said you didn't want to have your dog get harmed by

18   a bunch of chickens so you didn't take the dog out in the

19   backyard; right?

20   A.   Correct.

21   Q.   But on the report that you filed you put on here, "4 kilos

22   of ICE found in shed in backyard."  Correct?

23   A.   Yes, yes.

24   Q.   Now, that may be true, but it makes it look like the dog

25   found that.

Keltner - Cross

1    A.   It does not say Jozie alerted.  If you look at the lines

2    above it, it shows what the dog alerted on at the time of the

3    search warrant.

4    Q.   But that's what you're doing is testing the reliability of

5    the dog.  So why would you even put in here "4 kilos of ICE

6    found in shed in backyard"?

7    A.   Just a reminder of what was found at the search warrant.

8    Q.   So you don't believe that that's a half truth?

9    A.   No.

10   Q.   Or a whole lie?

11   A.   Absolutely not.

12   Q.   At the time of this search, the search warrant that was

13   issued, did you record that yourself from your own clock?

14   A.   At the time the search warrant was issued?

15   Q.   Executed.

16   A.   Executed.  I should have recorded on the log sheet

17   approximate time that I was there with the dog doing the search.

18   Q.   And so that is accurate here that K-9 started at 23:30

19   hours?

20   A.   By my watch, apparently, yes.

21   Q.   And so, again, you keep your own time; is that correct?

22   A.   Yes.

23   Q.   Okay.  Were you the first one in on the search or were you

24   the last one in?

25   A.   I was not the first one in.  Are you talking about the

Keltner - Cross

1    initial entrance?

2    Q.  Yes, sir.  When the search warrant was executed, did you and

3    Jozie go in first or are you-all last?

4    A.  We waited till everything was secured and safe.

5    Q.  Was there any reason to be fearful of safety there at the

6    house?

7    A.  You never know what you're going to walk into when you enter

8    anybody's house.

9    Q.  Okay.  So as far as this time here, the search probably

10   would have started then before 23:30 hours; is that correct?

11   A.  I think it's safe to say, yes.

12   Q.  And then you and Jozie came in after that?

13   A.  Yes.

14   Q.  Okay.  Do you recall how long you were at the scene before

15   you and Jozie left?

16   A.  I do not.

17   Q.  That's not something that you record?

18   A.  I do not put exit time down.

19   Q.  Other than these documents that we've gone over, do you

20   yourself have any reports, independent reports?

21   A.  No.

22   Q.  Any notes or anything like that of the search?

23   A.  No.

24            MR. RENN:  Your Honor, nothing further.

25            THE COURT:  Mr. Bonar.

Special Agent Brian Sanders - Direct

1          MR. BONAR:  Nothing further, Your Honor.

2          THE COURT:  All right.  You may step down.  Thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  Call your next witness.

5          MR. BONAR:  Your Honor, I'm telling Detective Keltner

6     he can leave.

7          MR. RENN:  Yes.

8          THE WITNESS:  Thank you.

9          MR. BONAR:  Your Honor, we'd call Special Agent

10    Sanders to the stand.

11       (SPECIAL AGENT BRIAN SANDERS, called by the Government,

12    sworn.)

13                    DIRECT EXAMINATION

14    BY MR. BONAR:

15    Q.  Good afternoon, sir.

16    A.  How you doing?

17    Q.  Could you please state your name for the record.

18    A.  Brian Sanders.

19    Q.  Agent Sanders, where are you employed?

20    A.  I'm a special agent with the DEA here in Louisville,

21    Kentucky.

22    Q.  How long have you been a DEA agent?

23    A.  Since January of 2005.

24    Q.  Have you been with the Louisville office of the DEA that

25    entire time?

Special Agent Brian Sanders - Direct

1    A.   I have, yes.

2    Q.   Agent Sanders, are you familiar with the investigation of

3    Yalexi Ruiz?

4    A.   I am, yes, sir.

5    Q.   Are you the lead agent in that investigation?

6    A.   To put a lead agent title on it would be difficult, but I am

7    one of the leads, yes, sir.

8    Q.   Okay.  Are you familiar with all the facts surrounding the

9    investigation?

10   A.   I am, yes.

11   Q.   I'm going to draw your attention specifically to August 4th,

12   2016, and ask do you recall that day?

13   A.   I do, yes.

14   Q.   Do you recall the facts surrounding a vehicle stop?

15   A.   Yes.

16   Q.   And a search warrant?

17   A.   Yes.

18   Q.   And then the next day a statement from Mr. Ruiz?

19   A.   I do, yes.

20   Q.   All right.  Let's start just in chronology here, and if you

21   could tell the court how the investigation into Mr. Ruiz started

22   and walk us through it.

23   A.   The investigation began with what I would call a joint

24   investigation between our office, which consists of DEA agents

25   and other task force officers, to include those from LMPD, as

Special Agent Brian Sanders - Direct

1   well as other members of the LMPD Narcotics Unit.  So we have

2   task force officers and then we've got LMPD Narcotic Units

3   officers.

4       We executed a consensual search at an apartment, seized

5   approximately 2 kilograms of crystal meth, along with a half

6   kilogram of heroin.  From that seizure, we gained a cooperating

7   defendant.  That cooperating defendant informed us that the

8   heroin had been provided by Yalexi Ruiz.

9       In order to corroborate that, we asked him to show us

10  Mr. Ruiz's phone contact in his telephone, any text messaging

11  between he and Mr. Ruiz that had happened up and to that point.

12  And he eventually placed a series of text messages, as well as a

13  consensually recorded phone call to Mr. Ruiz regarding the

14  outstanding debt, which I believe was $43,000 for what had been

15  provided, in addition to acquiring an additional amount of

16  crystal meth.

17  Q.  All right.  Let me stop you there.  So if the searches

18  occurred on August 4th, when did this investigation start?

19  A.  I believe it was the morning of -- well, to put a date on

20  the actual investigation, start date, I would have to go back to

21  when we began looking at the cooperating defendant.

22  Q.  All right.

23  A.  I'm not sure I can give you an exact time of that.  That was

24  the morning --

25  Q.  Let me focus you then.  You said that the cooperating

Special Agent Brian Sanders - Direct

1    defendant told you that he owed $43,000 to Mr. Ruiz.

2    A.  Yes.

3    Q.  When did that happen?

4    A.  I believe that was the morning of August 4th.

5         MR. BONAR:  May I approach the witness, Your Honor?

6         THE COURT:  Yes.

7         MR. BONAR:  I want to --

8       Mr. Renn.

9       (Counsel conferring off the record.)

10   BY MR. BONAR:

11   Q.  Agent Sanders, take a look at that.

12   A.  Okay.  It was the day before.  I apologize.  It was a

13   morning.  It was a weekday morning that we did the search, and

14   the deal would have happened the following day.  It would have

15   taken us a little while to get the money together to repay him

16   the 43,000.  So that's accurate.  It was the day before.

17   Q.  So August 3rd?

18   A.  Yes, sir.  I apologize.

19   Q.  So you learned that the cooperating defendant owes Mr. Ruiz

20   $43,000 for a drug debt.

21   A.  That's correct.

22   Q.  And so tell us what the investigation does with respect to

23   that knowledge.

24   A.  The original purpose of our series of text messages and a

25   phone call with Mr. Ruiz was to get him to show up with an

Special Agent Brian Sanders - Direct

1    additional amount of crystal meth.  It became pretty clear early

2    on that that was not going to be an option without the repayment

3    of the 43,000.

4        At that time our office, along with others, pooled together

5    our resources in order to repay that drug debt.  It was our hope

6    that we could repay the $43,000, acquire additional evidence

7    against Mr. Ruiz, who we believed to be the source of supply at

8    that time, as well as maintain surveillance on Mr. Ruiz, have

9    him provide an additional amount and possibly lead us to a stash

10   location where we may seize a greater amount of narcotics and/or

11   proceeds.

12   Q.  So after you were able to put together the $43,000, what did

13   you do?

14   A.  Our office established surveillance in the vicinity of the

15   Sam's Club on Fern Valley Road and Preston Highway.  That was

16   the location that our cooperating defendant and Mr. Ruiz had

17   agreed upon where the meet would take place.

18       After some time we observed Mr. Ruiz arrive in the silver

19   dually.  We then sent our cooperating defendant over to the

20   Sam's Club lot where he was seen meeting with Mr. Ruiz.  He

21   entered his passenger side of his vehicle, a brief stay inside

22   of that vehicle before exiting.  He returned to where we were

23   situated and Mr. Ruiz departed the area.

24       Surveillance was maintained on Mr. Ruiz --

25           THE COURT:  Mr. Bonar, let me just make sure I

Special Agent Brian Sanders - Direct

```
 1   understand.  So is this the same -- you call it a "dually."

 2   This is the same --

 3            THE WITNESS:  Yes, sir, silver F-350, the same vehicle

 4   that was stopped that night.

 5   BY MR. BONAR:

 6   Q.  So you conduct this controlled payback.  Surveillance has

 7   got eyes essentially on the meet?

 8   A.  The best I can recall, the surveillance was maintained on

 9   Mr. Ruiz.  He departed the Sam's Club, traveled to a used car

10   lot.  I believe it was Auto Max on Preston Highway, stayed there

11   briefly and surveillance was maintained on him.

12        We split our office into two different teams.  Myself, along

13   with one other, stayed with the confidential informant in order

14   to handle any correspondence between he and Mr. Ruiz.  We were

15   with him the whole afternoon while another portion of the office

16   was on the surveillance side of things.

17   Q.  And just for clarification sake, I think you previously

18   described that individual as a cooperating defendant.

19   A.  Yes, sir.

20   Q.  Are you talking about the same person?

21   A.  Same person, yes.

22   Q.  So you stayed with that person?

23   A.  I did.

24   Q.  All right.  What happens while you're with that individual?

25   A.  Again, there's a series of communications.  I can't tell you
```

Special Agent Brian Sanders - Direct

1    exactly how many between Mr. Ruiz and our cooperating defendant.

2    Q.   How do you know that it's Mr. Ruiz that is communicating?

3    A.   The majority of them are via text message.  It's been the

4    same text message chain from the 3rd to when we began this and

5    up and to that point.  We see his contact info on the

6    cooperating defendant's screen.  Again, we're with him the whole

7    time.  Any time an incoming or outgoing message comes across

8    that device, we are there as it's happening.

9    Q.   All right.

10   A.   There were very few actual phone calls, if I remember

11   correctly.  Most of it was text.

12   Q.   So the same individual or at least the same phone that had

13   been communicating prior to the payback is the same phone that's

14   communicating afterwards?

15   A.   That's correct, yes.

16   Q.   What do you learn from those communications?

17   A.   We learned -- again, there was a little bit longer

18   surveillance throughout the day, but we learned ultimately that

19   Mr. Ruiz had informed our cooperating defendant that he was

20   presently at the location where the 4 kilograms of narcotics

21   were being held, which is the 4 kilograms that we had requested.

22        And at that time our surveillance unit had observed him at

23   the Minyard address.  They observed the vehicle, the Ford F-350

24   show up at Minyard.  They observed the F-350 depart Minyard

25   following that conversation where he informed our cooperator

Special Agent Brian Sanders - Direct

1    that he was where the narcotics were being held.  After that

2    phone call, the vehicle stop was conducted by Detective Sanders,

3    and we ultimately discovered the 4 kilos in the back of the

4    dually.

5    Q.  And based on your knowledge of the communications with

6    Mr. Ruiz and the cooperating defendant, what did you think would

7    be in the dually?

8    A.  It was pretty clear that he was bringing 4 kilograms of

9    crystal meth.  That is what we asked for.  That's what he agreed

10   to provide.

11   Q.  So it was your belief at that time that he was traveling to

12   meet your cooperating defendant?

13   A.  Yes.  There had been a predetermined location where our

14   cooperator and Mr. Ruiz were going to meet.  I believe it was a

15   park.  I can't tell you exactly which park that was.  He was --

16   he had departed Minyard traveling -- he didn't get very far from

17   Minyard, but he had traveled northbound on Preston Highway in

18   the direction he would have been going had he been going to that

19   park.

20   Q.  So those actions were consistent with what you were led to

21   believe?

22   A.  Yes.

23   Q.  How, if you know, did it come to pass that Detective Sanders

24   got involved in the case?

25   A.  We use Detective Sanders a lot on our end.  As he stated, he

Special Agent Brian Sanders - Direct

1   just provides us a bit of camouflage for an underlying

2   investigation that may be going on.

3      Should that traffic stop had occurred and the 4 kilograms

4   that he said he was bringing not be in the vehicle, at that

5   point it's simply a marked unit stop.  And so we use him often

6   to provide us a bit of camouflage to further our investigation.

7   Q.  If it wasn't Detective Sanders making that stop, would you

8   have felt comfortable making that stop --

9   A.  Yes.

10  Q.  -- yourself?

11  A.  Yes, if we had to, yes.

12  Q.  When you say, "if we have to," what -- who do --

13  A.  It would be members of -- probably not myself on this

14  occasion, because I was with the cooperator, but it would have

15  been other members of the DEA office.

16  Q.  Okay.  And the basis for that stop would have been what?

17  A.  Would have been our belief that Mr. Ruiz was traveling to

18  the predetermined location to meet our cooperator with 4

19  kilograms of crystal meth.

20  Q.  Now, at some point do you arrive personally at the site of

21  the traffic stop?

22  A.  I do.  I can't give you an exact time on that.  I know the

23  stop occurred at 8:44 thereabouts.  I probably would have been

24  there -- it was a 37-minute video that we watched, and I believe

25  I arrived around the 30-minute mark, give or take, so 9:15-ish.

Special Agent Brian Sanders - Direct

1    Q.   You saw yourself on the video?

2    A.   Yes.

3    Q.   What do you do when you get out to the traffic stop scene?

4    A.   We photograph the drug evidence.  I believe I actually found

5    the money in the center console.  The money that we seized was

6    approximately $10,000, if I'm not mistaken, and it was

7    consistent with the money that we had provided prior in the

8    repayment of the 43,000.

9    Q.   When you say "it was consistent," what do you mean by that?

10   A.   The reason I believe that to be our money was because I was

11   actually the one that had possession of the 43,000 prior to the

12   repayment.  The way we banded the money, I think we banded them

13   in $10,000 increments, if I'm not mistaken, and I actually took

14   an ink pen and wrote on each bundle "10,000," "5,000," whatever

15   the denomination may have been at that time.  And at least one,

16   I believe two or three of the bills that I had written on with

17   my handwriting were in that stack in the center console.

18   Q.   You recognize your own handwriting?

19   A.   Yes.

20   Q.   So the cash that the investigation used to pay Mr. Ruiz

21   through the cooperating defendant, where actually did the bills

22   come from?

23   A.   It was a collective effort by the DEA office, the FBI.

24   Kentucky State Police contributed an amount.  I believe LMPD

25   narcotics contributed a bit.  $43,000 is a lot for us to repay.

Special Agent Brian Sanders - Direct

1   It typically doesn't -- we typically can't get that together

2   through one source.

3   Q.  Okay.  So are these -- you may not be able to speak to the

4   other agencies.  Do you know where the DEA got its cash?

5   A.  I do -- I know where we go to make withdrawals for our

6   money.

7   Q.  So this would have been money that would have come out of a

8   bank?

9   A.  Yes, absolutely.

10  Q.  Not necessarily money that had been sitting around, you

11  know, drugs?

12  A.  No.  I know that we -- we will withdraw money from the PNC

13  downtown.  I know the Kentucky State Police issues their task

14  force officers credit cards that they actually withdraw the

15  money directly from an ATM.  The FBI, I'm not sure.  Along with

16  the LMPD, I'm not sure.  I can't speak to that.

17  Q.  If you could, Special Agent Sanders, can you walk us through

18  what happens physically with Mr. Ruiz that night.

19  A.  When I arrived on scene -- again, I was there, I'm going to

20  guess, 9:15-ish, about 30 minutes after the stop was made -- the

21  drugs had already been found and were sitting on the rear

22  tailgate of the truck.  I conducted a brief search of the

23  interior of the vehicle, mainly looking for identification,

24  things of that nature.

25      Mr. Ruiz was already sitting in the rear of Detective

Special Agent Brian Sanders - Direct

1   Sanders' marked unit.  I believe we opened -- myself and another

2   officer opened the door, spoke to Mr. Ruiz briefly.  I do not

3   speak very much Spanish so I didn't feel comfortable asking him

4   any questions at that time.  It was pretty clear that our

5   language barrier was going to be such that we couldn't conduct

6   any kind of communications.

7       We put him in my car and we drove him to Floyd County Jail,

8   where we house prisoners overnight before we can get them into

9   U. S. Marshal's Service custody.

10  Q.  And, obviously, at the point that -- basically at the point

11  that the traffic stop begins, are you aware of whether the

12  federal courthouse was open at that time?

13  A.  I've never taken anyone that late so I didn't believe so.

14  Q.  That's certainly after --

15  A.  After hours, yes.

16  Q.  -- after hours for the court.  So after you logged or

17  dropped off Mr. Ruiz -- at the Floyd County Jail?

18  A.  Yes.

19  Q.  Did you -- we're going to kind of skip around.

20  Chronologically let's just go to the next day.  Do you have

21  occasion to encounter Mr. Ruiz the next day?

22  A.  The following morning -- typically the way our

23  investigations work, if it's an after hours type arrest, we will

24  either take them to Floyd County Jail or Oldham County Jail,

25  which is where our U. S. Marshal's Service has contracts, where

Special Agent Brian Sanders - Direct

1   they will house our prisoners overnight.

2       In that instance -- it can happen different ways.  If it's

3   early enough, if we've got no further investigation or

4   enforcement activity planned following that arrest, we will take

5   them to the DEA office.  We'll process them criminally, that

6   being fingerprints, photos, and information, DOB, social, that

7   type of stuff.

8       In this instance, we had obviously a search warrant to

9   execute at Minyard, and we had a separate investigation that we

10  were to do -- another signed search warrant on a completely

11  different matter following Minyard.  So we made a decision to

12  just drive Mr. Ruiz straight to Floyd County, where we left him

13  to process him the next morning.

14      And best I can recall, we picked him up around 9:00,

15  somewhere between 8:45 and 9:15 that following morning.  He was

16  brought back to our office for processing -- again, photos,

17  prints, personal identification or personal information -- and

18  that's where we asked Mr. Ruiz if he wanted to sit down and talk

19  to us a little bit.

20  Q.  All right.  Now, you said you don't speak Spanish.

21  A.  I do not, no.

22  Q.  All right.  So let me make sure that it's clear.  So you

23  pick him up at the Floyd County Jail?

24  A.  Yes.

25  Q.  In the morning?

Special Agent Brian Sanders - Direct

1   A.   Uh-huh.

2   Q.   Is that your first task of the day?

3   A.   Yes.

4   Q.   All right.  So you go straight there or do you come to work

5   and then go?

6   A.   Straight there.

7   Q.   So on your way in to work, you go to the Floyd County Jail?

8   A.   Yes.

9   Q.   And then from the Floyd County Jail, you come to DEA office?

10  A.   Yes.

11  Q.   All right.  So --

12  A.   Let me back up a little bit though.  I don't want to -- I

13  can't be 100 percent certain that I was actually the one that

14  picked him up that morning.  That is how these instances have

15  worked in the past.

16      Typically the case agents will be out a lot later than

17  everyone else once the operation is over.  So someone typically

18  will volunteer -- I can't say that I didn't pick Mr. Ruiz up

19  that morning, but I don't want to swear to it at this point

20  without looking at Floyd County's records that I was actually

21  the one to pick him up.

22  Q.   You recall though encountering -- or Mr. Ruiz being at the

23  DEA office?

24  A.   That morning, yes.

25  Q.   All right.  That morning.  Walk us through what happens at

Special Agent Brian Sanders - Direct

1    the DEA office upon his arrival.

2    A.   Mr. Ruiz will be brought in the back door.  If agents and

3    officers are there ready to process him, the processing will

4    happen immediately.  Sometimes they'll be placed in a -- in a

5    lockup, a temporary lockup until we can get officers back there

6    that know how to work the system.  It's a JABS booking system.

7    Not everyone knows and can maneuver their way through it as well

8    as others.  So we have a handful of people that will typically

9    lead the charge on getting that input.

10   Q.   How long approximately does that process take?

11   A.   Ten minutes, 15 minutes.

12   Q.   At what point in that process do you -- does this, I guess,

13   initiation of questions with Mr. Ruiz begin?

14   A.   It may -- again, it's hard to tell.  Sometimes we do it all

15   at the same time.  We've got what's called a form 202, which is

16   your personal identification.  You can very easily sit at a

17   table and do the 202 information while asking questions, if

18   someone is willing to speak with us.

19        In this particular instance, I don't recall specifically if

20   it was done separately, but had it been done separately, you're

21   looking at a 10- to 15-minute booking process followed by an

22   immediate interview.

23        Typically the way these investigations work in this

24   instance, as well as in the past, we don't like to keep them in

25   our office any longer than we have to because then it falls upon

Special Agent Brian Sanders - Direct

1   us to feed them and get them lunch and everything else before

2   they're brought before a judge.  So as soon as we're done with

3   our processing and any interview that may take place, they're

4   immediately walked over to the U.S. Marshal's Office for their

5   custody.

6   Q.  And is that what happened in this case?

7   A.  Yes.

8   Q.  All right.  Well, let's talk about the interview that you've

9   talked about.  Who was present for that?

10  A.  It was myself, Detective Willy Ortiz, and Special Agent Lisa

11  Brooks.

12  Q.  What is Detective Ortiz's role at that point?

13  A.  Mr. Ortiz was unavailable the night before.  In fact, we

14  tried to get ahold of him and he could not be reached.  When we

15  finally did get ahold of him, we had already dropped Mr. Ruiz

16  off, the best I can recall, and he had agreed to come in the

17  following morning and help us with processing and any interview

18  that may take place, because at that point we didn't know

19  whether he wanted to talk to us or not.  You know, a lot of

20  times they do, a lot of times they don't.

21  Q.  Is that because of Detective Ortiz's knowledge of the

22  Spanish language?

23  A.  Yes, yes, he's a fluent Spanish speaker.

24  Q.  Did you observe the interaction between Detective Ortiz and

25  Mr. Ruiz?

Special Agent Brian Sanders - Direct

1   A.  I did, yes.

2   Q.  Tell us how that went.

3   A.  Very casual, simply stated the facts surrounding his arrest.

4   We informed Mr. Ortiz -- Mr. Ortiz informed Mr. Ruiz that this

5   was essentially your time to help yourself out, should you

6   choose, and asked Mr. Ruiz if he would be willing to answer any

7   questions.  We had a consent or a rights waiver.  He refused to

8   sign the rights waiver but indicated that he would like to speak

9   with us.  I'm not sure he understood what the rights form meant.

10  Q.  And, obviously, you don't speak Spanish so your

11  understanding of what he's saying is coming from Detective --

12  A.  We're relaying.  We're relaying questions to Detective

13  Ortiz.  Detective Ortiz is relaying to Mr. Ruiz and vice versa.

14  Q.  Approximately how long did your -- did the interview process

15  beginning -- from beginning to end last with Mr. Ruiz?

16  A.  I would say no more than 20 minutes.

17  Q.  Okay.  Did he --

18  A.  20 to 30 minutes.

19  Q.  Is that a relatively short interview --

20  A.  Yes.

21  Q.  -- in your experience?

22  A.  Yes.

23  Q.  Mr. Ruiz not have a lot to tell you?

24  A.  Not specifically, no.  Generalizations of what happened.  We

25  sort of filled in some of the blanks for him.  We let him know

Special Agent Brian Sanders - Direct

1    that, hey, we didn't just happen upon you.  We indicated that we

2    had repaid some money, the 43,000, and that a search warrant had

3    been executed at the address at Minyard following his arrest.

4    And, again, he gave us some generalizations but nothing

5    specific, nothing we could act on.

6    Q.   Did you make any threats to Mr. Ruiz?

7    A.   No.

8    Q.   Did you have occasion to observe Mr. Ruiz's physical

9    appearance?

10   A.   Yes.

11   Q.   Did he appear to be under any kind of physical duress?

12   A.   No.  He was -- appeared remorseful.

13   Q.   Remorseful.  That's during your interaction with him?

14   A.   Yes.

15   Q.   So after this brief interview, what happens next with

16   Mr. Ruiz?

17   A.   He's immediately transferred to the U. S. Marshal's Service.

18   Q.   Okay.

19   A.   We take him down the elevator, walk him across the parking

20   lot, and remand him to U.S. Marshal custody.

21   Q.   What happens when you drop off a prisoner with the marshal's

22   from your perspective?

23   A.   They take full custody of the prisoner.  It is then their

24   responsibility to get him to and from court and to and from

25   wherever he may be housed pending any further judicial

Special Agent Brian Sanders - Direct

1    proceedings.  We enter via the back door, the sally port door.

2    The prisoner is patted down, handcuffs are removed and

3    essentially taken into marshal custody.

4    Q.  And from that point on, prisoners make it before the court?

5    A.  That's correct, yes.

6    Q.  Okay.  Is that something you have control over?

7    A.  No.

8    Q.  But once you've dropped them off with the marshals, you're

9    not -- you don't have anything to do with their custody at that

10   point; is that right?

11   A.  No, sir.  We just show up for the initial appearance.

12   Q.  When you're talking about your booking procedures, what's

13   the purpose of doing that?

14   A.  It's an inmate booking system.  It's called JABS.  It's an

15   acronym.  I couldn't tell you what it is for.  Essentially, it's

16   a database that's linked with NCIC that when we photograph and

17   fingerprint a prisoner, those prints are sent off.  They will

18   then let us know within a short period of time whether that

19   particular prisoner has any active warrants, if he is in fact

20   who he says he is based on fingerprints, if he had ever been

21   printed in the past.

22   Q.  Where does that obligation come from in terms of your

23   booking procedure?

24   A.  That's a DEA procedure.

25   Q.  DEA procedure.  Is that a procedure that you employ every

Special Agent Brian Sanders - Direct

1    time you arrest someone?

2    A.   Every time, yes, sir.   The circumstances sometimes are

3    different, but every prisoner -- every prisoner taken into DEA

4    custody is inputted into the JABS system.   And the timing of it

5    is sometimes different.   You know, the JABS system -- any time

6    we arrest a prisoner, I'm comfortable in saying that processing

7    begins as soon as the prisoner enters DEA -- into the DEA

8    office.   Sometimes, as I said, that time may be the following

9    morning, if it's a late night operation, but the actual sending

10   of the JABS information doesn't necessarily occur realtime with

11   when the fingerprints and the photographs and personal

12   identification is input.

13   Q.   Special Agent Sanders, let's switch, go back in time.

14   You've testified about the timeline of Mr. Ruiz's custody with

15   the DEA.   The previous night did you have occasion to be

16   involved with the execution of a search warrant at 5405 Minyard

17   Drive?

18   A.   Yes, sir.

19              THE COURT:   Mr. Bonar, before you get into detail

20   about that, can I just interrupt you to ask a couple of

21   questions about --

22              MR. BONAR:   Absolutely, Your Honor.

23              THE COURT:   -- just so that I make sure I understand

24   the sequence here, as well as the circumstances.   So the arrest

25   was made of the defendant on the 4th; is that right?

Special Agent Brian Sanders - Direct

1    The defendant was lodged that evening in New Albany and then

2    the next morning was brought to DEA office.  Is that right?

3              THE WITNESS:  Yes, sir, that's correct.

4              THE COURT:  And then at what point during his visit in

5    the DEA office was he given his *Miranda* warnings?

6              THE WITNESS:  He was Mirandized prior to his trip to

7    Floyd County by myself the night before, as he was sitting in

8    the back of Mr. Sanders' vehicle, and then Mr. Ortiz advised him

9    of his rights in Spanish the following day prior to any

10   questioning being --

11             THE COURT:  You may have touched on this, but let me

12   make sure I understand.  You Mirandized him in Detective

13   Sanders' car; is that right?

14             THE WITNESS:  We spoke -- I spoke with him briefly,

15   myself and another officer as he was -- his legs were hanging

16   out of the car --

17             THE COURT:  Right.

18             THE WITNESS:  -- briefly before we transported him to

19   Floyd County.  And the purpose of that interaction was simply to

20   gauge whether he was interested in talking to us before we took

21   him, because we had sort of a lineup of things that we had to

22   get done that night.  So I didn't know how much time to dedicate

23   to talking with him.

24             THE COURT:  You don't carry a Spanish language advice

25   of rights form?

Special Agent Brian Sanders - Direct

```
 1              THE WITNESS:  We're issued them.  I didn't have one,
 2   no, sir.
 3              THE COURT:  So he didn't get it in Spanish that
 4   evening.
 5              THE WITNESS:  Not from me, no, sir.
 6              THE COURT:  As far as you know, he didn't?
 7              THE WITNESS:  As far as I know, no, sir.
 8              THE COURT:  So Ortiz came the next morning?
 9              THE WITNESS:  The next morning.
10              THE COURT:  And at what sequence or what point in the
11   sequence of events was he given his Miranda warning?
12              THE WITNESS:  Immediately before any interview was
13   conducted, which would have likely -- as I said, it would have
14   either been as we were doing 202, what I call 202 personal
15   identification information or any questioning regarding the
16   charge which we had picked him up for.
17              THE COURT:  And was that done in your presence?
18              THE WITNESS:  Yes.
19              THE COURT:  By Detective Ortiz?
20              THE WITNESS:  By Detectives Ortiz.
21              THE COURT:  Ortiz.  In Spanish?
22              THE WITNESS:  Yes.
23              THE COURT:  All right.  Mr. Bonar, I just wanted to
24   make sure I understood those basic facts.
25   BY MR. BONAR:
```

Special Agent Brian Sanders - Direct

1    Q.  Special Agent Sanders, I'm going to place -- you've

2    testified that you were involved in the search that occurred at

3    5405 Minyard Drive?

4    A.  Yes, sir.

5    Q.  And I'm going to place on the viewing screen what we've

6    marked as Government Exhibit 4.  And can you tell us what that

7    is?

8    A.  That is an aerial photograph of the address on Minyard

9    Drive.

10   Q.  Now, does this picture fairly and accurately depict the

11   general layout of the house and the structures surrounding the

12   house on August the 4th?

13   A.  It does with the exception of the swimming pool.  There was

14   no swimming pool when the search warrant was executed.

15   Q.  Okay.  So this that we're talking -- is that what you're

16   talking about there?  I've placed a circle around the blue

17   circle.

18   A.  Yes, sir.

19        MR. BONAR:  That's the swimming pool.

20      Your Honor, I would move for admission of Government's

21   Exhibit 4.

22        MR. RENN:  No objection.

23        THE COURT:  It will be admitted.

24        (Government Exhibit 4 admitted in evidence.)

25   BY MR. BONAR:

Special Agent Brian Sanders - Direct

1    Q.  I'm going to show you on the screen what we've marked as

2    Government's Exhibit 5.  See if we can remove some glare here.

3    Can you tell us what that is?

4    A.  That is, for lack of a better word, a side view of the

5    address on Minyard Drive.  The privacy fence is part of -- is

6    part of our target address.

7    Q.  And you talk about the privacy fence, you're talking --

8    you're talking essentially about --

9    A.  The privacy fence, the shed, the addition off the back of

10   the residence, all of that is within what we're going to call

11   our target address at Minyard Drive.

12   Q.  All right.  So looking in this picture, along -- when you

13   talk about the privacy fence, you're talking about the wooden

14   fence that's in view there?

15   A.  Yes, correct.

16   Q.  So towards the back of that wooden fence -- I'm going to

17   draw my circle around the structure -- tell us what that is.

18   A.  That is the shed where the additional amount of crystal

19   methamphetamine was seized, along with numerous chickens and

20   whatnot.

21        MR. BONAR:  And I'm going to switch it back to

22   Government's Exhibit 4.  And if I haven't asked for admission of

23   5, I would do so at this time, Your Honor.

24        MR. RENN:  No objection, Your Honor.

25        THE COURT:  It will be admitted.

Special Agent Brian Sanders - Direct

1           (Government Exhibit 5 admitted in evidence.)

2     BY MR. BONAR:

3     Q.  Okay.  So with respect to Government's Exhibit 4, the aerial

4     view, I'm going to draw a circle around the structure.  Can you

5     tell us what that is?

6     A.  That is the shed and/or chicken coop.  They were sort of

7     separate entities, but they were leaned up -- there were

8     chickens and roosters.  I apologize.  I couldn't tell you the

9     difference between either, but there were chickens inside of the

10    shed, probably five or six of them, as well as the secondary

11    building that you see adjoining -- yeah, adjoining to the shed

12    is a large chicken coop as well.  They weren't actually

13    connected but leaned up against the shed.

14    Q.  And for purposes of the record, I've drawn a circle around

15    the structure that is at the bottom portion of the 5405 Minyard

16    Drive address.

17         Approximately how close is this structure that you found the

18    drugs in to the actual main house?

19    A.  I would say no further than the courtroom doors, 20 yards,

20    25 yards.

21    Q.  And we're talking about, just for point of reference, you

22    can see vehicles in this picture and other items to show you

23    sort of the size of things.  This appears to be a relatively

24    small backyard?

25    A.  Yes.

Special Agent Brian Sanders - Direct

1    Q.   And was your search confined to the backyard on the outside?

2    A.   Yes.

3    Q.   You searched the inside of the house too; right?

4    A.   Inside of the residence as well as the backyard, yes.

5    Q.   Also, I'm going to move on from this issue, but I'm going to

6    go back to the previous issue that we talked about in the

7    timeline.  Just for purposes of the record, where is the New

8    Albany Jail or the Floyd County Jail in relation to the federal

9    building in which you have your offices?

10   A.   I say approximately 10 miles.

11   Q.   Approximately how long of a drive?

12   A.   It takes 10 minutes tops to get to -- to get to and from,

13   depending on traffic.

14   Q.   All right.  So 10 minutes approximately to get from the jail

15   to your building?

16   A.   Yes, that's correct.

17   Q.   And then to get from your building to the federal courthouse

18   for purposes of the record?

19   A.   About four minutes walking.

20   Q.   Walking across the parking lot.

21   A.   Right.

22        MR. BONAR:  Your Honor, I have no further questions at

23   this time.

24        THE COURT:  As Mr. Renn is coming up here, let me go

25   back again, Mr. Bonar, to the issue of the defendant's

Special Agent Brian Sanders - Cross

1    interaction with you and the other agents on that morning in the

2    DEA office.  How long was he there in total before he was

3    presented or turned over to the marshals?

4              THE WITNESS:  I would say an hour in total.

5              THE COURT:  And how long was the --

6              THE WITNESS:  That's including our booking process and

7    then the brief interview that we did with him.

8              THE COURT:  And how long was the interview?

9              THE WITNESS:  I would say 20 to 30 minutes.

10             THE COURT:  All right.  Thank you.

11        Actually, Mr. Renn, why don't we take a 10-minute break at

12   this point.

13             MR. RENN:  Yes, sir.

14             THE COURT:  I think everybody could probably use that.

15        (Recess at 3:42 p.m. until 3:58 p.m.)

16                       CROSS-EXAMINATION

17   BY MR. RENN:

18   Q.  Special Agent Sanders, I was given a copy of your grand jury

19   testimony before we started the hearing today.  Other than the

20   criminal complaint -- I think you did sign a criminal complaint

21   in this case; correct?

22   A.  Yes, sir.

23   Q.  And the grand jury -- do you have any other reports or notes

24   or anything like that related to this investigation?

25   A.  No, sir, not off the top of my head.  I believe Agent Traud

Special Agent Brian Sanders - Cross

1    wrote the surveillance and vehicle stop, as well as the search

2    warrant report.

3    Q.   During your direct examination, you had testified about

4    being with this -- he was identified at one point as the

5    "cooperating defendant," another time "cooperating source," but

6    the same person?

7    A.   Same person.  I'm sorry.  Just bad language on my part.

8    Q.   We all do it.  You had indicated that there was realtime

9    text messages going back and forth.  Is that correct?

10   A.   That's correct, yes, sir.

11   Q.   Those text messages, they were all in Spanish, isn't that

12   fair to say?

13   A.   Yes, and I was being relayed the content of those messages

14   from the cooperator.

15   Q.   Okay.  So he is bilingual, I take it?

16   A.   Yes, speaks English.

17   Q.   And you, I think, on direct examination testified that you

18   were not bilingual?

19   A.   No, sir.

20   Q.   So he was able to receive them, show you that it came in,

21   and told you what the content was?

22   A.   That's correct.

23   Q.   And I think you're referring to the dash cam of the vehicle,

24   indicated that the stop in this case was 20:44 or 8:44 hours,

25   give or take.

Special Agent Brian Sanders - Cross

1    A.  Yes, sir.

2    Q.  And you arrived some -- an hour later, about 9:15?

3    A.  Thereabouts, yes, sir.

4    Q.  Okay.  And at the time you arrived, Mr. Ruiz was already in

5    custody; is that correct?

6    A.  Best I can recall, he was in Detective Sanders' marked car.

7    Q.  Okay.  And in custody.  Obviously --

8    A.  Yes.

9    Q.  -- we've seen the videotape.

10   A.  Yes.

11   Q.  He was detained from the moment that he was asked to get out

12   of the vehicle; is that correct?

13   A.  Yes, sir, he was, yes.

14   Q.  Okay.  And then ultimately placed in handcuffs and placed in

15   Chris Sanders' vehicle?

16   A.  That's correct, yes, sir.

17   Q.  That's where he was when you arrived?

18   A.  Yes, sir.

19   Q.  You've had an opportunity to review the videotape, I take

20   it?

21   A.  Yeah, what we've watched today, yes, sir.

22   Q.  And that was the entire videotape up until the stopping of

23   the tape?

24   A.  I believe so, yes.  That's what I've seen.

25   Q.  And nowhere on that videotape was Mr. Ruiz provided any

Special Agent Brian Sanders - Cross

1    *Miranda* warnings; is that correct?

2    A.   I didn't see them in the video, no, sir, but I was only in

3    it for a few minutes.  I'm not sure at what point Detective

4    Sanders turned his body camera off.

5    Q.   And, again, I think his testimony wasn't that it was

6    actually turned off.  It may have been a battery issue.

7    A.   Okay.

8    Q.   But, nonetheless, the videotape went off at some point?

9    A.   Yes, sir.  You can actually see in the video the point to

10   where myself and Task Force Officer Stone begin speaking with

11   Mr. Ruiz.  It's very brief.  Essentially, Detective Sanders

12   opens the door and I lean in, and I think that was about all

13   that you could glean from that video, but it was all within that

14   period right there.

15   Q.   And there was some reference in there, somebody asked

16   Detective Sanders -- and Chris Sanders -- if he spoke English;

17   correct?

18   A.   I don't recall that.

19   Q.   Okay.  Well, again --

20   A.   Possibly.

21   Q.   I believe it was on the tape and I believe we discussed it

22   with Officer Sanders, and that's where he went in to him

23   speaking broken Spanish with him.

24   A.   Okay.

25   Q.   Do you recall that exchange at all?

Special Agent Brian Sanders - Cross

1    A.  You mean between Detective Sanders and Mr. Ruiz?  Yes, yes,

2    he did ask him if he spoke English.

3    Q.  You and Chris Sanders, you-all don't look alike.  You-all

4    are not related, I take it.  Is that --

5    A.  We are related distantly.

6    Q.  Okay.  Well, then -- but, nonetheless, make sure that we've

7    got this right.  Chris Sanders, in speaking with some of the

8    officers there, was asked if Mr. Ruiz spoke English.  And he

9    said, "I've been speaking broken Spanish and he's been able

10   to" --

11   A.  That's correct.

12   Q.  -- "follow it."  Is that when you went and spoke yourself

13   with Mr. Ruiz?

14   A.  Yes.

15   Q.  Okay.  And when was it that you had this *Miranda* warning

16   that you gave to Mr. Ruiz, according to your testimony or your

17   questioning with the judge?

18   A.  It would have been when the door opened.  I've done these a

19   lot in the past, and a lot of times individuals don't speak

20   English initially until you find an excessive amount of

21   narcotics in their possession.  And then the situation becomes a

22   little bit more real for them and they want to get out in front

23   of it.

24       So I figured, even though Detective Sanders said he did not

25   speak good English, I thought it was worth at least my effort to

1    give him the opportunity to help himself out.  We typically will

2    do that in a situation.  So I would have opened the door, made

3    him aware of his rights, informed him that he was under arrest

4    and explained to him that we've got a limited window here.

5    We've got other things going on.  If you would like to help

6    yourself out, now would be the time to do so.  It became pretty

7    apparent to me very early on that he and I were not

8    communicating effectively.

9    Q.  That's the point.  You did read some rights to him.  They

10   weren't in Spanish; correct?

11   A.  They were not, no, sir.

12   Q.  And just as you testified, Mr. Ruiz made it very apparent to

13   you that he was not wanting to speak with you?

14   A.  Yes, he didn't -- he didn't say no, no, no.  We just -- it

15   wasn't going to go anywhere.  I did not speak Spanish and he

16   didn't speak well enough English to carry on an informative

17   conversation.

18   Q.  He was not going to speak with you, was he?

19   A.  I can't answer that because I'm not sure my explanation to

20   him as to what exactly was going on was coming across clearly.

21   So I can't say that he said, "No, I don't want to talk to you."

22   I just made a determination that this was not going to happen

23   and so we moved on.

24           MR. RENN:  Are you able to read that response back to

25   him?

1      (Record read by the reporter.)

2           THE COURT:  What are you trying to do here?

3           MR. RENN:  I'm sorry.  I guess what I heard this

4      witness say was he gave him his rights and Mr. Ruiz made it

5      plain that he was not going to speak with him and --

6           THE COURT:  All right.  Why don't you just ask him

7      that again directly if he recalls.  If we need to check the

8      transcript, we can.

9      BY MR. RENN:

10     Q.  You opened the vehicle and advised him of his rights in

11     English; correct?

12     A.  I opened the door.  I advised him of his rights.  I advised

13     him as to what was going on.  I'm not sure I ever gave him an

14     opportunity to respond.  I just went into, "Hey, this is where

15     we're at this particular point in the evening.  Would you

16     like to help yourself out?"  And in my opinion, it was clear

17     that he was not -- he was not understanding exactly what I was

18     telling him at that time.

19         And I made a determination that there wasn't any -- there

20     wasn't any point in me going any further with questioning

21     because we weren't going to be able to communicate with one

22     another.  So he -- I did not ask him, "Would you like to talk?"

23     and he did not say no.  It was just my understanding that

24     neither one of us understood one another.

25     Q.  Again, the record will speak for itself, because it was my

Special Agent Brian Sanders - Cross

1    understanding that he conveyed in words/action that he was not

2    going to speak with you.

3    A.  If that's what I said, then I misspoke.  It was a mutual

4    misunderstanding between both of us and a language barrier.

5    Q.  And you did not present to him any written waiver, I take

6    it?

7    A.  No, sir, I didn't have it at the time.

8    Q.  Okay.  Did you read from a card or did you go from memory?

9    A.  I did not have a card, no, sir.

10   Q.  Okay.  You were the one that transported then -- transported

11   Mr. Ruiz from the scene to Floyd County; is that correct?

12   A.  Myself and Task Force Officer Stone, yes, sir.

13   Q.  Okay.  Does he speak Spanish?

14   A.  No, sir.

15   Q.  Okay.  You indicated that standard procedure -- and I've

16   certainly had other cases where the DEA, when an arrest occurs,

17   they take them back to headquarters for processing; correct?

18   A.  Yes, sir.

19   Q.  That would be standard procedure?

20   A.  Typically, yes.

21   Q.  And so when you were asked on direct examination about

22   whether the courthouse would have been open at 9:00 or 10:00 at

23   night, the courthouse may not be open, but your-all's office is

24   always open.

25   A.  Our office is open, but there's nothing to say that we have

Special Agent Brian Sanders - Cross

1    to do it that night.  I mean, we can't house them in our office

2    overnight.  Floyd County or Oldham County are the only two

3    places that we typically will take them.

4        If we were to have transported him to the DEA office that

5    night, it would have simply been for processing, which we could

6    do the following morning.  We had to pick him up the following

7    morning anyway.  So it didn't make much difference whether we

8    did it the night before or the following day.

9    Q.   But, again, your office, if you-all wanted to go back and

10   interview him, you could have done that; correct?

11   A.   We could have, yes, sir.

12   Q.   Okay.

13   A.   We could have tried.

14   Q.   Tried, yeah, if you had --

15   A.   Right.

16   Q.   If he had the motivation to do so and you-all had a Spanish

17   interpreter then, yes.

18   A.   That is correct, yes.

19   Q.   Okay.  And in this case here, you initially testified on

20   direct examination that you-all didn't use the standard

21   procedure because you had to go and execute the search warrant

22   at Minyard, 5405 Minyard, and perhaps even another search

23   warrant on another case; correct?

24   A.   That's correct.

25   Q.   But then as it went on, we heard also that you testified

Special Agent Brian Sanders - Cross

1    that you-all reached out to Willy Ortiz that night; correct?

2    A.  We did.  We tried to reach him shortly after Mr. Ruiz was

3    arrested.  We couldn't got ahold of him.  Eventually we spoke to

4    him.  At what point in the night I couldn't tell you.  It was

5    later on in the evening.  I mean, it was close to 10:00, I'd

6    say, before we dropped Mr. Ruiz off.  So at what point or

7    another we talked to him, I can't tell you for sure, but I know

8    we did work out the details of him coming the following day and

9    helping us with processing and -- because we didn't have anyone

10   in the office that could even process him and get his name, date

11   of birth, social efficiently.

12   Q.  Okay.  So it was set up the night before that Willy Ortiz

13   was going to be there at your office on August the 5th?

14   A.  Yes, sir.

15   Q.  Okay.  And you or some other agent went over and picked up

16   Mr. Ruiz from the Floyd County Jail?

17   A.  That's correct, yes.

18   Q.  And if it wasn't you, you don't have any idea who it might

19   have been?

20   A.  No.  And I'm -- I don't want to say on the record that it

21   was me with 100 percent certainty, but I feel comfortable that

22   it was.  But we do this a lot and they sometimes get a little --

23   get a little confusing because there's other cases other than

24   just mine.  And you try to help others -- help other case agents

25   out.  When they've got paperwork and things to do, you'll

Special Agent Brian Sanders - Cross

1    volunteer to pick their prisoner up and vice versa.  So we pick

2    a lot of people up from Floyd County.  So I feel comfortable

3    saying that it was me, but I don't want to say with 100 percent

4    certainty.

5    Q.  I think on direct examination you said there might be some

6    paperwork from Floyd County to reflect what time he was booked

7    in and perhaps even what time he would have left that morning.

8    A.  There may be.  We give them a remand slip.  It's basically

9    just a handwritten form saying that I, Brian Sanders, of the DEA

10   present Mr. Yalexi Ruiz to your custody until he can be picked

11   up the following day and presented to the marshal's service.

12   That's typically all we get.  What they do on their end, I'm not

13   sure.

14   Q.  When you say "we get," do you have that?

15   A.  If there's a pink or yellow copy on the back, we get a copy

16   of it and Floyd County keeps a copy of it.  That's just an

17   intake form.

18   Q.  Where would your intake form be?

19   A.  I will be honest with you, I'd have to look in the file to

20   see if it's in there.  I'm not sure.  We've never been asked for

21   that in the past.

22        MR. RENN:  Again, under 26.2, I had requested any

23   other statements or reports you might have.  I would certainly

24   make that request that I be provided that.

25   BY MR. RENN:

Special Agent Brian Sanders - Cross

1   Q.   And, again, this will reflect what time you-all delivered

2   him to the jail; is that correct?

3   A.   I don't believe there's -- I don't know.

4   Q.   Okay.

5   A.   I'll have to look at the form.

6   Q.   Mr. Ruiz and yourself or another agent arrive back at

7   headquarters.  You proceed inside and then -- again, may not

8   have processed immediately, may have been in the holdover, but

9   at some point --

10  A.   It would have been pretty quickly.  I mean, it would have

11  been as soon as Mr. Ortiz arrived at the office.  I mean, his

12  sole purpose that today was to come and help us with any

13  criminal processing and interview of Mr. Ruiz that would have

14  taken place.  I don't recall it being any -- any later in the

15  day than between 9:00 and 10:00.  I don't recall any instance,

16  as a matter of fact, where any prisoner's been processed any

17  later than that.

18  Q.   Does the DEA require any interrogation or questioning of a

19  suspect, or in this case here a prisoner, to be recorded?

20  A.   No.

21  Q.   And in this case here there was no recording; is that

22  correct?

23  A.   No, we don't record interviews, no, sir.

24  Q.   No video?  No audio?

25  A.   No, sir.

Special Agent Brian Sanders - Cross

1   Q.  Okay.  You were present.  You made sure that Willy Ortiz was

2   present.  What about this FBI Agent Lisa Brooks?  Why was she

3   involved in this interrogation?

4   A.  We had some crossover in an investigation that we had been

5   working, as well as an investigation that the FBI had been

6   working.  We were both aware of Mr. Ruiz and who he was.  They

7   weren't necessarily directly involved, but as a courtesy, we

8   offered her the opportunity to come and be a part of this.  And

9   so she was around for the -- all the events on the 24th, as well

10  as the interview the following day.

11  Q.  The 24th or the 4th you mean?

12  A.  The 4th.  I'm sorry.  The 4th and the interview is on the

13  5th.

14  Q.  And she was the one that actually prepared a 302 in this

15  case.

16  A.  She prepared -- we call them a DEA Form 6, which is just a

17  report of investigation.  I'm not sure what the FBI calls their

18  reports.  She prepared that.  She had a little bit more detailed

19  knowledge of Mr. Ruiz and who he was based on their

20  investigation.  To be honest with you, I can't get into it any

21  further than that because I don't know all the ins and outs of

22  what they had going on, but she did know who Mr. Ruiz was, and

23  that's why she was brought in to assist with this particular

24  case.  So in the interview, she sort of led the charge with

25  questioning once he indicated that he would be willing to speak

Special Agent Brian Sanders - Cross

1   with us.

2   Q.  And what about the FBI, are they required to record

3   interviews?

4   A.  I don't know.  I'm not sure.

5   Q.  And in this case here there was no recording; is that

6   correct?

7   A.  No.

8   Q.  But if you-all wanted to record it, would there have been

9   tape recorders and video equipment available to do so?

10  A.  I'm sure we could have found a recorder if we wanted to do

11  so.  I'll be honest, since 2005, I've never recorded an

12  interview.  I'm sure we could track one down.

13  Q.  You could have?

14  A.  I wouldn't know where to find it if we had one.

15  Q.  Somebody could have?

16  A.  I guess we could have used an iPhone or something, if we

17  wanted to, but we just didn't think to do it.

18  Q.  And Special Agent Brooks, she prepared the 302.  You did not

19  prepare a DEA 6; is that correct?

20  A.  I did not, no, sir.

21  Q.  And Willy Ortiz was present.  You say that he gave a *Miranda*

22  waiver in Spanish.  Was that a written waiver?

23  A.  It was a written waiver, yes.

24  Q.  Okay.  The ones that I see are typically signed by the

25  agents at the bottom, read to the person, and then provided to

Special Agent Brian Sanders - Cross

1    the prisoner or suspect to sign.  Was that done in this case?

2    A.  Typically they're read.  The form was present.  Typically

3    they're read.  If a defendant chooses to sign the form, the

4    agents will sign as witnesses.  He refused to sign in this case,

5    so we didn't do anything with the form.

6    Q.  Did the agent sign one?

7    A.  I don't believe so.  I don't recall.

8    Q.  Again, you're the lead agent or at least one of the lead

9    agents.  You would have access to the central file.  Would that

10   be fair to say?

11   A.  Yes, absolutely.  I don't recall whether it was signed.  I

12   can certainly look.  If it was signed, it would be maintained.

13            MR. RENN:  I would make that request that we look for

14   any report that -- of rights that would have been signed by the

15   agents.

16   BY MR. RENN:

17   Q.  And also on those waiver forms, typically there's a time

18   that you would read the rights to the person; is that correct?

19   A.  I don't recall.  I'm not sure.

20   Q.  Again, you've been doing this --

21   A.  There would be a date.  There would absolutely be a date.

22   Q.  You don't believe that there's a time on there?

23   A.  I don't recall.

24   Q.  I mean, how long have you been doing this, Special Agent

25   Sanders?

Special Agent Brian Sanders - Cross

1    A.  I do a lot of them, but I don't -- I can't recall whether

2    there's actually a time on there.  I know there's two signature

3    lines for the witnesses and a date.  I don't recall off the top

4    of my head if there's a time.

5    Q.  You don't recall off of the top that there's a time that you

6    actually start?

7    A.  I don't, no.

8    Q.  And if we had that, again, that would show what time the

9    form was read and also that the agent signed and that Mr. Ruiz

10   failed to sign?

11   A.  If we have one, we'll absolutely present whatever we have.

12   I will say though that if he refuses to sign, it is not abnormal

13   for us not to keep that form.

14   Q.  After he was taken to the marshal's and handed off to those

15   folks, again, there's no record of any time that you-all would

16   have left DEA headquarters and then taken him to the marshals;

17   is that correct?

18   A.  I don't know the answer to that.  We spoke with the marshal

19   on the last break.  If that is -- if that documentation is

20   there, we'd be glad to get ahold of it.  I can't answer that

21   though.  I'm not sure how the marshals operate.

22   Q.  You did participate in the search warrant executed at 5405

23   Minyard; is that correct?

24   A.  Yes, sir.

25   Q.  From what I've seen from the property return, there was some

Special Agent Brian Sanders - Cross

1   marijuana seized, as well as firearms at the residence.  Is that

2   correct?

3   A.  I believe there was a small caliber firearm.  The marijuana

4   I don't recall.

5   Q.  Was it a .25 caliber Beretta as well as a long gun?

6   A.  To be honest with you, I don't recall specifically what they

7   were.  There's a lot of things going on during a search.  You've

8   got some officers in the back filling out -- or some officers in

9   the back searching an outbuilding, some officers inside the

10  residence searching.  You've typically got someone sitting at a

11  table taking a log and an inventory of what goes in, what goes

12  out.  So I do not recall exactly what was taken.

13  Q.  Were there any residents there at the home when the search

14  warrant was executed?

15  A.  Yes, there was.

16  Q.  Was anyone there arrested?

17  A.  No, sir.

18  Q.  Any reason for that?

19  A.  No, sir.

20  Q.  Are you familiar with this property and evidence voucher?

21  A.  That looks to me like a, yeah, Louisville Metro Police

22  inventory log.  That's typically the log that is handed out once

23  you present your evidence to the property room.  So that is

24  generated by the property room.

25  Q.  Okay.  And, again, here we've got -- you're listing the

Special Agent Brian Sanders - Cross

1    owner as being Yalexi Ruiz; correct?

2    A.   That's what it says, yes.

3    Q.   And the address at 5405 Minyard Drive; correct?

4    A.   That's what it says.

5    Q.   That's not accurate, is it?

6    A.   I don't know who filled this form out so I'm not sure who --

7    whoever filled it out, I'm not sure who presented the

8    information to them.  It wasn't me so I'm not sure.

9    Q.   Well, again, it's not accurate, is it?

10   A.   To the best of my knowledge, he did not live -- 5405 was not

11   a permanent residence, no.

12   Q.   Was it a temporary residence?

13   A.   I just -- I know that -- I believe it was not a permanent

14   residence for Mr. Ruiz.

15   Q.   What about your belief whether he was an owner?

16   A.   Again, I can't comment on that.  I don't know who these

17   items belonged to.  I did not take them to the property room.  I

18   did not fill that sheet out so I'm not sure.

19   Q.   You do know Danny Evans; correct?

20   A.   Yes, sir.

21   Q.   He's with LMPD, detective; correct?

22   A.   He's now on our task force, yes.

23   Q.   Okay.  So you've worked with him numerous times?

24   A.   Every day.

25   Q.   And it looks like he's the official that prepared this; is

Special Agent Brian Sanders - Cross

1    that correct?

2    A.   Okay.

3    Q.   Okay, yes?

4    A.   Yes, that would -- according to this report, that would be

5    correct.

6    Q.   And, again, this is not accurate, is it?

7    A.   Again, I don't know where this information was taken from.

8    I'm not sure what is mandated when you input -- because as a DEA

9    agent, I can't take property over to LMPD and present it to them

10   myself.  We have to have an officer with us.  And I have been

11   there before, but I'll be honest with you, I haven't paid a

12   whole lot of attention to the intake procedure when it comes to

13   dropping off evidence and the questions that they ask.  So I'm

14   not sure if they asked Detective Evans, hey, does this

15   specifically belong to them or who's your defendant in this case

16   and they plug it in.  That I can't answer.

17   Q.   But this is Bates stamped as part of the discovery in this

18   case?

19   A.   Yes.

20   Q.   Okay.  Noticeably absent from this, 4 kilograms of

21   methamphetamine, 3 kilograms of methamphetamine, some 9,000,

22   $10,000 currency; is that correct?

23   A.   That went to DEA property.  So that would not be on this

24   sheet.

25   Q.   The search warrant here was issued by the State of Kentucky;

Special Agent Brian Sanders - Cross

1    correct?  The Commonwealth of Kentucky; correct?

2    A.   That's correct.

3    Q.   And if we're looking here, you can only search somebody's

4    home pursuant to an order; correct?

5    A.   That is correct.

6    Q.   Here this judge, Judge Hainey, has in this order that if you

7    find the above described property, which includes

8    methamphetamine, or any part thereof, you're to deliver it

9    forthwith to me or any court in which the offense in respect to

10   which the property or things taken is triable or retain it in

11   your custody subject to an order of said court.  Correct?

12   A.   That's what it says, yes.

13   Q.   And it's basically repeated again here on page 14 of the

14   affidavit, again, that this property is to be seized and then

15   brought before the court; correct?

16   A.   That's what it says, yes.

17   Q.   Okay.  Now, 4 kilograms, according to the testimony of

18   Sanders, Chris Sanders and some of the folks who was out on the

19   highway, that there were 3 kilograms seized pursuant to a

20   warrant out at that shed; is that correct?

21   A.   That is correct, yes, sir.

22   Q.   And that was all done pursuant to this state court search

23   warrant.

24   A.   That's correct, yes, sir.

25   Q.   And that was not returned to the state; is that correct?

Special Agent Brian Sanders - Cross

1    A.   Yeah, I cannot give you an answer as to why it was not on

2    the return.  What I can tell you with confidence is that that --

3    all drug evidence and exhibits in this particular case were

4    transported to our office because we knew this particular case

5    was going to go through the U.S. Attorney's Office.  And when we

6    take them through DEA, they're sent off to DEA laboratory for

7    analysis.

8    Q.   But if you know that, you can get a federal judge to sign a

9    federal warrant; correct?

10   A.   We could, yes.

11   Q.   But you didn't do that here?

12   A.   We don't do it often.  I mean, there's no rhyme or reason

13   for it.  This isn't the only case that that's happened.

14   Q.   But when you decide to do it, you got to do it pursuant to

15   terms of the warrant; correct?

16   A.   I'm confused.

17   Q.   The warrant here authorized you to go in the house --

18   A.   If you're asking why there's not the 3 kilos on the log, I

19   don't have an answer for you.

20   Q.   But, again, the search warrant is what authorizes you to go

21   in the house; correct?

22   A.   Yes, it is.

23   Q.   You can't change the terms of the search warrant, can you?

24   A.   I don't believe so.

25   Q.   Okay.  And here as to this marijuana that was seized,

Special Agent Brian Sanders - Cross

1    apparently some 9 grams -- and we heard Billy Keltner talk about

2    Jozie hitting on this -- this was inside the house; right?

3    A.  I'm not sure where that was found.  If it doesn't say it on

4    there, I don't want to testify to where exactly inside the

5    residence or outside of the residence it was taken.  Again,

6    there were a lot of people in a lot of different places that

7    found different things.  I did not find it.

8    Q.  If you want me to get Mr. Keltner's file, we'll show where

9    he says Jozie found it on top of the refrigerator.  Do you

10   recall that?

11   A.  If that's what Mr. Keltner's report says, yes, but I was not

12   present for that.

13   Q.  And you were here when I was asking Mr. Keltner about these

14   reports; correct?

15   A.  I was.

16   Q.  Okay.  And this is the one that we looked at for August the

17   4th.

18   A.  I recall -- I recall you speaking of this.  I don't -- I

19   personally don't recall him finding it.  I cannot say that I was

20   there when the marijuana was found.

21   Q.  Well, you'll read this report, "Jozie alerted on marijuana

22   on top the upper cabinet in the kitchen."

23   A.  I'm not sure what you're asking me.  That's what it says.

24   Q.  Okay.  And the search warrant was executed for the DEA by

25   Major Case Danny Evans.  So would it stand to reason that this

Special Agent Brian Sanders - Cross

```
1    marijuana that was referenced in the return is the same
2    marijuana found in the kitchen?
3    A.   I would say that would stand to reason, yes.
4    Q.   Okay.  And these other people that were in the house, they
5    weren't charged or arrested; correct?
6    A.   No.
7    Q.   And in addition to the marijuana, again, we had the .25
8    caliber Beretta, but then we also had a rifle; correct?
9    A.   If that's what it says, yes.  I don't recall.
10   Q.   Do you know why they seized two boxes of Cohiba cigars?
11   A.   I don't.  Cuban cigars are illegal, I believe.  Maybe that's
12   why they seized them.  I really don't know.  It wouldn't be
13   something that we would typically take.
14   Q.   You'll agree that that was seized outside the scope of this
15   warrant, wouldn't you?
16   A.   Whether it was seized within the scope of the warrant -- I
17   was not there when these items were brought to the log -- to the
18   person taking the log.  DEA typically would not seize a box of
19   Cohiba cigars.
20   Q.   There's nothing mentioned in this summary about what could
21   be taken, including cigars.  Would that be fair to say?
22   A.   I would have to read the warrant a little further.  I mean,
23   if it includes any illegal items -- like I said, I believe Cuban
24   cigars are illegal and they would fall under illegal items, but
25   without having read the warrant in detail --
```

Special Agent Brian Sanders - Cross

1   Q.  Well, we can read it together.  "Methamphetamine or other

2   schedule I narcotics."  That's not cigars; right?

3   A.  No.

4   Q.  "Also focus on items of drug paraphernalia."  Not cigars;

5   correct?

6   A.  No.

7   Q.  "Utilized to distribute, sell, store, weigh, measure,

8   package, transport, conceal or use illegal substances.  Records

9   of drug activity, concealment, journals, cellular phones,

10  address, identities of suppliers, buyers, bills or statements

11  that provide information or financial status, guns, firearms,

12  weapons used to protect illegal substances, all currency or

13  other valuables found that may be attributed to the sale of

14  controlled substances shall be seized."

15  A.  It does not say cigars in there, I'll give you that.

16  Q.  Okay.  And as far as the currency, is there any way that you

17  know to show how some currency would be from the sale of

18  controlled substances as compared to somebody working, or

19  winning the lottery, or gambling, or anything else?

20  A.  You're referring to the currency that was seized from the

21  truck?

22  Q.  No, no.  On here, you know, how an officer would be able to

23  use discretion in not seizing gambling money and only seizing

24  money that might be attributed to the sale of controlled

25  substances?

Special Agent Brian Sanders - Cross

1   A.   When we seize bulk currency, we always explain and provide

2   the opportunity for the owner of that currency to claim it as

3   their own.  We place the currency in a self-sealing evidence

4   envelope and ask them to sign the top should they choose to

5   claim it.

6       We explain to them that if they are willing to provide

7   documentation as to where the money came from, the money will be

8   returned.  Nine times out of 10 that doesn't happen, but that is

9   how our policy works when it comes to the seizure of bulk

10  currency.

11  Q.   Well, then there's no reason to put anything other than

12  "seize all currency," because it doesn't matter if it's from the

13  sale of controlled substances.  You're going to take it anyway.

14  A.   Typically bulk currency we will, especially if there's a dog

15  hit on it.

16  Q.   As we talked about earlier --

17  A.   In this instance I can say with certainty that that money

18  came from the sale of narcotics as like -- I stated that I had

19  marked several of the bills prior to providing them to Mr. Ruiz.

20  Q.   But that money was already seized before this search warrant

21  was ever obtained.

22  A.   That was, yes.  You're asking me --

23           THE COURT:  Was there money taken from the house?

24           MR. RENN:  No.

25           THE COURT:  Then I'm having trouble understanding why

Special Agent Brian Sanders - Cross

1    we're staying on this.

2         MR. RENN:  Again, just the scope of the warrant is too

3    broad because there's no way for a reasonably well-trained

4    officer to distinguish between currency that's from gambling,

5    from winning the lottery, from selling stolen goods or anything

6    else.  This one here is specifically supposed to be for the sale

7    of controlled substances.

8         MR. BONAR:  I guess then, Your Honor, if that -- I

9    thought we were going a different direction.  If that's where we

10   are, I think the warrant speaks for itself.  I don't know that

11   this is testimony for Agent Sanders to give.  I mean, the

12   warrant says what it says.

13        THE COURT:  Yeah, I think you have an argument to make

14   there, Mr. Renn.  I'm just not sure where we're going with this

15   line of questioning, if there was no money taken pursuant to

16   this warrant.

17        MR. RENN:  I think it can be handled by case law and

18   the four corners of the affidavit.  But, again, in this case

19   here, the affidavit in our view would be overly broad.

20        THE COURT:  Just so that we're clear, Mr. Bonar, these

21   materials listed on this inventory that the witness has been

22   discussing with Mr. Renn, these materials you say you're not

23   using in your --

24        MR. BONAR:  No, we have no intention of introducing

25   those items, Your Honor.  I think Agent Sanders has testified

Special Agent Brian Sanders - Cross

1   that it's not -- it wasn't -- it's not our belief and it wasn't

2   their belief at the time that the actual house was where

3   Mr. Ruiz was residing.  We believe that was a different

4   location.

5       The search that I think has evidentiary value from the

6   United States' perspective is the search -- part of the search

7   of the shed outside where an additional amount of

8   methamphetamine was found, and that was accessed through a key

9   that Mr. Ruiz had on his person.

10              THE COURT:  The shed?

11              MR. BONAR:  Yes, sir.

12              THE COURT:  All right.  I'm sorry.  Go ahead.

13  BY MR. RENN:

14  Q.  But presumably this shed, again, close proximity to the

15  home, according to your direct testimony; correct?

16  A.  Yes, sir.  I'd estimate it to be from where I'm sitting to

17  the doors to the courthouse.

18  Q.  The residents --

19  A.  Courtroom.  Sorry.

20  Q.  The residents of that house would have had access to the

21  shed as well; correct?

22  A.  You know, I'm not sure what access they had.  I do know in

23  speaking with the homeowner, she had informed us that Yalexi had

24  access to it, as her husband was incarcerated and it was his

25  responsibility to maintain the chickens and whatnot.

Special Agent Brian Sanders - Cross

1    Q.  Have you ever had somebody lie about whether they had

2    knowledge of controlled substances when you come in?

3    A.  I'm just -- yes, sir.  I'm just telling you what she told

4    us.

5    Q.  That's what she told you.  But, again, do you always just

6    take the word of somebody?

7    A.  Absolutely not, no.

8    Q.  So, again, the question is did the people inside the home

9    have access to the shed?

10   A.  I don't know.  I don't know whether they had keys or not.

11   What I do know is in one particular communication with the

12   cooperating defendant -- in fact, the communication where he

13   said, "I'm where the narcotics are right now," he was clearly

14   inside of a chicken coop.  It was almost as if a chicken was on

15   the other end of the phone.  You could tell he was somewhere

16   where there was livestock present.

17   Q.  And you don't know if somebody else was standing next to

18   him?

19   A.  Just the chicken, as far as I know.

20   Q.  Okay.  But it could have been one of the residents of the

21   house who said we don't know anything about it; correct?

22   A.  Yeah.  I don't know who -- I don't know who was present when

23   the call was placed.

24   Q.  The assistant U. S. Attorney talked about these keys.  The

25   keys that were used to open the shed, you didn't have to knock

Special Agent Brian Sanders - Cross

1    the lock off?  And there was a lock on the shed; is that

2    correct?

3    A.   There was a lock on the shed, best I can recall, as well as

4    a lock on the actual box.  It was a small -- I think it was a

5    Husky brand, Home Depot brand small toolbox that had a small

6    padlock with a black plastic casing around it.

7    Q.   And these keys, these were seized -- or at least a key for

8    the shed and the toolbox were seized from Mr. Ruiz; is that

9    correct?

10   A.   Best I can recall, the keys were in one of his front

11   pockets.  And I believe there were two separate keys to operate

12   the respective locks on the shed door, as well as the one on the

13   toolbox.

14   Q.   And so those were seized out at the time of the stop on the

15   highway; correct?

16   A.   Yes, sir.

17            MR. RENN:  Your Honor, I don't have any other

18   questions.  Thank you.

19            THE COURT:  Mr. Bonar, anything further?

20            MR. BONAR:  No, sir.

21            THE COURT:  All right.  Thank you.  You may step down.

22       You have another witness to call?

23            MR. BONAR:  We do, Your Honor.  We have one more

24   witness out there, Detective Ortiz.

25       (DETECTIVE WILLY ORTIZ, called by the Government, sworn.)

Ortiz - Direct

1                        DIRECT EXAMINATION
2    BY MR. BONAR:
3    Q.   Good afternoon, sir.
4    A.   Good afternoon.
5    Q.   Could you please state your name for the record.
6    A.   Willy Ortiz.
7    Q.   And, Detective Ortiz, where are you employed?
8    A.   With the Louisville Metro Police Department.
9    Q.   How long have you been with LMPD?
10   A.   Approximately about 17 years.
11   Q.   What's your current assignment?
12   A.   With the LMPD Narcotics Intelligence Division.
13   Q.   Detective Ortiz, are you familiar with the Spanish language?
14   A.   Yes.
15   Q.   Can you please tell the court your familiarity with the
16   Spanish language.
17   A.   Yes.  I'm Puerto Rican.  I was born in Puerto Rico, raised
18   in New York but spent the most of my adult life in Puerto Rico.
19   Q.   Is Spanish your first language?
20   A.   Yes.
21   Q.   Obviously, we're talking in English.  So are you fluent in
22   both English and Spanish?
23   A.   Yes, that's correct.  I read and write in Spanish also.
24   Q.   During your course of police experience, have you had
25   occasion to act as an interpreter?

Ortiz - Direct

1    A.  Yes, entire -- yes, my entire career.

2    Q.  And interpreting Spanish to English and English to Spanish?

3    A.  That's correct.

4    Q.  I'm going to draw your attention to August 5th, 2016.  Did

5    you have occasion to engage in a conversation with Yalexi Ruiz?

6    A.  That's correct.

7    Q.  And was that at the DEA offices here in Louisville?

8    A.  Yes.

9    Q.  Can you tell the court what happened when you got to the

10   office that morning.

11   A.  I was introduced to Mr. Ruiz, and I was assisting them in

12   interpreting their interview.

13   Q.  Where exactly were you at the DEA offices?

14   A.  In a small interview room.

15   Q.  Who else was present?

16   A.  Agent Sanders and I believe Agent Traud and Agent Brooks.

17   Q.  Okay.  Detective Ortiz, are you familiar with the so-called

18   *Miranda* warnings?

19   A.  Yes.

20   Q.  Have you had occasion in your police career to advise

21   individuals of their *Miranda* rights?

22   A.  Yes.

23   Q.  Is that something you've done numerous times?

24   A.  Yes.

25   Q.  Did you, on August 5th, 2016, have occasion to provide

Ortiz - Direct

1    Mr. Ruiz with his *Miranda* rights?

2    A.   Yes.

3    Q.   Can you tell the court exactly how you provided Mr. Ruiz

4    with his *Miranda* rights.

5    A.   On the day I was given two copies of the *Miranda* warning in

6    Spanish.   I asked Mr. Ruiz if he knew how to read in Spanish,

7    and he acknowledged that he did.   I then handed him the *Miranda*

8    warning, and I read it out loud to him also.

9    Q.   Describe just sort of how your back and forth with Mr. Ruiz

10   went.  Was that in Spanish?

11   A.   Yes.

12   Q.   Did you have any discussion with Mr. Ruiz in English?

13   A.   No.

14   Q.   So all of your conversation with Mr. Ruiz was in Spanish?

15   A.   Was in Spanish, yes.

16   Q.   You talked about a form or a document.

17   A.   Yes, I advised him that it was his *Miranda* warnings.

18   Q.   And was that written in English or Spanish?

19   A.   In Spanish.

20   Q.   Did you observe Mr. Ruiz reading that document?

21   A.   Yes.  As I was reading it, he was reading it also.

22   Q.   Did you have any question as to whether Mr. Ruiz understood

23   the *Miranda* rights?

24   A.   No.

25   Q.   Did Mr. Ruiz ask you any questions about them?

Ortiz - Direct

```
 1   A.   No.  He --
 2   Q.   Did he indicate to you that he did understand them?
 3   A.   Yes.
 4   Q.   How did he indicate that he understood them?
 5   A.   At the end of me reading it to him, I asked him if he
 6   understood it.  He acknowledged that he did, and he was
 7   attempting to sign them -- the *Miranda* warning, but he
 8   decided -- opted to not sign the paperwork.
 9   Q.   Did he say anything about signing or not signing it?
10   A.   No.  He just didn't want to.
11   Q.   Okay.  So he never put his name on any paper?
12   A.   No.
13   Q.   Did he indicate though that he wanted to talk with the
14   authorities?
15   A.   Yes.
16   Q.   And did an interview happen afterwards?
17   A.   That's correct.
18   Q.   All right.  Did that interview occur after the *Miranda*
19   advisement?
20   A.   Yes.
21   Q.   Was there any kind of interview prior to you advising
22   Mr. Ruiz of his *Miranda* rights?
23   A.   Yes, I -- prior to the interview, I introduced myself and
24   told him the reason why I was there.  And due to my experience,
25   before I start an interview, I always try to get his -- an
```

Ortiz - Direct

1    individual's information like name, date of birth, social,

2    address.

3    Q.  All in Spanish again?

4    A.  Yes.

5    Q.  All right.  Now, when the interview happened, how did you

6    know what questions to ask?

7    A.  I didn't.  I just basically just translate what the

8    interviewing agent questioned in Spanish and I would relay it to

9    Mr. Ruiz.

10   Q.  Approximately how long did the interview last?

11   A.  About 25 to 30 minutes.

12   Q.  Based on your experience with previous interviews, was this

13   a long or short interview?

14   A.  Short.

15   Q.  Did you threaten Mr. Ruiz in any way?

16   A.  No.

17   Q.  Did you make him any promises?

18   A.  No.

19   Q.  Did you observe anyone else threaten Mr. Ruiz?

20   A.  No.

21   Q.  Or promise him anything?

22   A.  No.

23   Q.  And just so I'm clear, threats or promises in exchange for

24   his agreement to speak to the authorities?

25   A.  No.

Ortiz - Direct

1   Q.  All right.  Did Mr. Ruiz appear to be of sound mind?

2   A.  Yes.

3   Q.  Do you have any question in your mind whether he was capable

4   of understanding the *Miranda* warnings?

5   A.  Yes.

6   Q.  Yes, you --

7   A.  Oh, no, no, that he did, no.

8   Q.  No questions?

9   A.  No questions, no.

10  Q.  You believe that he understood?

11  A.  Yes.

12          MR. BONAR:  All right.  No further questions, Your

13  Honor.

14          THE COURT:  I have one as Mr. Renn is coming up.  How

15  did he indicate to you that he agreed to go ahead and answer

16  questions after you give him the *Miranda* warning?

17          THE WITNESS:  He acknowledged that he understood them.

18          THE COURT:  Right.  But then you said you asked him --

19  if I understood correctly your testimony, you then asked him if

20  he was willing to answer questions.

21          THE WITNESS:  Yes, that's correct.

22          THE COURT:  And how did he indicate that?

23          THE WITNESS:  He acknowledged yes.

24          THE COURT:  He said -- he actually verbalized --

25          THE WITNESS:  Yes, that he did.

Ortiz - Cross

1      THE COURT:  -- in Spanish?

2      THE WITNESS:  In Spanish.

3      THE COURT:  All right.  Thank you.

4                  CROSS-EXAMINATION

5   BY MR. RENN:

6   Q.  Judge Hale just asked about how Mr. Ruiz advised you that he

7   wanted to speak.  What did he say about not signing?

8   A.  That he didn't want to sign his name on the paper.

9   Q.  Did you ask why?

10  A.  I didn't, no.

11  Q.  What about these three officers/special agents, Traud,

12  Sanders, and Brooks?

13  A.  I don't recall if they did.

14  Q.  So you've got good recollection about everything other than

15  that?

16  A.  Yes.

17  Q.  That's the one thing you forgot?

18  A.  Well, I can't recall.

19  Q.  Okay.  Obviously, there wasn't any recording of this

20  interview; is that correct?

21  A.  That's correct.

22  Q.  If the interview had been recorded, we wouldn't have to rely

23  upon your memory; correct?

24  A.  That's correct.

25  Q.  So when you forget things, we would be able to refresh your

Ortiz - Cross

1  recollection; correct?

2  A.  Why absolutely.

3  Q.  All right.  At LMPD do you-all record interviews?

4  A.  When it's my interview, yes.

5  Q.  Okay.  Did you ask if you could record this one?

6  A.  No.

7  Q.  Okay.  The *Miranda* sheet, you said that you had two of them;

8  is that correct?

9  A.  Yes.

10  Q.  And you gave one to Mr. Ruiz?

11  A.  That's correct.

12  Q.  Where did you put your name on it?

13  A.  As a witness?

14  Q.  Yes, sir.

15  A.  Yes.

16  Q.  Okay.  You signed your name at the bottom?

17  A.  That's correct.

18  Q.  Did any of the three agents, did they sign their name to it?

19  A.  I can't recall if they did or not.

20  Q.  Okay.  Might have, might not have?

21  A.  Correct.

22  Q.  Okay.  But you're confident Mr. Ruiz didn't sign it?

23  A.  Yes.

24  Q.  Yes, he didn't sign it?

25  A.  Yes, he did not sign it.

Ortiz - Cross

1    Q.   Okay.  After you signed your name, did you put what date and

2    time it was?

3    A.   Yes.

4    Q.   Okay.  That's something you do in all --

5    A.   Normal procedure, yes.

6    Q.   Routinely?  Okay.  And then you say Mr. Ruiz read one and

7    then you read one; correct?

8    A.   That's correct.

9    Q.   Okay.  Where are those two forms now?

10   A.   I handed it to the agents.

11   Q.   At the conclusion?

12   A.   Yes.

13   Q.   Okay.  You don't -- do you remember if you gave it to

14   Special Agent Sanders, Brian Sanders?

15   A.   I can't recall if I did or not, to whom, but I gave -- it

16   was given to one of the agents, yes.

17   Q.   Okay.  You didn't keep it?

18   A.   No.

19   Q.   Okay.  Do you have any other writings?  Did you do a report

20   in this case?

21   A.   No.  The only notes that I took were Mr. Ruiz's name,

22   address, and date of birth and social, and I handed that over to

23   one of the agents.  I believe it was Jennifer Traud.

24   Q.   Okay.  So you yourself took down notes?

25   A.   Yeah, just the introduction of name and date of birth.

Ortiz - Cross

1    Q.   And you no longer have that?

2    A.   No.

3    Q.   You gave that to Jennifer Traud, special agent?

4    A.   Yes, yes.

5    Q.   Okay.  You're sure of that, not Brian Sanders?

6    A.   I believe it was her.

7    Q.   Okay.  But you don't know where those notes are now?

8    A.   No.

9            MR. RENN:  Obviously, I'm going to request those notes

10   that he has, as well as the forms that he signed.

11   BY MR. RENN:

12   Q.   And, again, you have no other reports or notes other than

13   that?

14   A.   No.

15   Q.   Okay.  And your recollection, again, you had no

16   conversations with Mr. Ruiz in English; correct?

17   A.   No.

18   Q.   And when you do the interpreting -- you said that you were

19   from Puerto Rico; is that right?

20   A.   That's correct.

21   Q.   Is it true that there are different types of Spanish, Puerto

22   Rican Spanish, Cuban Spanish, Mexican with its various dialect

23   Spanish?

24   A.   Yeah, there might be some difference in certain words,

25   like -- for example, in English, if you're from Britain, you

Ortiz - Cross

```
 1    call a vehicle a -- we call it a car.  They call it a -- like an
 2    elevator, we call it an elevator.  They call it a lift.
 3    Vehicles they call cars -- we call them -- we call it car.  They
 4    call it coach.  It's that example.
 5    Q.   So there are different words?
 6    A.   Different words for different things, yes.
 7    Q.   And, again, you're speaking Spanish Puerto Rican; correct?
 8    A.   Yes.
 9    Q.   Do you know where Mr. Ruiz was from?
10    A.   I believe he's from Cuba.
11    Q.   Okay.  So clearly there might have been some different words
12    as far as the translation; correct?
13    A.   That's correct.
14    Q.   Okay.  And you weren't making the questions up yourself; is
15    that correct?
16    A.   No.
17    Q.   So the agents were telling you what to ask him?
18    A.   That's correct.
19    Q.   And did you give a summary or did you give an exact word
20    translation?
21    A.   Exact word.
22    Q.   Other than there might be some difference in the languages;
23    correct?
24    A.   Yes.
25    Q.   Okay.  And, again, you testified that this was a 25- to
```

Ortiz - Redirect

1    30-minute interview.  Did you record that time as well?

2    A.   No.

3    Q.   Okay.  So you just had the start time but not the end time?

4    A.   Yeah.  I mean, I didn't write it down, no.

5    Q.   Okay.  So you're just guessing it was about 25 minutes from

6    when you started to when you ended?

7    A.   It was fairly short, yes.

8    Q.   Okay.  And after this interview, what then happened to

9    Mr. Ruiz?

10   A.   He remained in the interview room and I left.

11   Q.   And who was he left with?

12   A.   With one of the agents.

13   Q.   Okay.  So you don't know what happened after you left?

14   A.   No.

15   Q.   You didn't leave together with him?

16   A.   No.

17   Q.   Okay.  So if one of the agents had any other conversations

18   with him, you're not aware of that?

19   A.   No.

20   Q.   And you don't know exactly, you know, what was said after --

21   A.   After I left, no.

22   Q.   Okay.

23          MR. RENN:  Nothing further, Your Honor.

24          MR. BONAR:  Just a quick follow-up.

25                     REDIRECT EXAMINATION

1   BY MR. BONAR:

2   Q.   Detective Ortiz, you were asked about differences between

3   Cuban Spanish and Puerto Rican Spanish.  And did you have any

4   problem communicating with Mr. Ruiz on this date?

5   A.   No.  What I do in the beginning of the interview, I ask, if

6   there's anything he doesn't understand, to let me know and he

7   never indicated that he didn't understand anything.

8            MR. BONAR:  No further questions.

9            THE COURT:  All right.  Thank you.  You may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Do you have any further witnesses,

12   Mr. Bonar?

13           MR. BONAR:  No, sir.

14           THE COURT:  Mr. Renn, do you have any testimony that

15   you would like to present?

16           MR. RENN:  Not on issues presented here.  Obviously,

17   before we went on the record -- well, I guess started the

18   hearing I did address the issue about Mr. Ruiz's house at

19   Yorktown and his wife being there at that time when the officers

20   came in without a search warrant with his house keys, and the

21   court was going to withhold ruling on that.

22           THE COURT:  All right.  And you want to proceed with

23   that testimony now?

24           MR. RENN:  Yeah, I think we could do it real quickly.

25           THE COURT:  Well, Mr. Bonar, I think I'm inclined --

1    even though it's late in the day, I'm inclined to go ahead and

2    get this in the record and then the parties can argue about its

3    relevance.

4              MR. BONAR:  That's fine, Your Honor.

5              THE COURT:  How long do you think you'll be?

6              MR. RENN:  I would -- five, 10 minutes.

7              THE COURT:  That would be fine.

8         (YOLANNY LEYVA ZAYAS, called by the defendant, sworn.)

9              THE INTERPRETER:  Your Honor, are the services of the

10   interpreter needed for the witness?

11             MR. RENN:  Yes, she can't speak --

12             THE INTERPRETER:  Okay.

13                         DIRECT EXAMINATION

14   BY MR. RENN:

15   Q.  If you would tell Judge Hale your first name, please.

16   A.  Yolanny Leyva Zayas.

17   Q.  Okay.  And where do you live?

18   A.  7108 Yorktown Road, Apartment Number 2.

19   Q.  Okay.  And do you know Mr. Ruiz seated over here at counsel

20   table?

21   A.  Yes.

22   Q.  How do you know him?

23   A.  Since -- for 17 years we've been living together.

24   Q.  And how long have you-all been together here in Louisville,

25   Kentucky?

Zayas - Direct

1    A.   Two years.

2    Q.   Okay.  The address that you told the court that you -- or

3    that you're living at on Yorktown, back on August the 4th, 2016,

4    were you living at that same address?

5    A.   Yes.

6    Q.   And on that date prior to his arrest was Mr. Ruiz living

7    there with you?

8    A.   Yes.

9    Q.   You've been here and you've heard that I wanted to ask you

10   about some police officers coming to your home.  Do you remember

11   that?

12   A.   Yes.

13   Q.   If you would, tell Judge Hale what happened.

14   A.   At approximately 12:00 a.m. I was sleeping, and I was

15   awakened by hard knocks on the door of my apartment.

16      I got up and when I entered the room in the back, the

17   officers were already inside.

18   Q.   You didn't let the officers in?

19   A.   No, they were already in.  By the time I got up, they were

20   already inside.

21   Q.   How many officers were in the house?

22   A.   Inside the room, I can't remember whether it was one or two.

23   Q.   And, again, you did not open the door for them; is that

24   correct?

25   A.   No.

Zayas - Direct

1    Q.   Was the door locked?

2    A.   Yes.

3    Q.   And the officers were still able to come in?

4    A.   Yes, yes.

5    Q.   How did the officers get into your house?

6    A.   With keys.

7    Q.   Did you see them with the keys?

8    A.   I could not recognize whether those keys were the ones that

9    belonged to my husband, but they did carry keys.

10   Q.   Okay.  You saw the officers with keys that they used to open

11   your door?

12   A.   Yes.

13   Q.   Okay.  How were you dressed when they came in?

14   A.   With some sleeping clothing.

15   Q.   Okay.  And did you ask the officers if you could put on

16   other clothing?

17   A.   Yes.

18   Q.   Did they allow you to do that?

19   A.   Yes.

20   Q.   After the officers came in, what did they do?

21   A.   Well, they asked me -- I went and I changed my clothes.

22   Then I opened the door or they came in, and then they asked me

23   if they could come in.

24   Q.   Come in to -- what do you mean, the bedroom?

25   A.   Yes, into the house through the door in the room.

Zayas - Cross

1    Q.   Okay.  And what happened while they were in the house?

2    A.   Well, they searched all over.  They asked me which one is

3    Yalexi's room.

4    Q.   And did they go into his room?

5    A.   Yes.

6    Q.   And they searched.  How were they searching?

7    A.   Well, they were searching all over the place.

8    Q.   Okay.  Did they take anything out of your house?

9    A.   No.  They took pictures, photography.  I was very afraid.

10   There are things that I don't quite remember.

11   Q.   Did they show you a search warrant?

12   A.   No.

13   Q.   Did they leave anything with you about being at your house?

14   A.   No.

15   Q.   And after they left or as they were leaving, what did they

16   tell you?

17   A.   That they had found nothing.

18        MR. RENN:   Okay.  Nothing further, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. BONAR:

21   Q.   Good afternoon, ma'am.

22   A.   Good afternoon.

23   Q.   So this event that you've described is the night that Yalexi

24   was arrested; correct?

25   A.   Yes.

Zayas - Cross

1   Q.   And the agents who came to your house or your apartment told

2   you that Yalexi had been arrested; right?

3   A.   Yes.

4   Q.   And that's how you found out about it?

5   A.   Yes.

6   Q.   There were three officers?

7   A.   Yes.

8   Q.   They didn't speak Spanish?

9   A.   No.

10  Q.   And you don't speak English?

11  A.   No.

12  Q.   Do you recall speaking to someone over the phone?

13  A.   Yes.

14  Q.   So the officers got a linguist to talk to you over the

15  phone?

16  A.   After the search they did bring on a translator.

17  Q.   Now, do you recall the officers showing you a piece of

18  paper?

19  A.   Yes.

20  Q.   And that was a piece of paper that -- in which you could

21  give them consent to come into your apartment?

22  A.   What they told me is that with that paper that I was signing

23  that I was giving consent for the search.

24  Q.   And you signed it?

25  A.   Yes.

Special Agent Brian Sanders - Redirect

1              MR. BONAR:  No further questions, Your Honor.

2                        REDIRECT EXAMINATION

3    BY MR. RENN:

4    Q.  The consent that Mr. Bonar asked you about, had the officers

5    already come into your house?

6    A.  Yes.  It was at the end of their visit.

7    Q.  Okay.  So there's no question in your mind, when you got up

8    the officers were inside your house and you had not signed any

9    document letting them do that; is that correct?

10   A.  I'm sure.

11             MR. RENN:  Nothing further, Your Honor.

12             MR. BONAR:  Nothing further, Your Honor.

13             THE COURT:  All right, ma'am.  You may step down.

14       Any further testimony?

15             MR. RENN:  No, Your Honor.

16             MR. BONAR:  Your Honor, Special Agent Sanders, I would

17   call him for just very brief rebuttal.

18       (SPECIAL AGENT BRIAN SANDERS, called by Government,

19   previously sworn.)

20                        REDIRECT EXAMINATION

21   BY MR. BONAR:

22   Q.  Special Agent Sanders, did you go to the Yorktown Drive

23   apartment on the night of August 4th/August 5th?

24   A.  I did, yes, sir, myself and two others.

25   Q.  Is this -- at what point in the timeline did this --

Special Agent Brian Sanders - Redirect

1   A.   This was after the search warrant at Minyard had occurred.

2   Q.   Why did you go there?

3   A.   We believe it to be his primary residence, and we were

4   simply looking for bulk currency should we be granted a consent.

5   We did not have a search warrant for the residence, nor did we

6   use keys to enter the residence.  We spent quite a bit of time

7   outside banging on the door before -- I apologize.  I don't

8   remember her name.

9   Q.   Ms. Zayas?

10   A.   -- yes, before she let us into the residence.

11      We came a step or two into the residence.  As with Mr. Ruiz,

12   it was clear we had a language barrier.  Myself, LMPD Detective

13   Winstead, and Detective Billy Keltner did not speak Spanish.  I

14   did not realize this was an option at the time.  Detective

15   Winstead called dispatch in that district -- I don't remember

16   what district it was -- and they were able to put us on the

17   phone with a linguist.

18      The reason for this was just looking for bulk currency.  She

19   was very polite.  We tried to be as courteous as we could be.

20   She granted us consent.  I don't remember if we even ran a dog.

21   It was a very quick search looking for large sums of currency.

22   We didn't pull any clothes out.  We didn't tear the closets

23   apart.  We did a quick cursory search, opened the -- some of the

24   dresser drawers and that was the extent of it.  I don't remember

25   taking any photographs either.

Agent Brian Sanders - Rebuttal Cross

```
1   Q.  I think you testified to this.  Did you enter the apartment
2   with keys?
3   A.  No.
4   Q.  All right.  You knocked on the door?
5   A.  We knocked.
6   Q.  It's obviously late at night.
7   A.  It was, yes.
8   Q.  You said you were looking for bulk currency.  Is that
9   because you hadn't found all of the 43,000 that you had paid
10  earlier?
11  A.  We hadn't found all of the 43,000 that we had paid, and
12  given the amount of narcotics that were seized from Mr. Ruiz, in
13  instances such as that, you will typically find a large amount
14  of currency.
15     A lot of times -- I won't say all, but a lot of times higher
16  level traffickers will not keep drugs and money in the same
17  location.  But seeing as how we had knowledge of an address
18  associated with him, we felt it was worthy to follow up on it.
19          MR. BONAR:  No further questions, Your Honor.
20                      RECROSS-EXAMINATION
21  BY MR. RENN:
22  Q.  In this case here, after the stop, after the arrest of
23  Mr. Ruiz, you went and got a search warrant for 5405 Minyard;
24  correct?
25  A.  Yes, sir, we did.
```

Agent Brian Sanders - Rebuttal Cross

1  Q.  Because you thought there might be drugs there; correct?

2  A.  We did.

3  Q.  And what you're telling us now is you didn't ask for a

4  search warrant to go to the house where there might be bulk

5  currency?

6  A.  We had just finished up searching the house on Minyard.  As

7  I stated earlier, we had another operation in a separate

8  investigation.  We felt this was just a worthy follow-up.  We

9  didn't necessarily deem it worthy of a search warrant, but if we

10  were able to be granted consent for the residence, it would be

11  worth taking a look at, and that was the stance we took.

12  Q.  You got less than $10,000 at the stop of the vehicle;

13  correct?

14  A.  That's correct.

15  Q.  Your testimony is there was $43,000 on the street; correct?

16  A.  43,000 that we had give him.  We don't know what he had

17  beyond that.

18  Q.  Presumably at least another 33,000 somewhere; correct?

19  A.  Could be.

20  Q.  And you're telling the court that you decided that it wasn't

21  worth asking for a search warrant to go to that house?

22  A.  Well, based on the surveillance during the course of that

23  day, we didn't believe him to have traveled back to his

24  residence, best I can recall.

25      So the remaining amount of that money -- we found 10,000 of

Agent Brian Sanders - Rebuttal Cross

1   the 43 -- we didn't necessarily believe that 33 to be in that

2   house.  But in our eyes at that time, Mr. Ruiz was a drug

3   dealer, and drug dealers often store large amounts of currency.

4   So we felt, being that we believed it to be his residence, it

5   was worth taking a look at.  Again, we had other operations

6   going on that required our time and attention, but a quick

7   consensual search of a small apartment wouldn't have taken very

8   long.  So that's why we did what we did.

9   Q.  And, again, bulk currency can be placed a lot of different

10  places; correct?

11  A.  Yes.

12  Q.  So you say you didn't move any clothes.  What did you search

13  inside the apartment?

14  A.  We tried to be as courteous as we could to the homeowner.

15  She was clearly sleeping.  She was in her pajamas, for lack of a

16  better word.  We allowed her to get dressed.  She was very

17  polite with us.  She was concerned for Mr. Ruiz.  We didn't feel

18  the need to break down walls and to look -- I mean, we were

19  looking for big bags of money, basically, is what it boiled down

20  to.

21  Q.  Billy Keltner was there with you?

22  A.  He was.  I don't remember if we ran his dog or not, to be

23  completely honest with you.  We may have, but like I said, it

24  was a quick, courteous cursory search and then we got out of

25  there.

Agent Brian Sanders - Rebuttal Cross

1   Q.  If he did, he would have referenced one of those reports;

2   correct?

3   A.  I can't speak to what -- I'm not sure how he maintains those

4   logs, to be honest.  I'm not a K-9 handler so I don't know.

5   Q.  But you were here hearing his testimony and that's what he

6   said he did.  He filled out one of those reports when there was

7   any kind of a K-9 search.

8   A.  I believe that's what he said but, again, I can't speak for

9   him.

10  Q.  Again, if you're not going to move anything out of the way

11  and you're not going to bring the dog in there that might hit on

12  money, you're just hoping that you're going to, number one, find

13  money at the house and hope once you get to the house you're

14  going to find money.  Is that what your testimony is?

15  A.  To be completely honest with you, being a DEA agent, we're

16  looking for suitcases full of money.  If we find it in a small

17  Mason jar underneath a bunch of clothes and we miss it, we miss

18  it.

19  Q.  And in this case here, you say there was a consent to

20  search?

21  A.  Yes.

22  Q.  Where is that?

23  A.  That is in DEA possession.

24  Q.  When I asked you -- before your testimony here, I asked you

25  if there were any other reports and you said there weren't.

Agent Brian Sanders - Rebuttal Cross

1  A.  There were no other reports -- when you talk about reports,

2  I'm talking about much like Lisa Brooks' report of investigation

3  or an interview report.  There are various reports that go along

4  with this investigation.  There's drug evidence reports.

5  There's nondrug evidence reports.  There's defendant information

6  reports.  There's defendant disposition reports.

7      I didn't know what you were asking for fell within the scope

8  of all different types of DEA forms that go along with a case,

9  but we can get you everything we have, if that's what you want.

10  Q.  I think it becomes important as far as the timing because

11  that's kind of the issue here, isn't it?

12  A.  The timing of the consensual search.

13  Q.  The timing of the stop, the timing of the arrest, the timing

14  taken to the Floyd County Jail.

15  A.  The consensual search form will have a time on it.  It was

16  later in the evening.  It was following the search at Minyard.

17  Mr. Ruiz was well in custody at Floyd County.

18      The other reports that I'm speaking of, we've got what's

19  called a DEA Form 7.  That is basically a submission form to the

20  lab in Chicago where we submit the drug evidence.  There's no

21  times on that.  That may not be submitted for four or five days.

22  7A's are for nondrug exhibits that stay within the DEA office in

23  Louisville.  We've got 12s, which is what we call, basically, a

24  receipt, much like the LMPD inventory sheet that you showed me

25  that didn't have the 3 kilos on it.

Agent Brian Sanders - Rebuttal Cross

1     There's probably -- in any given investigation, there's 10

2   or 15 different types of reports off the top of my head.  When

3   you speak of reports of DEA 6s, those are the actual substance

4   of the investigation, the what was done, the dates, the times,

5   things like that.

6   Q.  But, again, these other documents would corroborate that or

7   show that it's not accurate?

8   A.  They're not going to give you much as far as a timeline.

9   Q.  The other two officers that were with you, this Officer

10  Winstead, he was LMPD; is that correct?

11  A.  Detective Jason Winstead -- he's with Major Case Narcotics

12  -- and Billy Keltner.

13  Q.  Okay.  Do you know if they would have been dispatched out or

14  if they would have been calling in?

15  A.  We absolutely called in, Detective Winstead did.  I don't

16  know whether that is recorded and if it is for how long, but all

17  communications between the homeowner and Mr. Winstead were over

18  dispatch.  They patched through a linguist or they had a

19  linguist present.  I'm really not sure, to be honest with you.

20  Q.  So there would be a CAD report or something along those

21  lines?

22  A.  I would hope so, but I can't say with 100 percent certainty

23  there would be.  We called and went through dispatch for the

24  linguist.

25  Q.  Okay.  But dispatch as to when they would have arrived at

Agent Brian Sanders - Rebuttal Cross

1   the scene?

2   A.  They never arrived.  This was all over the phone.

3   Q.  Do you know if they would have called in and said we're

4   leaving 5405 --

5   A.  Detective Winstead or Keltner?

6   Q.  Yeah.

7   A.  No, no.

8   Q.  You don't know that or they --

9   A.  No, they did not.

10  Q.  How do you know they didn't?

11  A.  Because that's typically for uniform officers when you're

12  clearing, say, for instance, a domestic run, time in/time out.

13  For plain clothes, major case narcotics investigators, that time

14  in/time out doesn't get relayed to dispatch.  In fact, we work

15  off separate radio channels that dispatch does not have access

16  to.

17  Q.  And as to photographs, you're saying there weren't

18  photographs taken or you're not aware?

19  A.  I do not recall any photographs taken.  Being that I was the

20  lead agent, I would have been the one taking them likely.  I did

21  not take any.

22      The only thing I can recall in the residence of note, best I

23  can recall, you went inside of the residence, there was a large

24  brand new propane grill sitting in the entry.  It was kind of an

25  odd layout to the apartment, the best I can recall.  There was a

1    propane grill.  On top of that propane grill was the exact same

2    Husky toolbox that we found the drugs in with the lock on it.

3       Speaking from experience, there should have been a

4    photograph taken of that.  Why we didn't, I do not know.  But we

5    did not take the toolbox and we did not take a photograph of it.

6    Q.   That you recall?

7    A.   Again, I would have been the one taking them.  I do not have

8    them.

9              MR. RENN:  Okay.  Nothing further, Your Honor.

10             MR. BONAR:  Nothing further, Your Honor.

11             THE COURT:  All right.  You may step down again.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  Anything further, Mr. Renn?

14             MR. RENN:  No, Your Honor.  Thank you so much.

15             THE COURT:  Anything further by way of parting

16   comments here at the end?  I'm going to give you-all time to

17   submit posthearing briefs.  So you should have an opportunity to

18   review the transcript, and since our trial is not until May, I

19   think we've got time to be a bit deliberate about this.  But is

20   there anything else that you wish to raise at this point?

21             MR. RENN:  Your Honor, I don't think so.  Obviously,

22   the transcript here today is going to be important.  And then I

23   do want to get a transcript of the video from Chris Sanders.  I

24   think that too will be very helpful to the court, and then we

25   could file briefs after that.

1            THE COURT:  All right.  Anything further, Mr. Bonar?

2            MR. BONAR:  Nothing at this time, Your Honor.

3            THE COURT:  All right.  We'll close the hearing then.

4    And rather than give you a specific day for your brief, your

5    briefs, let me just suggest that we'll check on how long it will

6    take to get the transcript prepared and then we'll enter an

7    order probably give you 14 days thereafter.  Is there any reason

8    not to do simultaneous briefs?  That would be my preference

9    versus going back and forth.

10            MR. RENN:  I don't mind simultaneous, but I think I

11   would need more than 14 days, Your Honor.

12            THE COURT:  Fourteen days -- you'd need more than 14

13   after getting the transcript?

14            MR. RENN:  I would sure think so, yes.

15            THE COURT:  All right.

16            MR. BONAR:  That would be fine, Your Honor.  There is

17   a week -- the week after next I'm actually out of town.  So,

18   obviously, wouldn't be able to be working on it during that

19   period of time.  So if we do more than 14 days -- however the

20   court wants to do it, but I do have a week coming up.

21            THE COURT:  How much time do you think you're going to

22   need?

23            MR. RENN:  Your Honor, I would ask for 30 days.

24            THE COURT:  All right.  We should be able to afford

25   that much time.  I'm not going to be able to turn around an

1    opinion overnight either.  So I'm trying to make sure that

2    we've got enough time for you-all to prepare your follow-up

3    briefs and so I'll take a look at it.

4        If once we figure out how long it will take to get the

5    transcript prepared, if I'm concerned about that, then I'll --

6    we'll get you on the phone or we can talk about a schedule.

7        In response to my question to you at the very beginning

8    regarding the -- and I forget which specific motion to suppress

9    addressed the probable cause for the affidavit issue -- you said

10   you had not asked formally for a *Franks* hearing, and I don't

11   want to put you on the spot.  So you might not be able to answer

12   this now, but do you anticipate addressing that in your post-

13   hearing brief?

14            MR. RENN:  Only to the extent, Your Honor, that -- you

15   know, they were saying that there was a stop.  Immediately after

16   the stop questioning ensued and consent was given.

17       I think it's very obvious from the videotape that isn't what

18   happened.  He was ordered out of the vehicle and they said it

19   was a traffic stop.  There's not a proper basis for the traffic

20   stop, and I think even Chris Sanders admitted that.  He didn't

21   even understand what the window tint issue was, much less what a

22   violation may have been.

23       So he's stopped, gets him out of the vehicle, starts

24   interrogating him without *Miranda*, does a search of his person,

25   goes into the vehicle, does a search of the vehicle before any

1    of that ever happens, before there's any drugs that are seized

2    so -- and even as to the consent issue, I'll have to get the

3    benefit of an interpreter to listen to this, but it sure doesn't

4    sound like there was proper consent ever given to the search of

5    the vehicle.  And so that would be the only *Franks*-type issue.

6    And, again, I think the videotape will be the one that will

7    speak volumes to that.

8         THE COURT:  All right.  You want to say anything about

9    that now or --

10        MR. BONAR:  Only in that we would object and I would

11   not agree with all of that characterization, but I don't think

12   the Court wants to hear argument on that at this point so --

13        THE COURT:  No, I don't.  I'm just looking for -- I

14   guess to the extent that I can get one, I'm looking for as much

15   of a roadmap as to next steps as anything.

16        MR. RENN:  Well, I guess Mr. Bonar and I have talked

17   about it.  Again, as to the search warrant, oftentimes, you

18   know, judges quite frankly may let you get in and argue facts.

19   And he certainly knows the law and I know it as well generally

20   that you are going to be confined to the four corners.  So

21   you've got the affidavit out there.  It's not necessarily going

22   to be testimony.  But to the extent that the testimony or

23   evidence is going to be different than what's in that four

24   corners, certainly that would be something to argue that there

25   is errors.

1    And then one of the things that we were -- that I was

2  getting into and the court was saying, you know, does it really

3  matter?  There wasn't any money seized.  If the scope of the

4  warrant exceeded the probable cause, that might be an issue.

5  The seizure of the cigars, do the cigars really matter one iota?

6  Not much, other than the officers went in there and would a

7  reasonably well-trained officer seize cigars pursuant to that

8  warrant?

9    And, again, I think Brian Sanders, special agent, said, you

10  know, "We wouldn't have seized cigars."  So that was evidence

11  that was seized outside of the scope of the warrant.  And,

12  again, I think that's been addressed by the scope of this

13  hearing.

14         THE COURT:  Anything further?

15         MR. BONAR:  I guess so I understand -- I don't know

16  that I've heard a *Franks* argument has been made as of yet.

17         THE COURT:  I don't think so.

18         MR. RENN:  I don't think it has.

19         THE COURT:  That was sort of my question.

20         MR. BONAR:  All right.

21         THE COURT:  I didn't get a yes or no, but I got an

22  explanation.  And I take from that explanation that it has not

23  yet.

24         MR. RENN:  Well, again, when the officer says, "I

25  stopped the vehicle, questioning ensued, and I got consent to

1    search," and now we know from the videotape that isn't what

2    happened, to the extent that's a false statement, yeah, there

3    might be a *Franks* issue.  But, again, I don't know that I raise

4    that in the motions that I've filed thus far.  I just got those

5    videotapes of the stop.

6              THE COURT:  That was my point at the outset is you

7    touched upon it, and so that was the point of my question was

8    whether or not you intended to request that and follow up on

9    because your motion does sort of preview that to the extent that

10   it suggests that there wasn't probable cause.

11             MR. RENN:  I'd have to pull up -- we've still got time

12   under the order to file motions to suppress.

13             THE COURT:  You do.

14             MR. RENN:  So that could still happen.

15             THE COURT:  You do.  And, again, that's why I say I'm

16   really just looking for a roadmap of next steps.  To the extent

17   that you anticipate doing that, the earlier that I know about it

18   the better because of my schedule.  It's not going to be -- I

19   don't have a lot of flexibility over the next couple of months.

20       So to the extent that you do anticipate that -- and I expect

21   the United States -- it sounds like the United States will not

22   agree to that.  So that's something else I would need to sort

23   through --

24             MR. RENN:  Yes, sir.

25             THE COURT:  -- in determining whether a *Franks* hearing

1    is necessary and appropriate.

2        All right.  If there's nothing further, then we'll get an

3    order out within the next couple of days.  Obviously, I'm taking

4    this under advisement while I await follow-up briefs.  Thank

5    you.

6            MR. RENN:  Thank you, Your Honor.  Have a good

7    evening.

8        (Proceedings concluded at 5:19 p.m.)

9                    C E R T I F I C A T E

10       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

11   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

12

13
          s/Dena Legg                    February 16, 2017
14   Certified Court Reporter No. 20042A157      Date
     Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2    GOVERNMENT WITNESSES:

3    DETECTIVE CHRIS SANDERS
          Direct Examination by Mr. Bonar          10
4         Cross-Examination by Mr. Renn            36
          Redirect Examination by Mr. Bonar        85
5    DETECTIVE BILLY KELTNER
          Direct Examination by Mr. Bonar          86
6         Cross-Examination by Mr. Renn            97
     SPECIAL AGENT BRIAN SANDERS
7         Direct Examination by Mr. Bonar          117
          Cross-Examination by Mr. Renn            143
8    DETECTIVE WILLY ORTIZ
          Direct Examination by Mr. Bonar          172
9         Cross-Examination by Mr. Renn            178
          Redirect Examination by Mr. Bonar        183
10
     DEFENSE WITNESS
11   YOLANNY LEYVA ZAYAS
          Direct Examination by Mr. Renn           185
12        Cross-Examination by Mr. Bonar           188
          Redirect Examination by Mr. Renn         190
13
     GOVERNMENT REBUTTAL WITNESS
14        Redirect Examination by  Mr. Bonar       190
          Recross-Examination by Mr. Renn          192
15

16                           EXHIBITS

17
     GOVERNMENT:
18   Exhibit 1 - DVD                               20
     Exhibit 2 - DVD                               20
19   Exhibit 3 - DVD                               92
     Exhibit 4 - photo                             139
20   Exhibit 5 - photo                             141

21

     DEFENDANT:
22   No Exhibits

23

24

25
```